## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF KANSAS

| | | |
|---|---|---|
| CARL JAMIESON, KENNETH LYNCH, AARON BORST, NATHAN COOK, RHONDA FOWLER, JAMES HADLEY, BRYAN HUDSON, TIANA KENNEDY, KENNETH MILLER, SHANNON POUND, BIBI SANANIKONE, SCOTT A. WARD, CLIFF ZOLLMAN, and all other similarly situated current and former students, | ) ) ) ) ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | Civil Action No. 06-CV-1103-WEB-DWB |
| v. | ) ) ) | |
| VATTEROTT EDUCATIONAL CENTER, INC. d/b/a VATTEROTT COLLEGE, | ) ) ) ) | |
| Defendant. | ) ) ) | |

## MEMORANDUM IN SUPPORT OF
## MOTION TO CERTIFY CLASS ACTION

COMES NOW the Plaintiffs by and through their counsel of record, Joseph H. Cassell of

Redmond & Nazar, L.L.P., and John W. Johnson and Edward L. Robinson of Morris, Laing,

Evans, Brock & Kennedy, Chartered, and in support of their Motion to Certify Class Action

show the Court as follows:

## I.      INTRODUCTION

Vatterott College (Vatterott) took actions and made statements to convince students to

enroll in various courses of study.  It then failed to provide the education it promised those

students.  Discovery has shown the statements made to induce students to enroll were part of a

pattern or practice by Vatterott's admissions representatives; were false when made; and were made with the intent to trick students into enrolling.

The Plaintiffs in this case are Vatterott graduates of the Computer Programming, Electrical Mechanic, and Medical Office Assistant courses of study. They request their claims be certified as a class consisting of three sub-classes based on their respective courses of study. They propose the class include all students who were enrolled in and completed or graduated from any of the three courses of study from April 20, 2001 until April 20, 2006.

Vatterott's scheme began when the Plaintiffs individually and respectively investigated what the school had to offer. Depending on the course of study they were considering, Vatterott would make attractive representations, such as that upon graduation they would be qualified for entry-level positions; that they would be qualified to sit for professional licensing exams, such as the journeyman electrician's exam; and/or that Vatterott had connections with reputable Wichita businesses that specifically sought out Vatterott graduates. Unfortunately, these attractive representations were false, and Vatterott knew they were false. Nevertheless, Vatterott made these statements to get Plaintiffs and other students to pay approximately $20,000 for a 60-week course of study resulting in a diploma, not a degree.

Once Plaintiffs and other students paid their money and enrolled, Vatterott did not provide the education it promised. Vatterott had a pre-printed Enrollment Agreement that it used for Plaintiffs and all other students who would be included in the proposed sub-classes. That Enrollment Agreement stated Plaintiffs would receive a certain number of hours and weeks of education in consideration for the course tuition. Unfortunately, Plaintiffs were not provided the hours and weeks promised in the Enrollment Agreement. Instead, Vatterott failed to provide instructors, cancelled classes early, and in some cases did not hold classes at all. In the end,

Plaintiffs and other students received a fraction of the hours and weeks of instruction Vatterott contracted to provide.

As will be shown herein, while Plaintiffs' experiences were at different times and in different courses of study, their claims are in essence the same: they are all victims of Vatterott's scheme of promising a useful course of study and, after the students paid for the course, not delivering the necessary hours and weeks of instruction it promised. These practices were not unique to the named Plaintiffs, but were common to Plaintiffs and other students in the proposed sub-classes.

As a result of Vatterott's actions and statements, Plaintiffs have brought three claims for class certification. The first is breach of contract for Vatterott's failure to provide the hours and weeks of instruction promised in the Enrollment Agreements. Plaintiffs and other former students signed the same, pre-printed form contract that made the same promise to provide a specific number of hours and weeks of instruction. If certified as a class, Vatterott's liability to Plaintiffs and other class members will be based on the same contractual language, so Vatterott will be held to one standard of liability on a class-wide basis.

Plaintiffs' second and third claims are based on representations Vatterott made to students to induce them to enroll. Plaintiffs have invoked multiple provisions of the Kansas Consumer Protection Act, K.S.A. 50-624 *et seq.*, because their relationship with Vatterott was a consumer transaction under Kansas law. Plaintiffs have also brought a claim of common law fraud based on the same representations that give rise to their KCPA claims. The reason these claims are appropriate for class treatment is that Vatterott made these statement routinely and as a matter of policy or practice to potential students as an enticement to enroll, even through Vatterott knew the statements were false. Therefore, even though the statements to Plaintiffs

and other former students may have been made at different times and places, they represent a common policy or practice by Vatterott of making inflated statements to convince students to enroll a 60-week course of study at a cost of approximately $20,000.00.

## II.    FACTUAL BACKGROUND

### A.    PLAINTIFFS

Plaintiffs are former Vatterott College students who enrolled in the Computer Programming, Electrical Mechanic, or Medical Office Assistant course of study between April 20, 2001 and April 20, 2006, and graduated or otherwise completed the course of study. Plaintiffs all enrolled in their respective courses of study as a result of false representations made to them by Vatterott.

In order to enroll, each Plaintiff executed an Enrollment Agreement and paid tuition of approximately $20,000.00, generally through student loans.  Once they had enrolled the classes would meet for only a fraction of the time scheduled, if at all.  As a result, they did not receive the extent of training they paid for.

### 1.    Computer Programming Students

#### a.  Carl Jamieson

Plaintiff Carl Jamieson (Jamieson) first made contact with Vatterott at a job fair (Deposition of Carl M. Jamieson, attached as Exhibit "A", at 14:12-15) (Jamieson Depo.). Vatterott later contacted Jamieson by phone, and he went to Vatterott for a visit (*Id.* at 15-16). During his visit, Vatterott employees made the following representations to him:

- Vatterott had connections with Koch Industries, Coleman, and other companies, which were "clamoring" for Vatterott graduates (*Id.* at 17-18; 23:8-13);

- When he graduated from Vatterott he would be qualified as an entry-level computer programmer (*Id.* at 23:8-13; 30:25-31:2);

- The credits he earned at Vatterott would transfer to other schools (*Id.* at 39:25-40:5);

- Vatterott would provide job placement assistance (*Id.* at 31).

Based on the representations made to him, on September 23, 2003 Jamieson executed an Enrollment Agreement with Vatterott (Jamieson Agreement, attached as Exhibit "Z")[1]. Jamieson enrolled in the Computer Programming course of study at a cost of $19,672.90 and signed up for the morning session (*Id.*). His classes were to begin at 8:00 a.m. and end at 12:30 p.m. Monday through Thursdays (*Id.*). However, his sessions generally ended around 12:00 p.m. (Jamieson Depo. at 50:19-25). Jamieson graduated with honors on December 9, 2004 (Jamieson Diploma, attached as Exhibit "AD")[2].

### b.  Kenneth Lynch

Plaintiff Kenneth Lynch (Lynch) heard about Vatterott through a television ad (Deposition of Kenneth H. Lynch, attached as Exhibit "B", at 18:23-24) (Lynch Depo.). In June 2003, Lynch called Vatterott to inquire about the programs (*Id.* at 19:19-21). During his visit a couple days later, Vatterott employees made the following representations to him:

- Vatterott had connections with "top-notch employers," which regularly sought out Vatterott graduates (*Id.* at 22:1-5);

- When he graduated from Vatterott, he would be qualified as an entry-level computer programmer (*Id.* at 76:19-77:7);

- The credits he earned at Vatterott would transfer to four-year colleges (*Id.* at 21:14-22:1);

- Vatterott would provide job placement assistance (*Id.* at 26:16-23).

---

[1] For the Court's convenience, the Plaintiffs' Enrollment Agreements are collected in Exhibit "Z".
[2] For the Court's convenience, the Plaintiffs' Diplomas and/or Transcripts showing graduation are collected in Exhibit "AD".

Based on the representations made to him, on June 24, 2003 Lynch executed an Enrollment Agreement with Vatterott (Lynch Agreement, attached as Exhibit "Z"). Lynch enrolled in the Computer Programming course of study at a cost of $19,672.90 and signed up for the evening session (*Id.*). His classes were to begin at 6:00 p.m. and end at 10:30 p.m. Monday through Thursdays (*Id.*). However, his sessions generally ended at least an hour early every night (Lynch Depo. at 54:2-20). Even though classes let out early, he was instructed to write 10:00 p.m. on the sign-out sheet (*Id.* at 55:5-9; 81:1-6). Lynch estimated that his classes let out early approximately 80 percent of the time (*Id.* at 80:13-23). Lynch graduated with honors on September 30, 2004 (Lynch Diploma, attached as Exhibit "AD").

### c. Aaron Borst

Plaintiff Aaron Borst (Borst) first made contact with Vatterott after learning of the school from a high school counselor (Deposition of Aaron Hughes Borst, attached as Exhibit "C", at 11:15-12:15) (Borst Depo.). Borst and his mother made a visit to Vatterott in April or May 2003 (*Id.* at 13:4-7). During his visit, admissions representatives made the following representations to him:

- Vatterott had connections with various companies that regularly sought out Vatterott graduates (*Id.* at 18:12-24);

- When he graduated from Vatterott, he would be qualified as an entry-level computer programmer (*Id.*);

- That Vatterott would provide job placement assistance (*Id.* at 14:21-15:2).

Based on the representations made to him, on **[date]** Borst executed an Enrollment Agreement with Vatterott (**Borst Agreement, attached as Exhibit "Z"**). Borst enrolled in the Computer Programming course of study at a cost of $19,672.90 and signed up for the evening session (*Id.*). His classes were to begin at 6:00 p.m. and end at 10:30 p.m. Monday through

Thursdays (*Id.*). However, during one 10-week phase his instructor would either not show up or would have nothing planned for the students (Borst Depo. at 52:2-9). Borst graduated with honors on September 30, 2004 (Borst Diploma, attached as Exhibit "AD").

### d. Nathan Cook

Plaintiff Nathan Cook (Cook) heard about Vatterott through a radio ad (Deposition of R. Nathan Cook, attached as Exhibit "D", at 17:24-25) (Cook Depo.).  In August 2003, Cook made an in-person visit at the school (*Id.* at 18:18-19:3). During his visit, Vatterott employees made the following representations to him:

- Vatterott had connections with "major companies" such as Cessna, Koch, Boeing, Spirit, and those companies regularly sought out Vatterott graduates (*Id.* at 20:15-21:13);

- When he graduated from Vatterott, he would be qualified as an entry-level computer programmer (*Id.* at 27:15-28:19);

- That Vatterott would provide job placement assistance (*Id.* at 20:2-21:18).

Based on the representations made to him, on October 27, 2003 Cook executed an Enrollment Agreement with Vatterott (Cook Agreement, attached as Exhibit "Z"). Cook enrolled in the Computer Programming course of study at a cost of $19,762.90 and signed up for the evening session (*Id.*)[3].  His classes were to begin at 6:00 p.m. and end at 10:30 p.m. Monday through Thursdays (*Id.*). However, in two of his 10-week sessions, his classes regularly let out by 8:30 or 9:00 p.m. (Cook Depo. at 41:6-14; 45:15-23). Cook graduated with honors on February 17, 2005 (Cook Diploma, attached as Exhibit "AD").

### e. James Hadley

Plaintiff James Hadley (Hadley) heard about Vatterott through a television commercial (Deposition of James. A. Hadley, Jr., attached as Exhibit "E", at 20:7-8) (Hadley Depo.).  On

July 8, 2003, Hadley made an in-person visit at the school (*Id.* at 21:2-16). During his visit, Vatterott employees made the following representations to him:

- Vatterott had connections with partner companies, and those companies hired Vatterott graduates (*Id.* at 23:17-24:9);

- When he graduated from Vatterott, he would be qualified for an entry-level position (*Id.* at 25:2-13);

- That Vatterott would provide job placement assistance (*Id.*).

Based on the representations made to him, on July 8, 2003 Hadley executed an Enrollment Agreement with Vatterott (Hadley Agreement, attached as Exhibit "Z"). Cook enrolled in the Computer Programming course of study at a cost of $19,762.90 and signed up for the day session (*Id.*). His classes were to begin at 8:00 a.m. and end at 12:30 p.m. Monday through Thursdays (*Id.*). However, in one of his 10-week sessions, his instructor was there only about half the time (Hadley Depo. at 53:6-54:8). Hadley graduated with honors on September 30, 2004 (Hadley Diploma, attached as Exhibit "AD").

### f.   Tiana Kennedy

Plaintiff Tiana Kennedy (Kennedy) heard about Vatterott through a television commercial (Deposition of Tiana M. Kennedy, attached as Exhibit "F", at 13:25-14:3) (Kennedy Depo.).  Kennedy then made an in-person visit at the school (*Id.* at 21:2-16). During her visit, Vatterott employees made the following representations to her:

- Several big companies in the area, including Koch, Coleman, and others were looking for Vatterott graduates (*Id.* at 16:3-22);

- When she graduated from Vatterott, she would be qualified for an entry-level computer programming position (*Id.*);

---

[3] Although Cook's Enrollment Agreement showed him signing up for the morning session, he attended the evening sessions (Cook Depo. at 41:6-18).

- The credit she earned at Vatterott would transfer to four-year colleges (*Id.* at 20:1-21:4).

Based on the representations made to her, on April 10, 2003 Kennedy executed an Enrollment Agreement with Vatterott (Kennedy Agreement, attached as Exhibit "Z")[4]. Kennedy enrolled in the Computer Programming course of study at a cost of $19,762.90 (*Id.*). She was in the evening classes for some phases and in the day classes for others (Kennedy Depo. at 49:20-25). Both morning and evening classes met for 4 ½ hours Monday through Thursdays. However, in two phases, the class let out at least one hour early, and sometimes sooner (*Id.* at 50:1-12). In addition, every instructor Kennedy had would tell students to sign out for the time class normally ended, regardless of how long the classes met (*Id.* at 51:5-52:21). Kennedy graduated with honors on July 22, 2004 (Kennedy Diploma, attached as Exhibit "AD").

### g. Kenneth Miller

Plaintiff Kenneth Miller (Miller) heard about Vatterott through a television commercial (Deposition of Kenneth R. Miller, attached as Exhibit "G", at 17:8-9) (Miller Depo.). In December 2003, Miller made an in-person visit at the school (*Id.* at 19:7-10). During his visit, Vatterott employees made the following representations to him:

- Vatterott had connections with several companies in the area, including Koch Industries and aircraft companies, that sought Vatterott graduates (*Id.* at 45:1-9; 49:4-11);

- When he graduated from Vatterott, he would be qualified for an entry-level computer programming position (*Id.* at 28:12-29:4);

- Vatterott would provide job placement assistance (*Id.* at 31:16-32:19; 93:4-16).

Based on the representations made to him, on December 4, 2003 Miller executed an Enrollment Agreement with Vatterott (Miller Agreement, attached as Exhibit "Z"). Miller

---

[4] At that time Tiana Kennedy's last name was Thorp, and was listed as such on the Enrollment Agreement.

enrolled in the Computer Programming course of study at a cost of $19,762.90 and signed up for the evening session (*Id.*).   His classes were to begin at 6:00 p.m. and end at 10:30 p.m. Monday through Thursdays (*Id.*).   However, in one phase the class would regularly end at 9:00 or 9:30 (Miller Depo. at 74:1-7). In another phase, class would end between 8:30 and 9:00 p.m. (*Id.* at 76:21-77:5). At other times, class would not start until between 6:30 and 7:00 p.m. (*Id.* at 77:10-17). In addition, instructors would mark out students as leaving at 10:30, even if the students had left earlier (*Id.* at 71:1-6). Miller graduated with honors on February 17, 2005 (Miller Diploma, attached as Exhibit "AD").

### h.  Shannon Pound

Plaintiff Shannon Pound (Pound) heard about Vatterott through a television commercial (Deposition of Shannon Marie Pound, attached as Exhibit "H", at 9:16-18) (Pound Depo.).   She then called to inquire about the programs and ended up making an appointment with a recruiter (*Id.* at 9:22-25).   A few days later, Pound made an in-person visit at the school (*Id.* at 10:5-10). During her visit, Vatterott employees made the following representations to her:

- Vatterott had associations with the aircraft industry, Koch, and Raytheon, and those companies would call wanting new Vatterott graduates (*Id.* at 11:20-12:6; 13:19-14:1);

- When she graduated from Vatterott, she would be qualified for an entry-level computer programming position (*Id.* at 13:19-24);

- Vatterott would help her get a job with the big companies with which Vatterott was connected (Id. at *Id.* at 11:20-12:6; 14:2-14:6).

Based on the representations made to her, on November 3, 2003 Pound executed an Enrollment Agreement with Vatterott (Pound Agreement, attached as Exhibit "Z")[5]. Pound enrolled in the Computer Programming course of study at a cost of $19,762.90 and signed up for

---

[5] At that time Shannon Pound's last name was Joiner, and was listed as such on the Enrollment Agreement

the evening session (*Id.*).  Her classes were to begin at 6:00 p.m. and end at 10:30 p.m. Monday

through Thursdays (*Id.*).  However, in one ten-week phase the class would regularly end at two

hours early (Pound Depo. at 31:15-25). In that same phase, she was without a regular instructor

for a week-and-a-half (*Id.* at 33:21-23).  In another phase, class would end between 8:30 and

9:00 p.m.  (*Id.* at 76:21-77:5).  Pound graduated with honors on February 17, 2005 (Pound

Diploma, attached as Exhibit "AD").

### i.  **Bibi Sananikone**

Plaintiff Bibi Sananikone (Sananikone) heard about Vatterott through television and radio

ads (Deposition of Bibi Sananikone, attached as Exhibit "I", at 16:7-11) (Sananikone Depo.).

She called the school, and a Vatterott representative scheduled a meeting (*Id.* at 17:7-23).

Sananikone made an in-person visit at the school (*Id.* at 21:2-16). During her visit, Vatterott

employees made the following representations to her:

- Vatterott had connections with companies such as Koch and Raytheon (*Id.* at 26:3-11);

- When she graduated from Vatterott, she would be qualified for an entry-level computer programming position (*Id.* at 25:11-17);

- Vatterott would provide job placement assistance (*Id.* at 18:8-19:3).

Based on the representations made to her, on October 28, 2003 Sananikone executed an

Enrollment Agreement with Vatterott (Sananikone Agreement, attached as Exhibit "Z").

Sananikone enrolled in the Computer Programming course of study at a cost of $19,762.90 and

signed up for the evening session (*Id.*).  Her classes were to begin at 6:00 p.m. and end at 10:30

p.m. Monday through Thursdays (*Id.*).  However, in one ten-week phase she had an instructor for

only two weeks, and the rest of the time Vatterott had a fill-in who merely handed out

assignments and told the students they could leave when finished (Sananikone Depo. at 61:6-

63:2). Sananikone graduated on February 17, 2005 (Sananikone Diploma, attached as Exhibit "AD").

### j.   Scott Ward

Plaintiff Scott Ward (Ward) heard about Vatterott through a television commercial (Deposition of Scott A. Ward, attached as Exhibit "J", at 14:18-22) (Ward Depo.).   On September 12, 2003, Ward made an in-person visit at the school (*Id.* at 26:18-21). During his visit, Vatterott employees made the following representations to him:

- Several big companies in the area, including Koch, Coleman, Raytheon and Boeing were looking for Vatterott graduates (*Id.* at 27:17-28:8);

- When he graduated from Vatterott, he would be qualified for an entry-level computer programming position (*Id.*);

Based on the representations made to him, on October 16, 2003 Ward executed an Enrollment Agreement with Vatterott (Ward Agreement, attached as Exhibit "Z"). Ward enrolled in the Computer Programming course of study at a cost of $19,762.90 and signed up for the day session (*Id.*).  His classes were to begin at 8:00 a.m. and end at 12:30 p.m. Monday through Thursdays (*Id.*).   However, because Vatterott did not always provide instructors, Ward's instructor would have to leave to get another class going, and then return (Ward Depo. at 56:16-57:11). Ward graduated with honors on December 9, 2004 (Ward Diploma, attached as Exhibit "AD").

### 2.      Electrical Mechanic Students

### a.   Bryan Hudson

Plaintiff Bryan Hudson (Hudson) learned about Vatterott through looking online for schools that offered electrical programs (Deposition of Bryan K. Hudson, attached as Exhibit "K", at 18:24-19:6) (Hudson Depo.).  Hudson made an in-person visit at the school and picked

up some brochures regarding the program (*Id.*). He later returned to Vatterott, and during that visit Vatterott employees made the following representations to him:

- The electrical mechanic course of study was 50 percent hands-on and 50 percent book work (*Id.* at 25:21-26:1; 26:15-17);

- He would take his journeyman electrician's test as a group with the rest of the class at the end of the course of study (Id. at 25:21-26:6);

- Vatterott had an 88 percent placement rate for graduates (Id. at 30:9-31:3);

Based on the representations made to him, on November 17, 2004 Hudson executed an Enrollment Agreement with Vatterott (Hudson Agreement, attached as Exhibit "Z"). Hudson enrolled in the Electrical Mechanic course of study at a cost of $20,056.00 and signed up for the evening session (*Id.*). His classes were to begin at 6:00 p.m. and end at 10:30 p.m. Monday through Thursdays (*Id.*). However, during two phases, the classes would routinely let out early; after the first three weeks of the 10-week phases, the classes would never meet past 9:00 p.m. (Hudson Depo. at 47:25-48:13). In addition, although there was a sign-in and sign-out sheet, the instructors would either mark students out at 10:30 p.m. or tell students to mark themselves out at 10:30 p.m., regardless of when the class actually dismissed (*Id.* at 65:21-67:5). In one 10-week phase, Hudson was without an instructor for two weeks (*Id.* at 72:22-73:5). Hudson graduated with honors on February 2, 2006 (Hudson Diploma, attached as Exhibit "AD").

### b.  Cliff Zollman

Plaintiff Cliff Zollman (Zollman) learned about Vatterott through a television commercial (Deposition of Cliff Allan Zollman, attached as Exhibit "L", at 21:6-9) (Zollman Depo.). Zollman made an in-person visit at the school, and during that visit Vatterott employees made the following representations to him:

- The electrical mechanic course of study was 80 percent hands-on and 20 percent book work (*Id.* at 24:4-14; 34:19-35:17);

13

- He would leave Vatterott with a journeyman electrician's license (*Id.* at 34:19-36:15; 78:10-79:11);

Based on the representations made to him, on February 11, 2005 Zollman executed an Enrollment Agreement with Vatterott (Zollman Agreement, attached hereto as Exhibit "Z"). Zollman enrolled in the Electrical Mechanic course of study at a cost of $20,056.00 and signed up for the evening session (*Id.*). His classes were to begin at 6:00 p.m. and end at 10:30 p.m. Monday through Thursdays (*Id.*). However, classes would generally adjourn by 8:30 p.m. (Zollman Depo. at 56:24-57:6; 59:25-60:6; 107:14-109:14). In addition, although there was a sign-in and sign-out sheet, the instructors would either mark students out at 10:00 p.m. or tell students to mark themselves out at 10:00 p.m., regardless of when the class actually dismissed (*Id.* at 57:12-60:20). In one 10-week phase, Zollman was without an instructor for two weeks (*Id.* at 96:13-97:12). Zollman graduated on April 13, 2006 (Zollman Academic Transcript, attached as Exhibit "AD").

### 3.  Medical Office Assistant Plaintiffs

### a.  Rhonda Fowler

Plaintiff Rhonda Fowler (Fowler) heard about Vatterott through a television commercial (Deposition of Rhonda F. Fowler, attached as Exhibit "M", at 14:224-25) (Fowler Depo.). On January 6, 2003, Fowler made an in-person visit at the school (*Id.* at 15:20-16:12). During her visit, Vatterott employees made the following representations to her:

- When she graduated she would have certifications in insurance billing and coding, transcription, CPR and first aid (*Id.* at 18:1-13);

- There would be jobs available when Fowler graduated and Vatterott guaranteed she would have a job upon graduation (*Id.* at 19:7-16; 20:3-14);

- Employers specifically asked for Vatterott graduates (*Id.* at 18:1-3).

14

Based on the representations made to her, on January 6, 2003 Fowler executed an Enrollment Agreement with Vatterott (Fowler Agreement, attached as Exhibit "Z"). Fowler enrolled in the Medical Office Assistant course of study at a cost of $17,971.63 and signed up for the evening session (*Id.*). Her classes were to begin at 6:00 p.m. and end at 10:30 p.m. Monday through Thursdays (*Id.*). However, in one ten-week phase she was without an instructor for four weeks (*Id.* at 70:22-71:9). In two other phases, class would let out between 30 minutes and two hours early (*Id.* at 71:20-72:8). Fowler graduated with honors on May 30, 2004 (Fowler Diploma, attached as Exhibit "AD").

### B.    DEFENDANT

Defendant is a for-profit corporation organized and operating under the laws of Missouri. Defendant's business is providing technical education in various occupational categories. Defendant has locations in numerous locations, including one in Wichita. Defendant claims to provide courses of study in Computer Programming, Electrical Mechanic, Medical Office Assistant, and others.

Defendant charged Plaintiffs approximately $20,000.00 for its 60-week courses of study. The course of study did not result in an associate's or other degree, but instead resulted in a certificate or diploma (List of Programs, attached as Exhibit "N"). Defendant did offer degree programs, but not for the courses of study involved in this action (*Id.*).

Preliminary discovery conducted for the purposes of this motion has revealed Defendant had a very structured program for its admissions representatives so uniform messages would be made to all prospective students, and the goal for admissions representatives was to enroll as many students as possible. Discovery has shown, *inter alia*, that Defendant's admissions representatives were trained to be sales people. The sole job description of Defendant's

15

admissions representatives was to "Actively recruit and enroll students as per goals set by administration" (see Admission's Job Description, attached as Exhibit "O"). In other words, the admissions representatives' job was to meet quotas for enrollment. In order to secure high enrollment, admissions representatives were trained to use sales techniques when communicating with prospective students (see Vatterott Sales Training materials, attached as Exhibit "P").

Vatterott admissions representatives were also taught how to conduct interviews, how to follow up with prospective students, and how to "Close the Sale" (see Interview, Follow-up, and Closing the Sale materials, attached as Exhibit "D"). These materials told admissions representatives exactly what to say and when; for example, when taking the prospective tour, the Interview materials had a section entitled, "Things to say on the tour," with full questions bulleted below (See Interview materials, at VAT012063). In addition, it told admissions representatives exactly what to say when "closing the sale." For example, when outlining the comparative cost of a four-year degree versus a Vatterott degree, the admissions representative was instructed to say, "I just wanted to show you this so that you could make a more knowledgeable decision based on what you have seen. What do you think of this?" (Closing the Sale materials, at VAT012089).

Defendant's admissions representatives were also given specific scripts to follow when recruiting potential students in different situations. For example, they were taught word-for-word what to say on the phone to prospective student still in high school (see Inside High Scholl (sic) Telephone Dialogue materials, attached as Exhibit "R"); word-for-word what to say on the phone to other prospective students (Lead Script materials, attached as Exhibit "S"); word-for-word what to say to prospective students when meeting face-to-face (see High School Dialogue materials, attached as Exhibit "T"); word-for-word what to say to high school students when

meeting face-to-face (see In-Home High School Close Dialogue materials, attached as Exhibit "U"); and word-for-word what to say generally to prospective students (see HSAC Laptop Portfolio Script materials, attached as Exhibit "V").

Vatterott was so focused on its admissions representatives saying the same things to incoming students, it instructed representatives that "MEMORIZATION IS THE ONLY WAY!!!!", and that they should "STUDY IT DAILY!!!!", to PRACTICE, PRACTICE, PRACTICE,", and "Know it VERBATIM!" (see The Presentation materials, attached as Exhibit "J", at VAT012402). Vatterott also gave its admissions representatives "Golden Phrases" to tell prospective students (Id. at VAT012403-VAT012410). For example, one of such phrases was as follows:

> AN INDIVIDUAL WHO WOULD BE OFFERED AN APPLICATION AND SELECTED INTO THE PROGRAM AND GRADUATES, COULD BE EMPLOYED BY ONE OF THE MANY COMPANIES AND CORPORATIONS ACROSS _____ AND _____ WHO HIRES OUR GRADUATES

(The Presentation Materials, at VAT012408 (emphasis in original)). This statement is very similar to what was said to Plaintiffs regarding having connections with large companies, such as Koch, Coleman, Raytheon, and Boeing, which purportedly hired Vatterott graduates (see Jamieson Depo. at 17-18; 23:8-13; Lynch Depo. at 22:1-5; Borst Depo. at 18:12-24; Cook Depo. at 20:15-21:13; Hadley Depo. at 23:17-24:9; Kennedy Depo. at 16:3-22; Miller Depo. at 45:1-9; 49:4-11; Pound Depo. at 11:20-12:6; 13:19-14:1; Sananikone Depo. at 26:3-11; Ward Depo. at 27:17-28:8; Fowler Depo. at 19:7-16; 20:3-14).

Finally, discovery has revealed that admissions representatives were trained not only to stick to the script, but also not to deviate and offer prospective students a chance to ask questions; indeed, admissions representatives were admonished in certain situations "**NEVER TO ASK IF THEY HAVE ANY QUESTIONS**" (Telephone Script materials, attached as

Exhibit "K", at VAT012006 (emphasis in original)).

Independent inquiry has also shown that Defendant's admissions representatives not only followed the same pattern with every prospective student, they would also make the same false statements to prospective students. Susan Coomes, formerly an instructor in the Computer Programming department and employee in the Career Services office, personally observed Vatterott employees making the same false statements to prospective students (Declaration of Susan Coomes, attached as Exhibit "Y"). Coomes personally observed, *inter alia*, the following:

- Admissions representatives gave the same tour of the building to prospective students (Declaration of Susan Coomes, at ¶ 7);

- Prospective students were told they would get a "degree" upon completion (*Id.* at ¶ 14);

- Students would receive entry level training in their respective fields (Id.);

- Vatterott had connections with companies such as Boeing, Coleman, Koch, and Fahnestock (Id.);

- Vatterott credits would transfer hour-for-hour to Southwestern College (*Id.*);

- Vatterott would provide job placement assistance (*Id.*);

- Prospective students were guaranteed employment upon graduation (*Id.*);

- Students would receive sufficient training for certification exams (*Id.*)

Coomes also observed instructors falsifying attendance records to make it look like classes met longer than they actually had (*Id.* at ¶ 4).

Once a person was persuaded to enroll, Vatterott had each student execute an Enrollment Agreement, a pre-printed form contract with spaces left blank for the course of study, the date and time classes would meet, the tuition amount, and other related information (Enrollment Agreements, attached hereto as Exhibit "Z"). Each course of study cost approximately

$20,000.00 and lasted 60 weeks (portions of Course Catalog, attached as Exhibit "AA", Information Sheets for Student Financing, attached as Exhibit "AB").

## III.   ARGUMENT

In deciding whether to certify a class, a court may not consider "whether the plaintiff or plaintiffs have stated a cause of action or will prevail on the merits." *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 178, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974).   Rather, the court must decide whether plaintiffs meet their burden of Federal Rule of Civil Procedure 23, which entails satisfying each of the four prerequisites set forth in Rule 23(a), and at least one of the requirements of 23(b).   In making this decision, "the Tenth Circuit has stated that 'if there is error to be made, let it be in favor and not against the maintenance of the class action.'" *Smith v. MCI Telecomm. Corp.*, 124 F.R.D. 665 (D. Kan. 1989) (quoting *Esplin v. Hirschi*, 402 F.2d 94, 99 (10th Cir. 1968)).

### A.   The Proposed Class is Sufficiently Definite and Readily Ascertainable.

As an initial matter, the proposed class definition must be precise, objective, and presently ascertainable. *See* FED. R. CIV. P. 23(c)(1)(B) ("An order certifying a class action must define the class[.]"); MANUAL FOR COMPLEX LITIGATION § 21.222, at 270 (4th ed. 2005) ("The definition must be precise, objective, and presently ascertainable."). However, "the class does not have to be so ascertainable that every potential member can be identified at the beginning of the action." *Vaszlavik v. Storage Tech. Corp.*, 175 F.R.D. 672, 683 (D.Colo. 1997).   Instead, it must only be "administratively feasible for the court to determine whether a particular individual is a member." *Id.* (citations omitted).

Plaintiffs have established three sub-classes defined as follows:

Computer Programming:

All persons who executed an Enrollment Agreement with Vatterott College for the Computer Programming course of study at the Wichita, Kansas campus, paid the course of study tuition, began the course of study between April 20, 2001 and April 20, 2006, and completed or graduated from the course of study.

Electrical Mechanic:

All persons who executed an Enrollment Agreement with Vatterott College for the Electrical Mechanic course of study at the Wichita, Kansas campus, paid the course of study tuition, began the course of study between April 20, 2001 and April 20, 2006, and completed or graduated from the course of study.

Medical Office Assistant:

All persons who executed an Enrollment Agreement with Vatterott College for the Medical Office Assistant course of study at the Wichita, Kansas campus, paid the course of study tuition, began the course of study between April 20, 2001 and April 20, 2006, and completed or graduated from the course of study.

Using Plaintiffs' sub-class definitions, it is administratively feasible to determine whether any particular individual is a member of a sub-class. Plaintiffs have defined relevant time period, the course of study, the location, and have limited the class to those who completed the course of study or graduated. This is sufficient. *See Cullen v. Whitman Med. Corp.*, 188 F.R.D. 226, 237 (E.D. Pa. 1999); *Johnson v. Midland Career Inst., Inc.*, 1993 WL 420954, at *7 (N.D. Ill. Oct. 18, 1993); *Rosario v. Livaditis*, 1988 WL 105303, at *5 (N.D. Ill. Oct. 4, 1988).

Relatedly, "a clear and complete summary of those claims, issues, or defenses subject to class treatment" should be set forth before a class is certified. *In re Urethane Antitrust Litigation,* 237 F.R.D. 440, 445 (D. Kan. 2006) (quoting *Wachtel ex rel. Jessee v. Guardian Life Ins. Co. of Am.*, 453, F.3d 179, 184 (3d Cir. 2006)); *see* Fed. R. Civ. P. 23(c)(1)(B) ("An order certifying a class action must define . . . the class claims, issues, or defenses[.]"). Here, the claims subject to class treatment are Plaintiffs' breach of contract, KCPA, and fraudulent

misrepresentation claims and are set forth in Plaintiffs' Second Amended Complaint—Class

Action (Court Document 18) (hereinafter "Complaint"). The related issues subject to class

treatment are:

- whether Defendant provided the hours and weeks of instruction promised in its Enrollment Agreement (Complaint, ¶ 152);
- the appropriate measure of class-wide damages for breach of contract (Complaint, ¶ 154);
- whether Defendant made representations knowingly or with reason to know that the services it provided had characteristics, uses, or benefits the services did not have (Complaint, ¶ 160);
- whether Defendant willfully failed to state material facts relating to its services (Complaint, ¶ 162);
- whether Defendant willfully concealed, suppressed and omitted material facts relating to its services (Complaint, ¶ 163);
- whether Defendant's tuition and fees for the respective courses of study grossly exceeded the prices at which similar services were readily obtainable from other colleges or universities (Complaint, ¶ 166);
- whether Defendant was aware Plaintiffs would be unable to receive any material benefit from the subject of the consumer transactions, from the time the consumer transactions were entered until the time Plaintiffs completed their respective courses of study (Complaint, ¶ 168);
- whether Defendant made misleading statements upon which Plaintiffs were likely to rely to their detriment (Complaint, ¶ 170);
- the appropriate measure of class-wide damages for violations of the KCPA (Complaint, ¶ 172);
- whether Defendant made false representations of existing and material fact to Plaintiffs (Complaint, ¶ 175);
- whether Defendant false representations were known by Vatterott to be false or were recklessly made without knowledge concerning the veracity of the representations (Complaint, ¶ 176-77);
- whether Defendant caused Plaintiffs to reasonably rely and act upon the false representations of Defendant (Complaint, ¶ 178); and
- the appropriate measure of class-wide damages for fraud (Complaint, ¶ 179).

The defenses subject to class treatment are those raised Defendant's answer, and include

violation of the statute of limitations, lack of subject matter jurisdiction, comparative fault,

estoppel, failure to mitigate damages, failure to plead in accordance with Fed. R. Civ. P. 9(b),

stating a cause of action (educational malpractice) not recognized in Kansas, and laches. *See*

Answer to Second Amended Complaint—Class Action (hereinafter "Answer") at ¶¶182-90.

Accordingly, this requirement is also satisfied. *See Urethane,* 237 F.R.D. at 446.

### B.      The Proposed Class Satisfies the Requirements of Rule 23(a).

The four elements of Rule 23(a) are:

(1) The class is so numerous that joinder of all members is impracticable;
(2) There are questions of law or fact common to the class;
(3) The claims or defenses of the representative parties are typical of the claims or defenses of the class; and
(4) The representative parties will fairly and adequately protect the interests of the class.

These four requirements will be referred to as "numerosity," "commonality," "typicality," and "adequacy of representation" respectively.  *See Smith,* 124 F.R.D. at 674. As set forth below, Plaintiffs' claims satisfy each of these criteria.[6]

### 1.      The Proposed Class is Sufficiently Numerous.

The first requirement under Rule 23(a) is "numerosity," or the class must be so numerous that joinder of all members is "impracticable." Fed. R. Civ. P. 23(a)(1). This "requirement calls for a practical judgment based on the particular facts of each case." *Schreiber,* 167 F.R.D. at 173. A complaint need not allege the exact size of the proposed class, nor the identity of the class members. *Rex v. Owens* ex *rel. Okl.,* 585 F.2d 432, 435 (10th Cir. 1978); *Schreiber v. National Collegiate Athletic Ass'n,* 167 F.R.D. 169, 173 (D. Kan. 1996). Rather, a plaintiff simply "must present some evidence or otherwise establish by reasonable estimate the number of class members who may be involved." *Rex,* 585 F.2d at 435; *see Aluminum Phosphide,* 160 F.R.D. at

---

[6] In applying the criteria of Rule 23, the substantive allegations in a plaintiff's complaint must be accepted as true. *In re Universal Serv. Fund Tele. Billing Practices Litigation,* 219 F.R.D. at 661, 665 (D. Kan. 2004). "Tenth Circuit caselaw strictly prohibits the Court from examining the merits of plaintiffs' claims when determining whether to certify a class." *In re Aluminum Phosphide Antitrust Litigation,* 160 F.R.D. 609, 616 (D. Kan. 1995) (citing *Adamson v. Bowen,* 855 F.2d 668, 676 (10th Cir. 1988), and *Anderson v. City of Albuquerque,* 690 F.2d 796, 799 (10th Cir. 1982); *see Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 178 (1974) ("In determining the propriety of a class action, the question is not whether the plaintiff or plaintiffs have stated a cause of action or will prevail on the merits, but rather whether the requirements of Rule 23 are met.").

613 (noting that "[t]here is no set formula . . . for determining whether this requirement is met").

In this District, classes of as few as 50 members have satisfied the numerosity requirement. *See Olenhouse v. Commodity Credit Corp.*, 136 F.R.D. 672, 679 (D. Kan. 1991); *accord Horn v. Associated Wholesale Grocers, Inc., 555* F.2d 270, 276 (10th Cir. 1977) (class of 46 members certified). As a result of limited discovery for the purpose of this motion, the exact size of each sub-class is known. The Computer Programming sub-class will consist of 98 persons; the Electrical Mechanic sub-class will consist of 46 persons; and the Medical Office Assistant sub-class will consist of 199 persons (see Student Lists, attached as Exhibit "AC"). The total class will comprise 343 students, which is of sufficient size to satisfy the numerosity requirement.

### 2.      There are Questions of Law and Fact Common to All Proposed Class Members.

The second requirement for class certification under Rule 23(a) is "commonality," or that there be "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). Under this requirement, a finding of commonality "requires only a single issue common to the class." *J.B. ex rel. Hart v. Valdez,* 186 F.3d 1280, 1288 (10th Cir. 1999). The common issue can be one of fact *or* one of law. *Smith*, 124 F.R.D. at 675 (citation omitted). The commonality requirement has been aptly characterized as a "`low hurdle' easily surmounted." *Scholes v. Stone, McGuire & Benjamin,* 143 F.R.D. 181, 185 (N.D. 111. 1992).

Commonality should be discussed separately for each claim. *Johnson*, 1993 WL 420954, at *3. Class treatment will not be defeated solely because some factual variances exist among the claims of the class members; the controlling consideration will be whether the individual claims arise out of the same legal theory. *Patterson v. Gen. Motors Corp.*, 631 F.2d 476, 481

(7th Cir. 1980), *cert. denied*, 451 U.S. 914 (1981).

### a.    Breach of Contract

Common issues of both fact and law exist in Plaintiffs' breach of contract claim. These issues will not be separately addressed by sub-class, as the issues of fact and law for breach of contract claim are the same for every Plaintiff and proposed class member.

The first common issue of fact for breach of contract is that Plaintiffs individually and respectively executed the same form Enrollment Agreement with Defendant, which Defendant provided, and which had the same contractual promises therein to provide a certain number of hours and weeks of instruction (See Enrollment Agreements, at ¶¶ 1,5). The second common issue of fact is that Plaintiffs did not receive the hours and weeks of instruction promised due to Defendant's failure to provide instructors, canceling classes early, or not holding class at all.

The common issue of law is whether Defendant breached its Enrollment Agreements with Plaintiffs by failing to provide the hours and weeks of instruction promised (Complaint, ¶ 153). Whether failing to provide the promised hours and weeks of instruction constitutes breach of contract will be a legal issue common to all class members.[7]

Because multiple common issues of law and fact exist in Plaintiffs' breach of contract claim, and because Plaintiff need only show one issue of law or fact, Plaintiffs have satisfied their burden of commonality for breach of contract.

### b.    Violation of the Kansas Consumer Protection Act (KCPA)

Common issues of fact and law also exist in Plaintiffs' claim for violations of the KCPA. The essence of Plaintiffs' claim is that they individually and respectively entered into "consumer transactions" with Defendant, a "supplier" under the Act. To induce Plaintiffs to enter into these

consumer transactions, Defendant made false statements regarding the school and its courses of study.

The proposed sub-classes are relevant to Plaintiffs' KCPA claim.  As stated above, Vatterott had a policy or practice of making the same misrepresentations to prospective students regarding particular courses of study, but some of those misrepresentations were specific to the course of study.  Therefore, the issues of fact are as follows:

Computer Programming

- Whether Defendant stated that Plaintiffs would be qualified for entry-level computer programming jobs upon graduation;
- Whether the Computer Programming course of study provided sufficient training for graduates to be qualified for entry-level computer programming jobs upon graduation;
- Whether Defendant stated that Plaintiffs' credits would transfer to other colleges or universities;
- Whether Plaintiffs' credits would transfer to other colleges or universities
- Whether Defendant stated that Defendant had connections with particular employers in the area;
- Whether Defendant had connections with particular employers in the area
- Whether Defendant stated that the employers with whom it had connections sought graduates of Defendant's programs;
- Whether the employers with whom Defendant had connections sought graduates of Defendant's programs;
- Whether Defendant stated that Defendant would provide job placement assistance;
- Whether Defendant provided job placement assistance;
- The tuition price for the Computer Programming course of study;
- The tuition price for similar courses of study at other colleges or universities;

Electrical Mechanic

- Whether Defendant stated that the Electrical Mechanic course of study was at least 50 percent hands-on training;
- Whether the Electrical Mechanic course of study was at least 50 percent hands-on training;
- Whether Defendant stated that the Electrical Mechanic course of study

---

[7] Plaintiffs' theory of breach of contract is pursuant to and consistent with this Court's order.  *See Jamieson v. Vatterott Educational Center, Inc.*, 473 F.Supp.2d 1153, 1160 (D. Kan. 2007).

provided sufficient knowledge for the journeyman certification exams;

- Whether the Electrical Mechanic course of study provided sufficient knowledge for the journeyman certification exams;
- The tuition price for the Electrical Mechanic course of study
- The tuition price for similar courses of study at other colleges or universities

Medical Office Assistant

- Whether Defendant stated that Plaintiffs would receive certifications in insurance billing and coding, transcription, CPR, and first aid;
- Whether Plaintiffs received certifications in insurance billing and coding, transcription, CPR, and first aid;
- Whether Defendant stated that it guaranteed employment upon graduation;
- Whether Defendant guaranteed employment upon graduation;
- Whether Defendant stated that employers specifically asked for Vatterott graduates;
- Whether employers specifically asked for Vatterott graduates;
- The tuition price for the Medical Office Assistant course of study;
- The tuition price for similar courses of study at other colleges or universities.

The issues of fact regarding Defendant's misrepresentations are common because they were made to each sub-class member. As Plaintiffs have shown through discovery and independent inquiry, Defendant had a policy or practice of making certain false representations to prospective students to induce enrollment. Although the statements may not have been made to the entire sub-class at the same time by the same person, because the same statements were being made to all prospective students, Defendant had a pattern or practice of making these claims to prospective students, and these statements will therefore be common to sub-class members.

Next, the factual issue regarding tuition price is common because each sub-class member paid the same or similar tuition for the course of study. Therefore, the tuition for sub-class members can be compared to the prices other school or universities charged for the same or similar education.

26

The following common issues of law exist regarding Plaintiffs' class claim for violations of the KCPA:

- Whether Defendant made representations knowingly or with reason to know that the services it provided had characteristics, uses, or benefits the services did not have;
- Whether Defendant willfully used exaggeration, falsehood, innuendo, and ambiguity regarding material facts relating to its services;
- Whether Defendant willfully failed to state material facts relating to its services;
- Whether Defendant willfully concealed, suppressed and omitted material facts relating to its services;
- Whether Defendant's tuition and fees for the respective courses of study grossly exceeded the prices at which similar services were readily obtainable from other colleges or universities;
- Whether Defendant was aware Plaintiffs would be unable to receive any material benefit from the subject of the consumer transactions, from the time the consumer transactions were entered until the time Plaintiffs completed their respective courses of study;
- Whether Defendant made misleading statements of opinion upon which Plaintiffs were likely to rely to their detriment.

As stated above, because the same misrepresentations were made to each sub-class member, the legal issues of whether those statements violated the KCPA will also be common. Moreover, as each sub-class was charged the same tuition, the analysis of whether the tuition "grossly exceeded" the tuition price of other institutions will be common. Therefore, common issues of both law and fact exist in Plaintiffs' KCPA claims, so Plaintiffs have satisfied the "commonality" requirement for their KCPA claim.

### c.    Fraudulent Misrepresentation

The elements for common-law fraud in Kansas include a false or untrue statement of existing and material fact, known by the speaker untrue and made by the defendant with intent to deceive or with reckless disregard for the truth, and resulting injury to the plaintiff. *Smith v. MCI*

*Telecomm. Corp.*, 124 F.R.D. 665, 677 (D. Kan. 1989) (citations omitted). The reliance element has both a subjective and objective component. *Id.* (citations omitted). Therefore, the plaintiff must in fact rely on the statement and that reliance must be reasonable. *Id.* (citations omitted).

Common questions of fact and law exist for each element of Plaintiffs' fraudulent misrepresentation claim, the essence of which is Defendant's pattern or practice of making the misrepresentations to prospective students to induce enrollment in the courses of study. The first common issue in Plaintiff's fraud claim is the statements Vatterott made. As discovery and independent inquiry have shown, Vatterott had a policy or practice of making the false representations to prospective students to induce enrollment.

While some of the representations were about the school generally, some of the representations were specific to the course of study, and those representations form the basis for the proposed sub-classes. Nevertheless, because Plaintiffs were all subjected to Vatterott's policy or practice of misrepresenting the school and its course of study, Plaintiff's false statements are a common issue of fact to class and sub-class members as appropriate. Although the statements may have been made to students individually, the statements were not individualized, and therefore commonality exists. *See Johnson*, 1993 WL 420954, at *3 (noting that commonality "will not be defeated where essentially identical misrepresentations were made"). Therefore, the representations were not individualized, but common to the class.

The second and third common issues of fact in Plaintiff's fraud claim are Defendant's knowledge or recklessness concerning the falsity of the statements, and the reason for Vatterott making the statements. As stated above, these fact issues are common to Plaintiffs because they were all subjected to Vatterott's policy or practice of misrepresenting the school and its courses

of study. Therefore, there will be no individual issues as to these elements. The common inquiry will be Vatterott's knowledge and motivation behind its false statements. Proof of these issues can therefore be made on a class and sub-class basis.

The fourth common issue of fact is reliance. While Defendant may argue that reliance is an individual inquiry, in this case it is not. Instead, reliance in this case is demonstrated by the very fact that Plaintiffs enrolled in the courses of study and paid tuition for the programs. *See, e.g.*, *Smith*, 124 F.R.D. at 679 (noting that telephone salesperson's reliance on telephone company commission plans was "demonstrated simply by their employment"); *Johnson*, 1993 WL 420954, at *6 ("That reliance predominates is demonstrated by the simple fact that the class members enrolled and by their willingness to . . . pay tuition.").

In order to be eligible as a class member, each person must have enrolled in one of the three courses of study during the relevant time frame and either completed or graduated from the program. Because demonstrated reliance through payment of tuition is a prerequisite for class membership, it is a common issue of fact. Therefore, reliance will not be a necessary inquiry in this case, but in any event is a common issue of fact.

The fifth common issue of fact is damages. Damages are a common issue of fact in this case because each class members' damages are based on the same Enrollment Agreement that promised a certain number of hours and weeks of instruction. In addition, the benefit conferred by Defendant upon Plaintiffs from their respective course of study will be common, because they were each in the same course of study. Therefore, Plaintiffs' damage calculation, while not necessary at this stage, could possibly be the value of the hours and weeks they did not receive as a result of relying upon Defendant's misrepresentations and enrolling in a course of study and paying tuition. Plaintiffs' damages could also be proven by expert testimony valuing the hours

and weeks of instruction not received.

The common issue of law among Plaintiffs' class claim for fraud is the proper calculation of damages. In this case Plaintiffs' damages for fraud will be common because they paid the same amount of money to receive the same level of education and training. While a precise calculation of each class members' damages is unnecessary for class certification, damages possibly could be based on tuition paid. As stated above, this is a common issue among class members. Accordingly, Plaintiffs have satisfied the "commonality" requirement for their fraud claim.

### 3.      Plaintiffs' Claims are Typical of the Claims of the Proposed Class.

The third requirement of Rule 23(a), called "typicality," is that the claims of the class representative be typical of the claims of the class. Fed. R. Civ. P. 23(a)(3). "The typicality element requires that the representative plaintiffs possess the same interests and suffer the same injuries as the proposed class members." *Aluminum Phosphide*, 160 F.R.D. at 613 (citing *Olenhouse*, 136 F.R.D. at 680). "A finding of typicality," however, "does not require that the claims of class members be identical to the claims of the class plaintiffs." *Universal Serv. Fund*, 219 F.R.D. at 667 (quoting *Hart*, 186 F.3d at 1299); *see also Smith*, 124 F.R.D. 675. "[D]iffering fact situations of class members do not defeat typicality . . . so long as the claims of the class representative and class members are based on the same legal or remedial theory." *Adamson*, 855 F.2d at 675; *see Urethane*, 237 F.R.D: at 447 (quoting *Adamson*). Correspondingly, typicality exists so long as the claims of the class representative are not "'significantly antagonistic' to the claims of the proposed class." *Aluminum Phosphide*, 160 F.R.D. at 613 (citing *Olenhouse*, 136 F.R.D. at 680).

### a.      Breach of Contract

30

Plaintiffs' claim for breach of contract is typical of the claim of the proposed class. Plaintiffs' breach of contract claim is based on Vatterott's failure to provide the hours and weeks of instruction promised in the Enrollment Agreements. The harm to Plaintiffs is paying for hours and weeks of instruction they did not receive, and their damages will be reimbursement for the value of that instruction. Plaintiffs' theory for breach of contract is the same as the proposed class members', because they executed the same Enrollment Agreement with the same contractual promises. The method of proving liability and damages for the class members will be the same as for Plaintiffs. Therefore, Plaintiffs' claim for breach of contract satisfies the "typicality" requirement.

### b.    Violation of KCPA

Plaintiffs' claim for violation of the KCPA is also typical of the claims of the proposed class. Plaintiffs' KCPA claim is based on false statements Vatterott made to induce them to enroll in a course of study. As discovery and independent inquiry have shown, Vatterott's false statements to Plaintiffs resulted from Defendant's policy or practice of making false representations regarding the school and its courses of study. Plaintiffs were harmed by enrolling in a course of study that they otherwise would not have and paying for instruction they never received. Therefore, because Plaintiffs' KCPA claim originates from Vatterott's policy or practice, and not from any individual experiences unique to them, and because Plaintiffs have suffered same harm as the proposed class members, Plaintiffs' KCPA claim satisfied the "typicality" requirement.

### c.    Fraudulent Misrepresentation

Plaintiffs' claim for fraudulent misrepresentation is also typical of the claims of the proposed class. Plaintiffs' fraud claim is based on the same representations that give rise to their

KCPA claim.  Because these representations were indicative of a policy or practice of making false representations to students to induce enrollment, Planitiffs' fraud claim meets the typicality requirement in the same way that their KCPA claim meets the requirement.

### 4.    Plaintiffs Will Fairly and Adequately Represent the Proposed Class' Interests.

The final requirement of Rule 23(a) is that the representative party will fairly and adequately represent the class. Fed. R. Civ. P. 23(a)(4). "Resolution of two questions determines legal adequacy: (1) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (2) will the named plaintiffs and their counsel vigorously prosecute the action on behalf of the class?" *Rutter & Wilbanks Corp. v. Shell Oil* Co., 314 F.3d 1180, 1187-88 (10th Cir. 2002) (quotation omitted); *see Aluminum Phosphide, 160* F.R.D. at 614 ("Adequacy of representation depends upon the qualifications and experience of plaintiffs' counsel and whether the representative plaintiffs have interests antagonistic to the class."). Here, the adequacy requirement is met.

First, the interests of the named Plaintiffs do not conflict with those of the absent class members.  Rather, their interests are aligned because they have all been injured by the same conduct and proof of their respective claims will not harm the claims of other class members. Plaintiffs do not have any interests antagonistic to those of the other class members and all share a strong and identical interest in proving Defendants' liability. *See Harman v. Lyphomed, Inc.,* 122 F.R.D. 522, 528 (N.D. Ill. 1988); *In re Fine Paper Antitrust Litig.,* 82 F.R.D. 143, 150-51 (E.D. Pa. 1979). While it is not uncommon for defendants to attempt to defeat class certification by conjuring up fanciful scenarios involving potential conflicts between named and unnamed class members, the courts routinely reject efforts to defeat certification "by raising the possibility

of hypothetical conflicts or antagonisms among class members," unless they are "apparent, imminent, and on an issue at the very heart of the suit." *Bulk (Extruded) Graphite,* 2006 WL 891362, at *8 (quoting NASDAQ, *169* F.R.D. at 513-14). No such conflicts exist here. To the contrary, in proving their own claims, Plaintiffs necessarily will be proving the claims of their fellow class members.

Second, Plaintiffs are represented by counsel whose firms have litigated claims of breach of contract, consumer protection, fraud, and class actions to successful conclusions. The firms representing Plaintiffs stand ready and able to advance the resources necessary to litigate this case vigorously and to see it through to the best possible conclusion (*Id.*). Thus, "there is no ground for supposing that plaintiffs will not adequately represent the class." In *re Glassine and Greaseproof Paper Antitrust Litig.,* 88 F.R.D. 302, 306 (E.D. Pa. 1980).

**D.      This Action Meets the Requirements of Rule 23(b)(3).**

Once the four prerequisites of Rule 23(a) are met, the potential class must also satisfy at least one provision of Rule 23(b). *Universal Serv. Fund,* 219 F.R.D. at 673.  Rule 23(b)(3) provides that a class should be certified where the court finds that "the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." As demonstrated below, these requirements are satisfied.

**1.      Common Questions of Law and Fact Predominate in This Action.**

Predominance of common issues does not require that each issue in the case be common to all members, but only that there are substantial common issues that predominate over the individual ones. *See, e.g., Lorazepam,* 202 F.R.D. at 29; *Cardizem,* 200 F.R.D. at 339; *Flat*

*Glass,* 191 F.R.D. at 484; Potash, 159 F.R.D. at 693. *Accord NASDAQ,* 169 F.R.D. at 517 (noting that the predominance requirement is met unless "it is clear that individual issues will overwhelm the common questions and render the class action valueless"). Predominance generally is met "when there exists generalized evidence which proves or disproves an element on a simultaneous, class-wide basis, since such proof obviates the need to examine each class members' individual position." *Vitamins,* 209 F.R.D. at 262.

### a.   Plaintiffs Will Prove Breach of Contract on a Common Basis

Plaintiffs have alleged that Defendant failed to provide the hours and weeks of instruction promised in the Enrollment Agreements.   The evidence Plaintiffs will submit to prove Defendant's breach of the Enrollment Agreements is common to the class.   That evidence includes: (1) records and testimony of at what times the classes began and ended; (2) records and testimony of when there was no instructors to teach class; and (3) records and testimony of at what times classes were otherwise cancelled.   This evidence is common to the class and shows there are few if any individual issues.

Defendant may argue that because there were different classes with different instructors, then there needs to be an inquiry for each class.   This is not the case.   Plaintiffs will be able to prove when classes began and ended not only with Plaintiffs' testimony, but also the testimony of instructors and administrators.   Therefore, the testimony that Plaintiffs elicit at trial will cover all classes during the relevant time period and will not necessitate individual inquiries for each class member.

Indeed, there will likely be no individual issues among class members in Plaintiffs' breach of contract claim.   As the Enrollment Agreements expressly state, Plaintiffs' only responsibility was to pay the tuition (see Enrollment Agreements, attached as Exhibit "Z").   It

cannot be disputed they fulfilled that responsibility, because to begin a course of study they would have first had to pay the tuition. Therefore, there are no issues related to Plaintiffs. The only inquiry for breach of contract will be whether Defendant fulfilled its contractual promise to provide the hours and weeks of instruction in the Enrollment Agreement.

Plaintiffs will also prove damages from breach of contract on a class-wide basis. At this preliminary stage of the proceedings, Plaintiffs do not have to prove their damages. Nor do Plaintiffs need to specify the details of the damages methodology they will employ. The inquiry at this stage is whether there likely are recognized and reliable methodologies that will allow Plaintiffs to prove their damages on a class-wide basis and sufficient data to allow these methodologies to be performed. *See Urethane,* 237 F.R.D. at 452 ("The court is also satisfied that plaintiffs have suggested a potentially feasible method for proving damages on a class-wide basis."); *Universal Serv. Fund,* 219 F.R.D. at 676 (same). In "assessing whether to certify a class, the court's inquiry is limited to whether or not the proposed methods are so insubstantial as to amount to no method at all." *Rubber Chemicals,* 232 F.R.D. at 354.

Based on the Court's previous ruling, the sole method of claiming breach of contract in this case is proving that Plaintiffs did not receive the hours and weeks of instruction promised. *See Jamieson v. Vatterott Educational Center, Inc.*, 473 F.Supp.2d 1153, 1160 (D. Kan. 2007). Therefore, any damage calculation will be based on the hours and week promised compared to the hours and weeks received. Plaintiffs at this stage do not have to show the monetary value of each hour and week not received; at this point they need only show there is a potentially feasible method for providing damages on a class-wide basis. *Universal Serv. Fund,* 219 F.R.D. at 676. Calculating class-wide damages by placing a monetary value on each hour and week not received is a "potentially feasible method." *See Urethane,* 237 F.R.D. at 452.

To demonstrate the feasibility of Plaintiffs' methodology, one way of calculating damages would be the fractional value of tuition for education paid for but not received. One example would be as follows:

**Damages = Tuition Paid x (1-(Hours and Weeks Received/Hours and Weeks Promised))**

For example, if a student paid $20,000 to receive 1,000 hours of instruction, but only received 600 hours of instruction, the damages calculus would be:

Damages = Tuition Paid x (1-(Hours and Weeks Received/Hours and Weeks Promised))

Damages = $20,000 x (1-(600/1000))

Damages = $8,000

As stated above, Plaintiffs do no contend this formula is the only practical expression of the methodology, but provide it as an example of how damages can be determined on a class-wide basis without testimony from each class member. However, Plaintiffs may also prove the value of hours and weeks not received through expert testimony.

Any class-wide methodology for calculating damages will result in different levels of damage for different class member. However, "the fact that there may have to be individual examinations on the issue of damages has never been held . . . a bar to class actions." *Gold Strike Stamp Co. v. Christensen,* 436 F.2d 791, 798 (10th Cir. 1970). In *Smith v. MCI Telecommunications Corporation*, 124 F.R.D. 665 (D.Kan. 1989), the court addressed a motion to certify a class action brought by salespersons alleging that they had been cheated out of sales commissions. Recognizing that each person's amount of damages would be different because each person had made different sales and were thus entitled to different levels of commissions, the court stated:

In essence, Smith's complaint alleges that because of MCI's actions, salespersons

were cheated out of the commissions to which they were entitled. Thus the members of the proposed class all suffered the same type of damages. Further, the fact that the proposed class members worked under different compensation plans does not indicate that the damages question is predominantly individualized. Of course, the amount of damages allegedly suffered by members of the prospective class will vary depending on the plans under which they worked and the number of sales on which they were denied commission. However, the actual amount of damages is invariably an individual question and does not defeat class action treatment. Thus, if the computation following a ruling in favor of a class is a largely mechanical task, then the existence of individualized claims for damages seems to offer no barrier to class certification.

*Id.* at 677 (citations omitted).

The present case is analogous to the class members' situation in *Smith*. Here, each class member had a contractual agreement with Defendant to receive a certain number of hours and weeks of instruction. As the Complaint shows, Plaintiffs allege they all were denied the hours and weeks promised, and thus suffered the same type of damages. Although each class member may have been denied a different number of hours and weeks, this does not defeat the issue of predominance. As the court stated in *Smith*, the fact that damages may be individual does not defeat certification so long as the computation of damages is "largely mechanical." In this case, as stated above, the calculation of damages will be the monetary value of the hours and weeks of instruction paid for but not received. The unit value of each hour and week may be determined by expert witness testimony or by simple arithmetic, but in any event will be a formulaic task, and is therefore is a common issue that predominates over individual issues.

> **b.      Plaintiffs Will Prove Violation of the KCPA on a Common Basis.**

Plaintiffs have alleged ten (10) violations of the KCPA in their Complaint. As stated above, the violations fall into two categories: misrepresentations and overcharging. These categories will be addressed in turn.

The first category of KCPA violations are for misrepresentations by Defendant to class

members.  The misrepresentations include:

- Defendant made representations knowingly or with reason to know that the services it provided to Plaintiffs had characteristics, uses, or benefits the services did not have [Complaint, at ¶160].
- Defendant willfully used exaggeration, falsehood, innuendo, and ambiguity regarding material facts relating to its services [Complaint, at ¶161].
- Defendant willfully failed to state material facts relating to its services [Complaint, at ¶162].
- Defendant willfully concealed, suppressed and omitted material facts relating to its services [Complaint, at ¶163].
- Defendant was aware Plaintiffs would be unable to receive any material benefit from the subject of the consumer transactions, from the time the consumer transactions were entered until the time Plaintiffs completed their respective courses of study [Complaint, at ¶168].
- Defendant made misleading statements of opinion upon which Plaintiffs were likely to rely to their detriment [Complaint, at ¶170].

As has been stated above, Plaintiffs' claim for these violations of the KCPA are based on a pattern or practice of making the same misrepresentations to prospective students.  Vatterott's own documents show it trained admissions representatives to make the same statements to every prospective student, and went so far as to provide scripts for different situations.  Based on Vatterott's own documents, it wanted prospective students to be told the same thing every time, and in some instances directed admissions representatives not to ask if the prospective student had questions, presumably to prevent talking about matters Vatterott did not want to discuss. Vatterott's training documents show a concerted effort to prevent individualized statements to prospective students, and shows how Plaintiffs and proposed class members were unwitting actors in a script designed to persuade them to enroll in a 60-week course of study and pay $20,000.00 for a diploma.

Vatterott's policy or practice of making the same representations to prospective students is confirmed by the Declaration of Susan Coomes (attached as Exhibit "Y").  Coomes witnessed the acts alleged in Plaintiffs' Complaint, and has stated under penalty of perjury not only that

Vatterott made the same statements to each prospective student, but also that Vatterott made the same *false* statements to each prospective student (Declaration of Susan Coomes, at ¶¶ 5-18). Therefore, the misrepresentations made to Plaintiffs and the proposed class members are not individualized statements, but were evidence of Vatterott's policy or practice of making attractive but false statements to justify its tuition price. Because the same statements were made as a policy or practice to Plaintiffs and all members of the proposed sub-classes, proof of KCPA violations can be made on a common basis. *See Smith*, 124 F.R.D. at 678-69 (stating that where the fraud complained of constitutes a common course of action composed of many separate activities or where fraud is carried out through recurring misrepresentations "the maintenance of a single class of [persons] affected by defendant's activities is proper" (quotations omitted)).

As stated above, the following fact issues of misrepresentation predominate as common to the sub-classes:

### Computer Programming

- Whether Defendant stated that Plaintiffs would be qualified for entry-level computer programming jobs upon graduation;
- Whether the Computer Programming course of study provided sufficient training for graduates to be qualified for entry-level computer programming jobs upon graduation;
- Whether Defendant stated that Plaintiffs' credits would transfer to other colleges or universities;
- Whether Plaintiffs' credits would transfer to other colleges or universities
- Whether Defendant stated that Defendant had connections with particular employers in the area;
- Whether Defendant had connections with particular employers in the area
- Whether Defendant stated that the employers with whom it had connections sought graduates of Defendant's programs;
- Whether the employers with whom Defendant had connections sought graduates of Defendant's programs;
- Whether Defendant stated that Defendant would provide job placement assistance;
- Whether Defendant provided job placement assistance;
- The tuition price for the Computer Programming course of study;
- The tuition price for similar courses of study at other colleges or

universities;

Electrical Mechanic

- Whether Defendant stated that the Electrical Mechanic course of study was at least 50 percent hands-on training;
- Whether the Electrical Mechanic course of study was at least 50 percent hands-on training;
- Whether Defendant stated that the Electrical Mechanic course of study provided sufficient knowledge for the journeyman certification exams;
- Whether the Electrical Mechanic course of study provided sufficient knowledge for the journeyman certification exams;
- The tuition price for the Electrical Mechanic course of study
- The tuition price for similar courses of study at other colleges or universities

Medical Office Assistant

- Whether Defendant stated that Plaintiffs would receive certifications in insurance billing and coding, transcription, CPR, and first aid;
- Whether Plaintiffs received certifications in insurance billing and coding, transcription, CPR, and first aid;
- Whether Defendant stated that it guaranteed employment upon graduation;
- Whether Defendant guaranteed employment upon graduation;
- Whether Defendant stated that employers specifically asked for Vatterott graduates;
- Whether employers specifically asked for Vatterott graduates;
- The tuition price for the Medical Office Assistant course of study;
- The tuition price for similar courses of study at other colleges or universities.

As stated above, Defendant's policy or practice of making these representations to prospective students predominates as an issue common to the sub-class members and is evidenced not only by Vatterott's training documents but also by the Declaration of Susan Coomes. The proof of these misrepresentations therefore will not involve an individual inquiry of each class member, but a determination of what Vatterott trained its admissions representatives to tell prospective students and what those representatives in fact said as a matter of policy or practice. If Vatterott had a specific training regimen for new admissions

representatives, so each representative knew what to say generally about the school and specifically about each course of study, then proof of these representations on a class-wide basis can be made.

In addition, whether Defendant followed through on these representations, or whether the representations were true, will be common to the class. Proof of the falsity of these representations about the school and the courses of study will be common to the class because whether the statement was true or false will generally apply to each class member. Any variance regarding the falsity of statements over time, such as whether Vatterott had connections with Koch Industries in 2001 through 2006, can be proven through testimony from Vatterott and Koch Industries, and will not result in any individual inquiry of class members.

The issues of proof regarding these representations will not be unique to each Plaintiff or class member. Instead there will be single inquiry of whether Vatterott and its courses of study could offer what was claimed. This need not be made on an individual basis. Because these issues of proof will be common to all sub-class members, common issues of fact will predominate over individual issues of proof.

Another common issue is the price Defendant charged for its courses of study. Plaintiffs have alleged the following KCPA violation:

- When Plaintiffs entered into their individual and respective consumer transactions with Defendant the tuition and fees for the respective courses of study grossly exceeded the prices at which similar services were readily obtainable from other colleges or universities [Complaint, at ¶166].

This claim involves common issues of fact because the tuition price each Plaintiff paid for the course of study was the same, approximately $20,000.00. Proof of this violation thus requires establishing the tuition price, which will be common to each sub-class, and the tuition price for similar programs in the area. Whether the programs are "similar" may be proven by expert

testimony, and in any event will not require inquiry of any Plaintiff or class member.

As to each sub-class, therefore, the common issues of fact are as follows:

### Computer Programming

- The tuition price for the Computer Programming course of study;
- The tuition price for similar courses of study at other colleges or universities.

### Electrical Mechanic

- The tuition price for the Electrical Mechanic course of study;
- The tuition price for similar courses of study at other colleges or universities.

### Medical Office Assistant

- The tuition price for the Medical Office Assistant course of study;
- The tuition price for similar courses of study at other colleges or universities.

These facts require no individual inquiry of class members, but rather require a single inquiry and comparison of what Vatterott charged for its course of study during the relevant time period and what other schools charged for the same or similar course of study during the same time. There are no individual issues of proof involved for each Plaintiff or class member, so common issues of fact predominate over any individual issues.

Common issues of law also predominate in the Plaintiffs' KCPA claims. They are as follows:

- Whether Defendant made representations knowingly or with reason to know that the services it provided had characteristics, uses, or benefits the services did not have [Complaint, at ¶ 160];
- Whether Defendant willfully used exaggeration, falsehood, innuendo, and ambiguity regarding material facts relating to its services [Complaint, at ¶ 161];
- Whether Defendant willfully failed to state material facts relating to its services [Complaint, at ¶ 162];
- Whether Defendant willfully concealed, suppressed and omitted material facts relating to its services [Complaint, at ¶ 163];

- Whether Defendant's tuition and fees for the respective courses of study grossly exceeded the prices at which similar services were readily obtainable from other colleges or universities [Complaint, at ¶ 166];
- Whether Defendant was aware Plaintiffs would be unable to receive any material benefit from the subject of the consumer transactions, from the time the consumer transactions were entered until the time Plaintiffs completed their respective courses of study [Complaint, at ¶ 168];
- Whether Defendant made misleading statements of opinion upon which Plaintiffs were likely to rely to their detriment [Complaint, at ¶ 170].

These issues of law can be proven on a common basis because the facts giving rise to the claims are common and arise out of Vatterott's policy or practice of making false representations regarding the school and the courses of study to induce enrollment. Therefore, whether Defendant violated the KCPA as to any of these allegations will involve comparing what Vatterott trained its admissions representatives to tell prospective students with the truth of those statements. These are both common issues of fact predominate over individual issues.

An additional common issue of law is the calculation of Plaintiffs' damages for KCPA violations. K.S.A. 60-634(d) states that "a consumer who suffers loss as a result of a violation of this act may bring a class action for the damages cause by (the violations alleged above)." Plaintiffs' damages for Defendant's violations of the KCPA will be based on the tuition paid, which is common among sub-class members. As previously stated, Plaintiffs need not show an exact methodology for calculating damages, but need only show a class-wide calculation is possible. If Plaintiffs' allegations are proven, they will have been induced to enter into Enrollment Agreements with Defendant through deliberate misrepresentations. Therefore, their damages will be what Kansas law allows for fraudulent inducement, discussed below. Regardless of what their actual damages are, the methodology for the class will be uniform and therefore be a common issue of law for all class members.

      **c.**     **Plaintiffs Will Prove Fraudulent Misrepresentation on a Common Basis.**

Common issues of fact and law predominate in Plaintiffs' claim for fraudulent misrepresentation in the same way that issues of fact and law predominate in Plaintiffs' KCPA claim. The first predominating issue in Plaintiff's fraud claim is Defendant's misrepresentations. In *Johnson v. Midland Career Institute, Inc.*, 1993 WL 420954, at *1 (N.D. Ill. Oct. 18, 1993), the plaintiffs were told the school would provide "career training, job placement services and the other advertised benefits." In opposing the motion to certify the class action for fraud, the defendant argued the representations to the class members were too individual for common issues to predominate. Rejecting this reasoning, the court noted that "the basic claim of misrepresentation in this case does not involve possibly different oral promises of transportation of benefits, but rather, the representation that students who enrolled at MCI would receive the education they paid for. It is this representation which is common to and predominates over any individual factual issues among class members." *Id.* at *6 (citations omitted). *See also Rosario v. Livaditis*, 1988 WL 105303 (N.D. Ill. Oct. 4, 1998) (holding that "interrelated misrepresentations were communicated by various means" raised "common questions of law and fact as part of the same allegedly fraudulent scheme to defraud class members").

This case is in all material respects identical to *Johnson*. In this case, Plaintiffs were given numerous representations regarding the school and other collateral benefits, but the underlying message was the students would get what they paid for. The fact Vatterott had a defined policy of training admissions representatives to make the same statements to students regarding the school and the courses of study and that a former employee has stated under penalty of perjury the same *mis*representations were given to every Plaintiff in each sub-class

shows Defendant's actions were not unique to one or two students, but were part of a policy or practice of misleading prospective students to encourage enrollment. *Johnson*, 1993 WL 420954, at *1; *see also Smith*, 124 F.R.D. at 678-679 (citations omitted). Therefore, proof of these representations will involve determining what Vatterott told its admissions representatives to say and whether those statements were false. These issues will predominate as common to all class members.

Reliance is also a common issue that predominates. As stated above, the class is limited to those who executed an Enrollment Agreement, paid tuition, and either graduated from or completed the course of study. Therefore, reliance is a prerequisite to class membership and is a common issue of fact that predominates over any individual issues. *See Smith*, 124 F.R.D. 665, 679 (holding that class members' reliance on representations by defendant was demonstrated by initiating or continuing employment with defendant); *Rosario*, 1993 WL 420954, at *6 (holding in certifying trade school class action that "the issue of reliance by class members is a common and predominate issue. That reliance predominates is demonstrated by the simple fact that the class members enrolled and by their willingness to . . . pay tuition").

Because reliance is a prerequisite to class membership, the definition of Plaintiffs' proposed sub-classes will ensure that any class member has proven reliance upon Defendant's misrepresentations by paying tuition and enrolling, and will therefore be an inherently predominant issue for the class. Further, whether Plaintiffs' reliance was reasonable will be "an objective inquiry common to the entire proposed class." *See Smith*, 124 F.R.D. at 679.

Plaintiffs' damages for fraud will also predominate over any individual issues. As stated above, Plaintiffs' proposed calculation of damages for fraud will be based on the tuition paid. Whether Plaintiffs are entitled to a refund of tuition paid as a result of fraudulent inducement, or

whether they are entitled to a different amount based on the hours and weeks received, the methodology of calculating damages will be common among all class members.   Therefore, Plaintiffs' damages for fraudulent inducement will predominate over any individual issues.

> **2.      A class action is the superior and most efficient method for adjudicating this action.**

Rule 23(b)(3) provides that certification is appropriate if class treatment "is superior to other available methods for the fair and efficient adjudication of the controversy."   It sets forth four factors to consider in determining whether a class action is superior to other methods.

"The first factor to be weighed is the interest of the members to the proposed class in individually controlling the prosecution of separate actions." *Smith*, 124 F.R.D. 679.   Because none of the proposed members has filed a suit on these claims, there is little interest in pursuing separate actions. *See id.*

The second factor is "the extent and nature of any litigation concerning the controversy already commenced by proposed class members." *Id.*   There is no such litigation here.

The third factor is "the desirability of concentrating the litigation in this forum." *Id.* Here, there is no other forum that would be better suited for this litigation.   The defendant is in this forum, the named Plaintiffs all live in this forum, and the events giving rise to the lawsuit occurred in this forum.   In addition, the total class will be approximately 345 members, and resolving their disputes in one action would be far superior to having 345 individual actions on this Court's docket.

Moreover, Plaintiffs and the proposed class members do not have the financial resources to prosecute an action of this type.   While they may be awarded punitive damages, their economic damages will not exceed the value of the tuition paid, which in every case is $20,000.00 or less.   Establishing Defendant's policy or practice of misrepresenting its school

and courses of study is a costly venture, and the cost of litigating any individual claim would easily exceed the damages recovered. Therefore, if this class action is not certified, there is little or no chance that Plaintiffs or their proposed class members would individually have financially viable claims. In addition, there is little or no chance that any individual class member would have the financial wherewithal to seek justice knowing their claim would cost more than it was worth. In the end, if this case is not certified there is little or no possibility that justice will be served for any of the 342 individuals contemplated in this class action, and if Plaintiffs' allegations against defendant are proven true, there is a correspondingly slim chance that Defendant will be held accountable for its behavior.

The fourth factor is the "difficulty of judicial management of a class action." *Id.* Because common issues detailed above predominate in this case, certification as a class will not present manageability issues, as the overriding inquiry will be what Defendant said and did to induce enrollment in its courses of study and whether Defendant was truthful. In addition, to the extent there are individual issues such as the amount of each class members' damages, "the court may address these issues following trial or in separate proceedings." *See id.* (citations omitted).

In general, any alternative to class certification would result both in duplicative and wasteful litigation and the choice by many plaintiffs not to sue based not on the merit of their claims, but on the relatively small size of their claims coupled with the high cost of litigating them. Therefore, class treatment is the most appropriate way for this case to proceed.

## IV.  CONCLUSION

Based on the foregoing, Plaintiffs respectfully request that their Motion for Class

Certification be granted.

Respectfully submitted,

MORRIS, LAING, EVANS
 BROCK & KENNEDY, CHTD.
300 N. MEAD, SUITE 200
WICHITA, KANSAS 67202
Telephone: (316) 262-2671
Facsimile: (316) 262-6226
Cell phone: (316) 651-6517
e-mail: jjohnson@morrislaing.com
e-mail: erobinson@morrislaing.com

By:  ___s/John W. Johnson___
John W. Johnson #07684
Edward L. Robinson #22043

REDMOND & NAZAR, L.L.P.
245 North Waco Street
402 Farm Credit Building
Wichita, Kansas 67202
Telephone: (316) 262-8361
Facsimile: (316) 263-0610
Cell phone: (316) 371-9586
e-mail: jhcassell@redmondnazar.com

By:  ___s/Joseph H. Cassell___
Joseph H. Cassell #10861


Attorneys for Plaintiffs

Dated: December 17, 2007

## CERTIFICATE OF SERVICE

I hereby certify that on this 17th day of December 2007, I electronically filed the foregoing Memorandum in Support of Motion to Certify Class Action with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to the following:

Mitchell L. Herren
Amy D. Decker
Jennifer R. Sager
Hinkle Elkouri Law Firm, LLC
2000 Epic Center
301 N. Main Street
Wichita, Kansas 67202
Telephone:  316-267-2000
Fax:  316-264-1556
E-mail:  mherren@hinklaw.com
E-mail:  jsager@hinklaw.com
E-mail:  adecker@hinklaw.com

s/ Edward L. Robinson