# EXHIBIT A

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF KANSAS


CARL JAMIESON, et al.,                  )
                                        )
                   Plaintiffs,          )
                                        )
        vs.                             ) Case No.
                                        ) 06-1103-WEB-DWB
                                        )
VATTEROTT EDUCATIONAL CENTER,           )
INC.,                                   )
                                        )
                   Defendant.           )
                                        )


D E P O S I T I O N

        The deposition of CARL M. JAMIESON taken on behalf
of the Defendant pursuant to the Federal Rules of Civil
Procedure before:

                SUSAN K. ORTH-NEVIL, CSR
                KELLEY, YORK & ASSOCIATES, LTD.
                Suite 220, 200 North Broadway
                Wichita, KS    67202


a Certified Shorthand Reporter of Kansas, at

Suite 200, 300 North Mead, Wichita, Sedgwick County,

Kansas, on the 27th day of November, 2007, at 1:34 p.m.

## Page 2

APPEARANCES

PLAINTIFFS:

MORRIS, LAING, EVANS, BROCK & KENNEDY, CHARTERED
Mr. John W. Johnson
Suite 200
300 North Mead
Wichita, KS  67202
(316) 262-2671
jjohnson@morrislaing.com


DEFENDANT:

HINKLE ELKOURI LAW FIRM L.L.C.
Mr. Mitchell L. Herren
2000 Epic Center
301 North Main Street
Wichita, KS  67202
(316) 267-2000
mherren@hinklaw.com

## Page 3

INDEX
CARL M. JAMIESON
Direct Examination by Mr. Herren          4
Cross-Examination by Mr. Johnson          81

Jamieson Exhibits
No. 105 - 12-8-01 To Whom it May Concern
(1 pg.)                                          51
No. 106 - E-mail (1 pg.)                    51
No. 107 - E-mail (1 pg.)                    51
No. 108 - Graduate Update (1 pg.)      51
No. 109 - Resume (4 pgs.)                 51
No. 110 - Letter with Attached Resume
(6 pgs.)                                          51
No. 111 - Enrollment Agreement (1 pg.)     51
No. 112 - Application (4 pgs.)             51
No. 113 - "Series of Questions" (4 pgs.)     51
No. 114 - Academic Transcript (4 pgs.)     51
No. 115 - Acknowledgement (1 pg.)      51
No. 116 - 6-6-04 Note; Harvey to Jennifer
(1 pg.)                                          51
No. 117 - Academic Transcript (1 pg.)     51
No. 118 - Request for Advising (11 pgs.)    51
No. 119 - Student Critique (10 pgs.)     51
No. 120 - E-mail (3 pgs.)                   51
No. 121 - E-mail (2 pgs.)                   51
No. 122 - E-mail Resume Receipts (4 pgs.)     51
No. 123 - Online Applications (128 pgs.)     51
No. 124 - Tax Returns (12 pgs.)           51
No. 125 - Direct Loans, Quarterly Interest
Statement (1 pg.)                            51

REQUEST FOR PRODUCTION
No. 1 - Any Additional Record of Applications
or Responses                                79


SIGNATURE OF WITNESS          86

CERTIFICATE                         87

## Page 4

1              CARL M. JAMIESON,
2    having been first duly sworn on his oath to
3    state the truth, the whole truth, and nothing
4    but the truth, testifies as follows:
5             DIRECT EXAMINATION
6  MR. HERREN:
7  Q.  Would you state your full name, please.
8  A.  Carl Milton Jamieson.
9  Q.  Mr. Jamieson, where do you currently live?
10  A.  I currently live at 328 Clinton in Haysville.
11  Q.  And did I hear you tell the court reporter
12    that you're getting ready to move?
13  A.  Yes, sir.
14  Q.  What will your new address be?
15  A.  1114 North Spruce, and that's in Kingman.
16  Q.  And why are you moving to Kingman?
17  A.  I'm -- my niece -- currently I'm living with
18    one of my sisters and her daughter and her
19    daughter's three children need to move in so
20    they need the room that I have at the moment.
21  Q.  And can you give me the names of all of the
22    people over age 18 that you currently live
23    with in Haysville?
24  A.  Over the age of 18?
25  Q.  Yes.

## Page 5

1  A.  My father, Austin Jamieson; my sister, Nadine
2    Armstrong; and my niece, Christy Regal.
3  Q.  And who will you be living with in Kingman?
4  A.  My younger brother.
5  Q.  What's his name?
6  A.  Griffin.
7  Q.  Jamieson?
8  A.  Yes.
9  Q.  Have you ever given a deposition before,
10    Mr. Jamieson?
11  A.  No.
12  Q.  Have you had an opportunity to speak with
13    your attorney about generally what a
14    deposition is and why we're here?
15  A.  Yes.
16  Q.  If I ask you any question that you don't
17    understand, either because I mumble or
18    because I simply ask a poor question, I want
19    you to feel free to ask me to restate the
20    question, okay?
21  A.  Okay.
22  Q.  Because it's very important that we
23    communicate clearly to each other today.
24    I also want to make sure that you
25    understand that everything I say and

Page 6

1    everything you say will be taken down word
2    for word by the court reporter here; do you
3    understand that?
4    A.  Yes, I do.
5    Q.  And do you understand that the transcript of
6    this may end up being read in court and so it
7    might have the same effect as if we were in
8    the courtroom today; do you understand that?
9    A.  Yes.
10   Q.  If you need to take a break at anytime, let
11   me know and I'll do my best to accommodate
12   you.  We're not in any kind of a marathon
13   session here.
14   A.  Okay.
15   Q.  You're doing a good job so far but it's also
16   important for you to wait until I completely
17   finish my question before you answer since
18   the court reporter can only type one of us at
19   a time.
20   A.  Okay.
21   Q.  Are you currently taking any medication,
22   either prescription or nonprescription, that
23   would affect your ability to either
24   understand my questions or formulate your
25   answers?

Page 7

1    A.  I am taking medications but I don't know if
2    they would affect my answers.
3        MR. HERREN:  Okay.  Why don't we
4    go off the record for a moment.
5        (Off-the-record discussion.)
6    MR. HERREN:
7    Q.  We've had an off-the-record discussion about
8    the medications you're taking.  Are you
9    taking any narcotic medications?
10   A.  Not at present, no.
11   Q.  Are you taking any medications that we
12   discussed that to your knowledge would have
13   any impact on your ability to understand my
14   questions or form a clear answer?
15   A.  I don't believe so.
16   Q.  If at anytime during the deposition you
17   believe that any of your medication is
18   starting to impair your ability to either
19   understand my questions or formulate the
20   answers that you want to give me, will you
21   let me know?
22   A.  Yes, I will.
23   Q.  Do you have any medical condition underlying
24   all of this that would affect your ability to
25   sit in this deposition and understand my

Page 8

1    questions and respond accurately?
2    A.  Not to my knowledge.
3    Q.  When you attended Vatterott, you were not
4    married; is that correct?
5    A.  Correct.
6    Q.  You're not married now?
7    A.  Correct.
8    Q.  Have you ever been married?
9    A.  Yes.
10   Q.  Were you married at anytime after the year
11   2002?
12   A.  No.
13   Q.  Do you have any children?
14   A.  Yes.
15   Q.  How many?
16   A.  Four.
17   Q.  Do any of them live in the Wichita area?
18   A.  No.
19   Q.  What's the age of the youngest of the
20   children?
21   A.  13.
22   Q.  Did any of them live with you when you
23   attended school at Vatterott?
24   A.  No.
25   Q.  It looks like you're a Shawnee Mission South

Page 9

1    High School graduate?
2    A.  Yes.
3    Q.  And you attended Lakeside School in Granite,
4    Oklahoma?
5    A.  Yes.
6    Q.  What kind of a school is that?
7    A.  It was a reformatory.
8    Q.  How long were you at Lakeside School?
9    A.  18 months.
10   Q.  And that was after high school?
11   A.  Yes.
12   Q.  Did you study any particular curricula of
13   classes?
14   A.  Drafting.
15   Q.  Did you receive any type of certification or
16   diploma or degree?
17   A.  No.
18   Q.  And then did you next attend Central State
19   University in Oklahoma?
20   A.  Yes.
21   Q.  And about how many hours did you complete at
22   Central State University in Oklahoma?
23   A.  It was two semesters, if I remember right.  I
24   think ten hours.
25   Q.  Ten hours total?

Page 10

1   A.  I believe so.
2   Q.  And were you a full-time student at Central
3       State University?
4   A.  Yes.
5   Q.  And was your next schooling at Newman
6       University?
7   A.  Yes.
8   Q.  And how long did you attend at Newman?
9   A.  One semester.
10  Q.  And do you know how many credit hours you
11      completed there?
12  A.  Three.
13  Q.  And were you a full or a part-time student at
14      Newman?
15  A.  Part-time.
16  Q.  What class did you take at Newman?
17  A.  I took psychology and biology and journalism.
18  Q.  So three different classes?
19  A.  Yes.
20  Q.  And you started at Vatterott in October
21      of 2003?
22  A.  I believe that's right.
23  Q.  And you graduated from Vatterott in December
24      of 2004?
25  A.  Yes.

Page 11

1   Q.  And from some of your previous responses to
2       written questions, it looks like you've done
3       a fair amount of carpentry work in your life?
4   A.  Yes, sir.
5   Q.  And at the time you were enrolled at
6       Vatterott were you employed anywhere?
7   A.  Yes.
8   Q.  Were you working anywhere when you first
9       enrolled at Vatterott?
10  A.  No.
11  Q.  Had you just completed your job at
12      Van Buskirk Construction?
13  A.  Prior to starting at Vatterott, yes.
14  Q.  And why did you leave Van Buskirk
15      Construction?
16  A.  My employer slowed down and I was no longer
17      necessary.
18  Q.  And what was the first job you obtained while
19      you were at Vatterott going to school?
20  A.  I was a maintenance man for five different
21      daycare centers.
22  Q.  And did you get that job in April of 2004?
23  A.  I believe that's when I started.
24  Q.  And your next job after that was through
25      Adecco working at CCH?

Page 12

1   A.  Yes.
2   Q.  And that was in September of 2005?
3   A.  I believe that's right.
4   Q.  And your next job after that was through
5       Spherion working again at CCH?
6   A.  Yes.
7   Q.  And have you had any employment after the
8       Spherion job at CCH?
9   A.  Yes.
10  Q.  Where is that?
11  A.  At, again, at CCH through Kelly Services.
12  Q.  And when did that job start?
13  A.  I think it was March of this year.
14  Q.  And are you still working at that job or has
15      it completed?
16  A.  No.  I'm not working.  I'm unemployed.
17  Q.  When did the Kelly Services CCH job stop?
18  A.  September 21.
19  Q.  Do you have any professional certifications
20      or licenses that you've ever had in your
21      career since high school?
22  A.  No.
23  Q.  Do you have any physical disabilities?
24  A.  Yes.
25  Q.  What are those?

Page 13

1   A.  The COPD, and then I have a -- I forget the
2       medical term.  Basically, a hernia that runs
3       down the center of my stomach.  And I have a
4       pin in my left hip and my right knee I've had
5       surgery on and I was born with a deformed
6       back.  Technical term for that is spina
7       bifida occulta.
8   Q.  Has any doctor or workman's compensation
9       entity ever given you a disability rating?
10  A.  No.
11  Q.  Are you currently disabled --
12  A.  No.
13  Q.  -- under the standards of Social Security?
14  A.  No.
15  Q.  Have you received any formal education at any
16      technical school or college after you
17      completed Vatterott?
18  A.  No.
19  Q.  Have you ever been a plaintiff or a defendant
20      in a civil lawsuit before this one?
21  A.  No.
22  Q.  Have you ever been convicted of or pled
23      guilty to a felony or a misdemeanor other
24      than a traffic violation?
25  A.  Within the last ten years?

Page 14

1  Q.  At anytime.
2  A.  Yes.
3  Q.  Tell me what that is.
4  A.  That was possession of marijuana.
5  Q.  And when was that?
6  A.  That was back in 1970 -- in the '70s.
7  Q.  Any other felony or misdemeanor plea or
8      conviction?
9  A.  No.
10 Q.  Have you ever been in the military?
11 A.  No.
12 Q.  How did you first hear about Vatterott?
13 A.  Job fair at the Century II.
14 Q.  Do you remember when that was?
15 A.  It was about two months before I enrolled.
16 Q.  And that was after Van Buskirk Construction
17     had let you go?
18 A.  Yes.
19 Q.  And did you pick up any written materials
20     from Vatterott at that job fair at
21     Century II?
22 A.  Yes.
23 Q.  You still have any of these written materials
24     with you?
25 A.  I've lost track of them.

Page 15

1  Q.  What was your first contact with anyone at
2      Vatterott other than at that job fair?
3  A.  It was the next day after the job fair I got
4      a phone call from Debra Ann Mancusco to set
5      up an appointment to tour the school.
6  Q.  Do you remember if you spoke with anyone from
7      Vatterott at the job fair?
8  A.  Yes.
9  Q.  Who did you speak with?
10 A.  Linda McClure.
11 Q.  Do you remember any details of that
12     conversation with Linda McClure at the
13     Century II job fair in the summer of 2003?
14 A.  I was just asking about the school, just
15     general information.
16 Q.  And you presumably filled out some type of a
17     form that had your phone number on it?
18 A.  Yes.
19 Q.  So the next day you got a call from -- who
20     did you say at the school?
21 A.  Debra Ann Mancusco.  She was the counselor
22     there.
23 Q.  And what do you remember about that telephone
24     call?
25 A.  That she was exuberant and was looking

Page 16

1      forward to me coming in and touring the
2      school.
3  Q.  So she offered an invitation for you to tour
4      the school?
5  A.  Yes.
6  Q.  And did you set up a time at that time?
7  A.  Yes, I did.
8  Q.  And how many days later was it before you
9      went in to tour the school?
10 A.  It was only a couple of days if I remember
11     correctly.
12 Q.  So on your first visit to the school who did
13     you meet with?
14 A.  Debra Ann Mancusco.
15 Q.  Did you meet with or talk to any other
16     Vatterott person during your first visit to
17     the school?
18 A.  Yes.
19 Q.  Who else?
20 A.  I was introduced to Linda McClure and Darlene
21     Smith in Career Services.
22 Q.  I'm sorry, what was the last name?
23 A.  Darlene Smith.
24     I was also introduced to the computer
25     programming teachers, Susan Coomes and Ray

Page 17

1      Costello.  I was introduced to several of the
2      other teachers but I honestly do not remember
3      their names.  They were in different classes.
4  Q.  Other departments?
5  A.  Other departments, yeah.
6  Q.  The day you made this first visit to
7      Vatterott, was that the same day that you
8      signed your Enrollment Agreement?
9  A.  Yes.
10 Q.  Does September 23rd, 2003, sound correct then
11     if that's the date that's on your Enrollment
12     Agreement?
13 A.  That's about right.
14 Q.  So on your first visit you met with or were
15     introduced to Debra Mancusco, Linda McClure,
16     Darlene Smith, Susan Coomes, Ray Costello and
17     some other teachers from other departments
18     whose names you do not remember?
19 A.  Correct.  And I was also introduced to the
20     rest of the front office staff.
21 Q.  Do you remember any of the specifics of any
22     of your conversations that day with Linda
23     McClure the day of your first visit?
24 A.  Yes.  She was telling me that Vatterott
25     students were in high demand, that they had

Page 18

1      connections, that Vatterott had connections
2      with aircraft industries, Koch Industries,
3      Coleman and other industries.  And that they
4      were clamoring for Vatterott graduates.
5    Q.  Was clamoring her word or is that a word
6      you're assigning to describe what she told
7      you?
8    A.  I remember it as her word.
9    Q.  Anything else you remember Linda McClure
10     telling you?
11   A.  She also said that within two years of
12     graduation I would be making -- I should be
13     making a six figure income.
14   Q.  Was this all in one conversation you had with
15     Linda McClure during your first visit to
16     Vatterott?
17   A.  I believe so.
18   Q.  Do you remember where you were when this took
19     place?
20   A.  In the Career Services area.
21   Q.  In an office, in the hallway?
22   A.  I think it was in their office.
23   Q.  Was anyone else in the room at this time?
24   A.  Darlene Smith.
25   Q.  Anyone else?

Page 19

1    A.  Myself and Debra Ann Mancusco and that was
2      it.
3    Q.  So there were four of you in the room when
4      Linda made these statements?
5    A.  Yes.
6    Q.  Anything else specifically that you remember
7      Linda saying during your first visit to
8      Vatterott?
9    A.  Just that she was exuberant and upbeat. Made
10     me feel very confident in them.
11   Q.  Do you remember anything specifically from
12     that first visit to Vatterott that Darlene
13     Smith said to you?
14   A.  Not specifically, no.
15   Q.  Do you remember generally anything Darlene
16     Smith said to you that first meeting?
17   A.  That she was upbeat also.
18   Q.  Anything else you remember about Darlene
19     Smith that first meeting?
20   A.  That they were always there, more than happy
21     to help us at anytime.
22   Q.  Do you remember anything specifically that
23     Susan Coomes said to you during your first
24     visit to Vatterott?
25   A.  Exact words, I don't remember the exact words

Page 20

1      but she was looking forward to having me in
2      her class, that they had a good group of
3      students.
4    Q.  Anything else you remember from Susan during
5      your first visit to Vatterott?
6    A.  Not specifically.
7    Q.  How about Ray Costello, do you remember
8      anything that he said to you during your
9      first visit to Vatterott?
10   A.  Susan was the one that did most of the
11     talking.  They were together in the hallway
12     and he just kind of backed her up.
13   Q.  Do you remember any of the specific things
14     said to you by any of the other teachers from
15     other departments that you met during your
16     first visit to Vatterott?
17   A.  Just the general feeling that everybody was
18     upbeat and that it was a good place to be.
19   Q.  Do you remember anything specifically said to
20     you by any of the front office staff that you
21     met during your first visit to Vatterott?
22   A.  The financial aid, when I went in to sign up
23     and enroll, I don't remember who the lady was
24     in financial aid at that time, but when I was
25     enrolling and she told me about the Pell

Page 21

1      grant and the loan that I would be taking
2      out.  I remember being set back by the amount
3      but she assured me that after graduating
4      Vatterott, that paying back that loan
5      wouldn't be a problem for me.
6    Q.  Anything else you remember being told by any
7      of the front office staff during your first
8      visit to Vatterott?
9    A.  Not specific.  Not specific words.  But
10     everybody was upbeat, told me that they were
11     there for me at anytime, to, you know, call
12     on them for any needs that I might have.
13   Q.  Anything else?
14   A.  Not specifically, no.
15   Q.  Do you remember anything that Debra Ann
16     Mancusco told you during your first visit to
17     Vatterott?
18   A.  She told me about the other campuses,
19     basically a history of Vatterott and how it
20     had grown and what the main offices were
21     like, the other departments that they have
22     there.  Just kind of gives me an overall
23     view.
24   Q.  Is there anything else you remember Debra Ann
25     Mancusco telling you during your first visit

Page 22

1    to Vatterott?
2    A.  She told me she thought I would do well
3       there.
4    Q.  Anything else you remember her telling you
5       during your first visit to Vatterott?
6    A.  Not specifically, no.
7    Q.  So you were given some materials that same
8       day, you signed some forms and signed your
9       Enrollment Agreement that same day?
10   A.  I believe so.
11   Q.  Did you visit the school or have telephone
12      contact with anyone else from Vatterott
13      before you showed up for your first day of
14      class?
15   A.  I think I remember getting a phone call from
16      Debra Ann Mancusco reminding me of the start
17      date.
18   Q.  Any other contact with Vatterott after the
19      day you signed up before you started class?
20   A.  I don't believe so.
21   Q.  Have you described to me all of the
22      statements you remember from Debra Mancusco,
23      Linda McClure, Darlene Smith, Susan Coomes,
24      Ray Costello, any of the other teachers or
25      any of the front office staff made to you

Page 23

1       during your first visit to Vatterott?
2    A.  I believe so.
3    Q.  Of the statements you've described to me, do
4       you believe today that any of those were
5       misrepresentations by Vatterott?
6    A.  Yes.
7    Q.  Which ones?
8    A.  That I would be making the six figure income,
9       that they had connections with the aircraft
10      industries and Koch and Coleman, and that
11      when I graduated from Vatterott, that I would
12      be a -- I'd be qualified as an entry level
13      computer programmer.
14   Q.  Maybe my notes are missing something but I
15      don't remember you telling me that someone
16      told you that you would be qualified to be an
17      entry level computer programmer.  Who told
18      you that?
19   A.  Oh, yeah.  I believe it was Linda McClure.
20   Q.  All right.  Do you believe any of the other
21      statements were things said to you by any of
22      those people on your first visit to Vatterott
23      were misrepresentations?
24   A.  Not that I can recall at the moment.
25   Q.  Linda McClure give you anything in writing in

Page 24

1       connection with this statement you say she
2       made about a six figure income?
3    A.  No.
4    Q.  Did she give you anything in writing in
5       connection with the statement you said she
6       made about having connections with the
7       aircraft industry, Koch and Coleman?
8    A.  I don't believe so.
9    Q.  What is it about the statement about having
10      connections with the aircraft industry, Koch
11      and Coleman that you now believe was a
12      misrepresentation?
13   A.  That they were clamoring for Vatterott
14      graduates.
15   Q.  Anything else that you believe was a
16      misrepresentation about that comment of Linda
17      McClure's about Vatterott having connections?
18   A.  Well, I am not qualified to be an entry level
19      computer programmer.
20   Q.  How do you know that?
21   A.  From talking to prospective employers and
22      other Vatterott graduates.
23   Q.  Do you have any way of describing to me what
24      you believe you would need to be qualified as
25      an entry level computer programmer?

Page 25

1    A.  I believe that if any one of the languages
2       that I was taught was applied for the full 60
3       weeks that I was there, that I would come
4       close to having the knowledge but I would
5       still need a degree.
6    Q.  What is your definition as you're using it in
7       this context of entry level computer
8       programmer?
9    A.  When I signed up for Vatterott, I was
10      interested in securing Internet security and
11      I was hoping to be able to apply what I had
12      learned there to start, you know, making the
13      Internet more secure.
14   Q.  So it sounds like that was a job or a career
15      goal that you had for yourself, correct?
16   A.  Yes.
17   Q.  Do you have any way of defining for me what
18      qualifications you think are necessary for an
19      entry level computer programming job other
20      than simply saying that you would need more
21      training than you received at Vatterott?
22   A.  I'm sorry, I lost the thread of the question.
23      Would you repeat that, please, for me.
24   Q.  It's probably just a poor question.  Let me
25      re-ask it.

Page 26

1    What is your definition of computer
2  programming?
3  A.  Writing and implementing programs toward a
4    specific function.
5  Q.  In your definition, do all computer
6    programming related jobs involve the actual
7    writing and implementing of programs toward a
8    specific function?
9  A.  Yes, as I understand it.
10  Q.  When did you first understand that the term
11    computer programming as used in the Vatterott
12    curricula was broader than that definition
13    you just gave me?
14  A.  During my last phase just before graduation.
15  Q.  So you never read the catalog before your
16    last phase before graduation?
17  A.  Oh, yes, I did.
18  Q.  Did you read Vatterott's description of what
19    it considered to be its computer programming
20    area?
21  A.  Yeah.  But I've got to admit my naivety in
22    not really understanding.
23  Q.  Well, it obviously said a lot more than
24    writing and implementing programs toward a
25    specific function, didn't it?

Page 27

1  A.  I don't remember exactly what it said.
2  Q.  When you applied to Vatterott, you didn't
3    limit your statements of what you were
4    seeking to only wanting to be qualified to
5    write and implement programs toward a
6    specific function, did you?
7  A.  When I was asked why I applied there, I told
8    the person, and I don't remember who it was
9    exactly, that I was interested in Internet
10    security and I was assured that that was part
11    of the curriculum.
12  Q.  Do you believe a person can be involved in
13    Internet security without being an actual
14    computer programmer defining that as someone
15    who actually writes and implements programs?
16  A.  I imagine so but I wouldn't know what it
17    would be.
18  Q.  Do you consider yourself to be an expert in
19    the necessary qualifications for an entry
20    level computer programming job as that job
21    was defined in the Vatterott catalog?
22  A.  No.
23  Q.  Is there any other statement that you believe
24    was made to you or anything in writing before
25    you enrolled that you believe was a

Page 28

1    misrepresentation other than what we've just
2  discussed?
3  A.  I can't think of any right at the moment.
4  Q.  Do you believe you've received any
5    misrepresentations from Vatterott after you
6    enrolled?
7  A.  I'm sure I did but at the time I don't -- at
8    the time I don't think I realized it.  I
9    remember the first week of school everything
10    was real upbeat and, you know, we're going to
11    have a good time, we're going to learn this
12    to get you on your way to a new career, a new
13    future.
14  Q.  You're not saying that the fact that the
15    instructors were upbeat is some type of
16    misrepresentation, are you?
17  A.  No.  No.
18  Q.  With what you know today, can you think of
19    any misrepresentation that was made to you in
20    any form by any person or in any writing made
21    to you after you enrolled at Vatterott?
22  A.  After I enrolled, that I would be qualified
23    as an entry level computer programmer.  But
24    who specifically said that, I can't remember.
25    I do remember that conversation coming up

Page 29

1    though.
2  Q.  Any other misrepresentations after you
3    enrolled?
4  A.  Not that comes to mind.
5  Q.  Were you a day student or a night student at
6    Vatterott?
7  A.  Day.
8  Q.  For all six phases?
9  A.  Yes.
10  Q.  Did your work at Knowledge Learning Corp
11    interfere with your school schedule?
12  A.  No.
13  Q.  When did you work?  What hours would you
14    work?
15  A.  Afternoons, after I left school.
16  Q.  So you are not claiming that anyone
17    misrepresented to you before you signed your
18    Enrollment Agreement the assistance you would
19    get from the Career Services group?
20  A.  Would you say that again, please.
21  Q.  You are not claiming that anyone at Vatterott
22    misrepresented to you before you signed your
23    Enrollment Agreement the assistance you would
24    get from the Career Services group?
25  A.  No, that's not right.  It was

Page 30

1   misrepresentation of what they did tell me.
2   Q.   I don't think that was in what you told me
3       before.  Who said something to you before you
4       enrolled about Career Services' assistance?
5   A.   It was during the tour of the school when I
6       talked to the people in Career Services
7       before I enrolled.
8   Q.   Who did you speak with in Career Services?
9   A.   That was Linda McClure and Darlene Smith.
10  Q.   And who said what to you in connection with
11      assistance?
12  A.   Linda McClure said that they had connections
13      with Koch and Coleman, in the aircraft
14      industries and that they were clamoring for
15      Vatterott graduates and that within about two
16      years after I graduated I should be making a
17      six figure income.
18  Q.   Okay.  So you're not claiming that they said
19      anything to you about the services their
20      group would provide, you're saying that the
21      misrepresentation was the connections they
22      claimed to have but you think didn't have and
23      that within two years you would be making a
24      six figure income?
25  A.   And also that when I graduated, I would be

Page 31

1       qualified as an entry -- to become an entry
2       level computer programmer.
3   Q.   Okay.  Do you believe you received assistance
4       in your job search from the Career Services
5       people at Vatterott?
6   A.   A little.
7   Q.   Are you claiming that the assistance you
8       received from Career Services was deficient
9       in any way?
10  A.   There wasn't a whole lot of it.  I was told
11      that they sent out my resume but they never
12      did tell me exactly who they sent it to so I
13      could respond.
14  Q.   Are you claiming in this lawsuit that the
15      assistance you received from Career Services
16      was less than what was represented to you
17      before you signed your Enrollment Agreement?
18  A.   I believe so, yes.
19  Q.   In what ways?
20  A.   I don't believe that they really sent out a
21      lot or followed up.  When Susan Coomes was
22      there, was transferred into Career Services,
23      she was the one that got me the part-time job
24      at Knowledge Learning Center.  But she wasn't
25      able to find anything in an entry level

Page 32

1       computer programming job either.
2   Q.   That was before you had even graduated,
3       correct?
4   A.   Correct.
5   Q.   Do you know the places that Career Services
6       sent your resume?
7   A.   No.
8   Q.   Have you ever asked them?
9   A.   Yes.
10  Q.   And what were you told?
11  A.   Nothing.  I was told that they would look it
12      up and get back with me.
13  Q.   When was that?
14  A.   That was toward the end of -- it was during
15      the last phase I believe.
16  Q.   Before you graduated?
17  A.   Yes.
18  Q.   And are you aware of any of the places they
19      sent your resume after you graduated?
20  A.   No.
21  Q.   Did you ever have any discussions, either
22      telephone, in person or E-mail with anyone at
23      Career Services after you graduated?
24  A.   I contacted them by phone a couple of times.
25  Q.   Was that the only contact you had with Career

Page 33

1       Services after you graduated from Vatterott?
2   A.   Until they contacted me about the job at
3       Adecco for CCH.
4   Q.   So they contacted you about the job you ended
5       up getting at CCH through Adecco?
6   A.   Yes.
7   Q.   And did they send your resume for that?
8   A.   I do not know.
9   Q.   Did you send your resume to Adecco?
10  A.   No.
11  Q.   Can you think of anyone else that would have
12      sent your resume to Adecco for the CCH job if
13      you didn't send it other than Vatterott?
14  A.   No.
15  Q.   Do you remember telling the people in Career
16      Services you were going to apply online for a
17      Ryan Aviation position shortly after you
18      graduated?
19  A.   I could have.  I applied to a lot of places.
20  Q.   Did you remember Career Services sending your
21      resume to Heartland Open MRI?
22  A.   No.
23  Q.   How about to Preferred Health Systems?
24  A.   No but I think I did.
25  Q.   How about Pulse?

Page 34

1  A.  No but I think I did.
2  Q.  How about All Solutions?
3  A.  I could have sent one to them but I don't
4     know about Career Services.
5  Q.  Do you remember them sending your resume to
6     KG & Associates?
7  A.  No.  But I remember sending one to a KG.
8  Q.  How about to Contech?
9  A.  That doesn't sound familiar.  Doesn't mean I
10    didn't.
11 Q.  Do you remember Career Services sending your
12    resume to Contech?
13 A.  No.
14 Q.  So the only contact you remember having with
15    anyone in Career Services, whether they
16    initiated it or you initiated it, after you
17    graduated was shortly before you got your job
18    at CCH through Adecco?
19 A.  There was a period of time, I don't remember
20    exactly how long, between the time that I
21    graduated and that I started at Adecco.
22    Several months.
23 Q.  The records indicate you graduated in
24    December of 2004 and you started your job at
25    CCH through Adecco in September of 2005.

Page 35

1     Does that sound correct?
2  A.  Sounds about right.
3  Q.  Is it your memory that you had no contact
4     with Career Services after you left Vatterott
5     until shortly before you started your job at
6     CCH in September of 2005?
7  A.  No.  I think I -- I think I was in contact
8     with Career Services by phone a couple of
9     times shortly after I graduated.
10 Q.  And by "shortly after," what do you mean?
11 A.  Probably within the following month, I
12    remember calling at least twice.
13 Q.  So that would be in approximately January
14    of 2005?
15 A.  Approximately.
16 Q.  So from February 2005 until shortly before
17    you started your new job at CCH in September
18    of 2005, you had no contact with Career
19    Services?
20 A.  I could have but I don't remember.  I think I
21    remember getting frustrated and giving up on
22    them.
23 Q.  And do you remember all of your contact after
24    you graduated -- let me start again.
25    Do you remember that all of your

Page 36

1     contact with Career Services after you
2     graduated was by telephone or was there any
3     other method of communication?
4  A.  I stopped by once.  I don't remember the
5     exact reason.
6        No.  It was just before Christmas
7     because I got a -- they gave me a refund
8     check.  I remember they were saying that
9     they're glad I stopped by so they didn't have
10    to mail it to me.  But I believe I also
11    talked to Career Services at that time.  I
12    don't really remember -- I don't remember
13    that that was the specific reason for my
14    stop.
15 Q.  What was the refund check for?
16 A.  Was out of the Pell grant, I believe.  I
17    remember it was for about $600.
18 Q.  When was that?
19 A.  That was just before Christmas.
20 Q.  In 2004?
21 A.  Yes.  It would have to have been.
22 Q.  So you remember after you graduated having a
23    brief stop by visit when you picked up your
24    refund check and you remember a couple of
25    phone calls in about January of 2005 and you

Page 37

1     remember some contact shortly before you
2     started your September 2005 job --
3  A.  Yes.
4  Q.  -- correct?
5  A.  Correct.
6  Q.  Any other contact of any other kind that you
7     remember having with Career Services after
8     you graduated before you started at CCH?
9  A.  No, not that I recall.
10 Q.  Did you use Career Services to help you with
11    your resume?
12 A.  Yes.
13 Q.  Did you use Career Services for mock or fake
14    interviews?
15 A.  No.
16 Q.  Did you go to any career fairs while you were
17    at Vatterott?
18 A.  No.
19    Oh, let me take that back.  No.  There
20    was one that was at Vatterott that was -- it
21    was actually mainly military.
22 Q.  Did you attend any Vatterott career fairs
23    regardless of whether they were held at
24    Vatterott or at Century II or anywhere else
25    other than the one you just told me about?

Page 38

1   A.  It seems like there was one but I really
2       don't remember details.
3   Q.  You remember if you spoke with any
4       prospective employers at the career fair you
5       attended?
6   A.  No, I did not.
7   Q.  Did you use any materials from Career
8       Services on how to conduct a job search?
9   A.  I don't believe so.
10  Q.  Have you ever attempted to transfer your
11      credits from Vatterott to any other
12      institution?
13  A.  No.
14  Q.  So you personally are not claiming any damage
15      related to an inability to transfer Vatterott
16      credits?
17  A.  No.  I was told by other students who tried
18      that they weren't being accepted.
19  Q.  Have you talked to any students who have
20      transferred their credits?
21  A.  As far as I could -- the people I've talked
22      to, there's no college that would take those
23      hours as credit.
24  Q.  If I've asked you this, I apologize.  The job
25      you had through Kelly Services at CCH, why

Page 39

1       are you no longer working at that job?
2   A.  I was terminated due to excessive illness.
3   Q.  And what illness was that?
4   A.  Migraine headaches and COPD acting up.
5       Mainly migraine headaches.
6   Q.  What is COPD?
7   A.  Chronic obstructive pulmonary disease.  It's
8       a disease of the lungs.
9   Q.  Were you ever terminated from any other job
10      in your career other than the Kelly Services
11      CCH job?
12  A.  I've been laid off.
13  Q.  Other than layoffs, have you ever been
14      terminated before this last position?
15  A.  No.
16  Q.  As you probably understand, a major reason
17      for a deposition is for me to discover
18      everything that you might talk about at trial
19      so that's why I keep asking you this question
20      over and over:  Now that we've had the
21      discussion that we've had so far, have you
22      thought of any other misrepresentations that
23      you believe were made to you at anytime in
24      any form by anyone at Vatterott?
25  A.  Well, you reminded me about the college

Page 40

1       credits.  I was told that they were
2       accredited.  And it was my plan to further my
3       education but once I discovered that the
4       other students could not transfer their
5       credits, I didn't even try.
6           I was told that when I graduated, I
7       would be qualified for an entry level
8       computer programming position and that turned
9       out to be wrong.  While trying to obtain a
10      job, when I started really seriously looking,
11      I discovered that the languages that I had
12      been taught rarely showed up in
13      qualifications for a job that was being
14      offered.  And in almost always they were
15      asking for a degree.  I'm definitely not
16      making a six figure income.
17  Q.  Did anyone at Vatterott promise that you
18      would have employment after you completed
19      your work?
20  A.  They didn't actually come out and say I
21      promise you this job.  They said that with
22      their connections, that industries were
23      clamoring for Vatterott students.  And I
24      guess I assumed that that was a promise.
25  Q.  In fact, on your written agreement, your

Page 41

1       contract, they specifically said, did they
2       not, that Vatterott was not guaranteeing you
3       any employment?
4   A.  That's right.  But I was also told at the
5       time of initialing all of those, that it was
6       just a formality, not to worry about it, that
7       it didn't mean anything.
8   Q.  Who told you that the Enrollment Agreement
9       didn't mean anything?
10  A.  I don't remember the gentleman's name.  It
11      was a man, though.  Because I asked about it.
12  Q.  What caused you to be talking to this man?
13  A.  He was the one that was enrolling me.  He was
14      the one that gave me the test.  We had to
15      take a test, pretty simple one.  But after I
16      took the test, came out and told me I passed
17      and had the enrollment papers.
18  Q.  Do you remember going through the Enrollment
19      Agreement with Debra Mancusco?
20  A.  We didn't go line by line, no.
21  Q.  Do you remember going through the contents of
22      the Enrollment Agreement with Debra Mancusco?
23  A.  No.
24  Q.  Do you remember who was in the room when you
25      signed your Enrollment Agreement?

Page 42

1  A.  It was just the gentleman that gave me the
2      test and had the enrollment papers.
3  Q.  And it's your memory that Debra Mancuso was
4      not there when you signed your agreement?
5  A.  I don't believe she was, no.
6  Q.  You didn't mention a gentleman as someone you
7      spoke with during your first visit.  Do you
8      know -- can you give me any more description
9      of this person?
10 A.  Was a long time ago.  All I really remember
11     is the only time I saw him was when he came
12     out to give me the test, after I finished the
13     test he came and collected the paper, was
14     gone for a bit, came back, took me into an
15     empty office and told me that I had passed
16     and he had the enrollment papers and at that
17     time I enrolled.
18 Q.  What enrollment papers do you remember him
19     having?
20 A.  There was a bunch of them.  It was the form
21     that you referred to, he had me initial
22     several items but I don't remember for sure
23     what else he had.
24 Q.  What did this man look like?
25 A.  A little shorter than I am, dark hair.

Page 43

1  Q.  How tall are you?
2  A.  I'm 5"9.  He was about 5"6 or 7.
3  Q.  About how old?
4  A.  I'd say in his 40s.
5  Q.  Mustache, beard?
6  A.  No.
7  Q.  Glasses?
8  A.  No.  I don't think so.
9  Q.  Long hair, short hair?
10 A.  Short, businessman's haircut.
11 Q.  Caucasian?
12 A.  Caucasian.
13 Q.  Did you ever see him again around there after
14     you enrolled?
15 A.  No.  Come to think of it, I never did.
16 Q.  You said something a few minutes ago about
17     the school being accredited.  Do you have
18     some belief that Vatterott is not accredited?
19 A.  The fact that when other students tried to
20     apply the hours they had at Vatterott to
21     college -- to different colleges, that the
22     colleges would not accept it.
23 Q.  So you're using the term accreditation to
24     mean the same thing as transfer of credits
25     from Vatterott to certain other schools?

Page 44

1  A.  Yes.
2  Q.  So you're not making a claim that Vatterott
3      is not accredited by any accrediting agency,
4      are you?
5  A.  I didn't try to transfer any credits.
6  Q.  Do you remember what the Vatterott catalog
7      told you about transferability of credits to
8      other institutions?
9  A.  No, I don't.
10 Q.  You've not spoken to any of your fellow
11     students who have successfully transferred
12     their credits?
13 A.  No.  I've never -- I haven't talked to
14     anybody who was successful.
15 Q.  Did you know that one of your fellow
16     plaintiffs has done that?
17 A.  No.  Which one?
18 Q.  I can't remember.
19 A.  I know several who tried and were turned
20     down.
21 Q.  I think it's someone we spoke to this week.
22        MR. JOHNSON:  There hasn't been
23     anybody that's transferred their programming
24     credits.
25        MR. HERREN:  I thought someone

Page 45

1      testified that they had transferred 48 of 60
2      credits.
3          MR. JOHNSON:  No.
4  MR. HERREN:
5  Q.  Are you claiming in this lawsuit that you
6      were trained in improper computer languages
7      or codes?
8  A.  I'm claiming that the languages that I was
9      trained in, the training was minimal and that
10     most of the languages that I was trained in,
11     I never saw come up in any job offers.
12         MR. HERREN:  This is our usual
13     break point.  If you want to take a break or
14     I can keep going for a while, it's up to you.
15         MR. JOHNSON:  You want to take a
16     break?
17         THE WITNESS:  I'm fine myself.
18 MR. HERREN:
19 Q.  Now have we discussed all of the
20     misrepresentations you believe were made to
21     you at anytime, in any form by anyone at
22     Vatterott?
23 A.  I believe so --
24 Q.  Let me ask --
25 A.  I could be wrong.

12 (Pages 42 to 45)

1  Q.  Let me ask you a series of questions about
2      any complaints you had with the different
3      phases of your education starting with
4      Phase 1.  Do you have any complaints about
5      the education you received from Vatterott
6      during Phase 1?
7  A.  That was Microsoft Office and no, other than
8      we had to run through everything fairly
9      quickly.
10 Q.  Do you agree that it was a good thing to
11     learn about Microsoft Office?
12 A.  Yeah.  I knew quite a bit to begin with but I
13     didn't know a lot about Access.
14 Q.  Which is a common database software tool,
15     correct?
16 A.  Yes.
17 Q.  And database management is one of the areas
18     that Vatterott said they would provide
19     training in, correct?
20 A.  They said that they would provide training in
21     it but that's not what I signed up for.  I
22     signed up for computer programming and I made
23     that clear when I signed up.
24 Q.  And is that one of your basic complaints in
25     this lawsuit?

1  A.  That I am not qualified to become an entry
2      level computer programmer?  Yeah.  That's
3      one -- that's my main complaint.
4  Q.  And that things while database management are
5      not what you signed up for?
6  A.  That's not the type of job I was looking for.
7  Q.  Do you believe it was some sort of
8      misrepresentation by Vatterott to train you
9      in subjects such as database management
10     during your time at Vatterott?
11 A.  I'm not the one that set the curriculum.  But
12     I was told that when I signed up, that I
13     would be qualified as an entry level computer
14     programmer.
15 Q.  Part of what I'm trying to figure out today
16     is whether you believe it was somehow
17     improper for you to have been taught, for
18     example, Microsoft Office including Access.
19 A.  I wouldn't say it was improper.
20 Q.  You thought it was useful?
21 A.  Any knowledge is useful.
22 Q.  And you would agree that, for example, Access
23     is useful for someone who might be working in
24     database management?
25 A.  Yes.

1  Q.  Any other complaints you had about Phase 1?
2  A.  No.  Susan Coomes went above and beyond.  She
3      was a good teacher.
4  Q.  Any complaints with Phase 2?
5  A.  Not near enough time in it.
6  Q.  What do you mean by that?
7  A.  Phase 2 for me was Visual Basic and I felt
8      like we were just getting good and started in
9      it when it was time to move on to Phase 3.
10 Q.  Did you feel that was a problem with the
11     school or simply a product of how much there
12     was to learn and you all were in a ten-week
13     phase?
14 A.  The amount of information needed to be really
15     adept in Visual Basic.  There just wasn't
16     enough time.  Ten weeks was not near enough
17     time.  It's the same with all of the
18     languages really.
19 Q.  Any other complaint you have about Phase 2?
20 A.  No.
21 Q.  How about Phase 3, any complaints?
22 A.  I don't remember exactly what my Phase 3 was.
23 Q.  Relational Database Management, Ray Costello,
24     Darlene Smith.
25 A.  Darlene Smith was Gen. Ed. at that time.  Was

1      that SQL?  If that was SQL, I had a difficult
2      time with it.  I would like to have spent
3      more time in it to get a further
4      understanding.
5  Q.  Again, just more material than you felt would
6      be taught in a ten-week session?
7  A.  Yes.
8  Q.  Any other complaints about Phase 3?
9  A.  No.
10 Q.  How about Phase 4; any complaints with
11     Phase 4, Programming with Visual Basic?
12 A.  That was Visual Basic.  No.  I've got no
13     complaints other than too much to learn in
14     too short of time.
15 Q.  You thought Bill Harvey was a wonderful
16     teacher?
17 A.  Yes, I did.
18 Q.  Any other complaints about Phase 4 other than
19     too much material for a ten-week session?
20 A.  No.
21 Q.  How about Phase 5?
22 A.  Phase 5 was JAVA.  And the first week and a
23     half or so we had some kind of IT glitch and
24     were not able to download some pertinent
25     program that we needed to run JAVA.  I

Page 50

```
 1    believe it was during that time that Bill
 2    Harvey had to leave the class occasionally to
 3    go next door but basically, same thing, not
 4    enough time; too much knowledge, not enough
 5    time.
 6  Q.  So you thought JAVA was too much material for
 7    too short of a ten-week session?
 8  A.  Yes.
 9  Q.  But again, you thought Bill Harvey was a good
10    teacher?
11  A.  Yes.
12  Q.  How about Phase 6, any complaints?
13  A.  That was C#.  I found it a little difficult
14    to grasp but there again, a lot of
15    information in too short a time period.  I
16    did start to pick it up.
17  Q.  You always attended the morning sessions?
18  A.  Yes, sir.
19  Q.  And did you all normally go from what time to
20    what time, do you remember?
21  A.  8:00 to noon --
22  Q.  Okay.
23  A.  -- I think.
24  Q.  Maybe 12:30?
25  A.  Could be.
```

Page 51

```
 1  Q.  And you normally left about 12:30 and then
 2    went to your other job?
 3  A.  Yeah.  I had time enough to eat lunch and it
 4    was open-ended enough that I could kind of
 5    set my own hours.  It was originally a
 6    part-time job.
 7  Q.  You had some illness problems while you were
 8    at Vatterott, correct?
 9  A.  Yes.
10  Q.  Now, on the days you were there, you normally
11    started at 8:00 in the morning, went to about
12    12:30 and then left and either went home or
13    when you were working to your job?
14  A.  Correct.
15        MR. HERREN:  I'll go ahead and
16    take a five-minute break and we'll mark some
17    documents.
18        MR. JOHNSON:  Okay.
19        (A recess was taken from 3:04 p.m. to
20    3:20 p.m.)
21        (Deposition Exhibit Nos. 105-125 were
22    marked for identification.)
23  MR. HERREN:
24  Q.  We've taken a break, Mr. Jamieson.  Can you
25    tell me about all of the damages you think
```

Page 52

```
 1    you have suffered as a result of the
 2    Vatterott education you received?
 3  A.  Well, I feel that the time that I spent there
 4    for the career I was looking for is basically
 5    wasted.  The expenses that I incurred during
 6    that time, the total amount of my loan, I
 7    believe is not -- not in line with what I
 8    thought I was going to get as far as the
 9    education.  I definitely did not -- I
10    definitely do not qualify to be an entry
11    level computer programmer.
12  Q.  Can you put any dollar amount on the damages
13    you're claiming in this lawsuit?
14  A.  Not without looking at my notes.
15  Q.  So what would you look at to come up with a
16    dollar figure?
17  A.  Well, I figure -- well, the amount of my loan
18    for sure.  At the moment I've got it
19    deferred.  The -- oh, just the expense of
20    going to school every day, that type of
21    thing.
22  Q.  Who is your loan with?
23  A.  Direct Loans.
24  Q.  And why is it deferred?
25  A.  Because I don't make enough money to make
```

Page 53

```
 1    payments on it with everything else that I've
 2    got and at the moment I'm unemployed.
 3  Q.  Is there any other thing you would look at to
 4    put a dollar figure on the damages you're
 5    claiming in this case?
 6  A.  I've never gone through this before so I
 7    don't know.
 8  Q.  Can you think of any other category or type
 9    of damage other than what you've just
10    described to me?
11  A.  Other than the feeling that I got a raw deal.
12  Q.  Are you claiming in this case that any of the
13    medicine you're on is caused by -- let me
14    start that again.
15        One of the medications that you're on
16    is Prozac, correct?
17  A.  Correct.
18  Q.  And why are you taking Prozac, do you know?
19  A.  I was taking Wellbutrin to -- I'm a smoker
20    and I was taking Wellbutrin to help me stop
21    smoking.  It was no longer available to me.
22    And the Prozac is one of those Wal-Mart $4
23    prescriptions and my doctor transferred me on
24    to that so at least I could afford to
25    continue with the mood elevator to help me at
```

Page 54

1    least cut down on my smoking.
2  Q.  So it's your understanding that you're taking
3    Prozac as an aid to stop or cut back on your
4    smoking and not because of depression?
5  A.  No. I'm not depressed.
6  Q.  Okay. So then it stands to reason that
7    you're not claiming any type of emotional
8    distress or damage in this lawsuit, are you?
9  A.  No.
10  Q.  Who is Daniel Orman?
11  A.  Daniel Orman was a student that started when
12    I did. He was an unfortunate child,
13    unfortunate man. He was born deformed and
14    according to him, he had 26 surgeries on his
15    head and it was my distinct impression that
16    he was slow and should not have been allowed
17    to enroll in Vatterott for the computer
18    programming class. That was just not his
19    interest at all.
20  Q.  Were you critical of the school because you
21    thought it was not Daniel Orman's interest
22    area or because you thought he was not
23    qualified because of his disability to be in
24    the program?
25  A.  I thought he was not qualified due to his

Page 55

1    disability.
2  Q.  Why did you think he was not qualified?
3  A.  During class he would not do the required
4    studies that we were doing, the projects that
5    we were supposed to do. He was more into
6    playing. And I think it was after two phases
7    that he finally withdrew.
8  Q.  Did you have Sue Colle for an instructor?
9  A.  Only for Gen. Ed.
10  Q.  And do you remember which phase or phases you
11    had Sue Colle as a General Education
12    instructor?
13  A.  I think it was 1 through 3. I think it was
14    1, 2 and 3. It might have just been 1 and 2.
15  Q.  So you don't have any complaints about Sue
16    Colle's attendance at or during computer
17    classes?
18  A.  No. No. Even though there were several
19    times that she did not -- she was not there
20    for the Gen. Ed. class.
21  Q.  Someone else would have to fill in?
22  A.  Yes.
23  Q.  Did you see any value to the General
24    Education classes?
25  A.  No.

Page 56

1  Q.  Did you see any value to the General
2    Education classes for any of your fellow
3    students?
4  A.  No, not really.
5  Q.  Did you keep any of your class notes,
6    syllabuses, books or other materials given to
7    you by the people at Vatterott?
8  A.  Yes.
9  Q.  Everything that you kept, have you turned
10    over to your attorneys in this lawsuit?
11  A.  I haven't turn the books over, no.
12  Q.  You still have the textbooks?
13  A.  Yes. Well, most of them anyway.
14  Q.  Do you still have any of your class notes
15    that you have not yet turned over to your
16    lawyers?
17  A.  Not that I've discovered.
18  Q.  Sir, can you identify Exhibit 105?
19  A.  This is shortly after I started school I
20    wrote this. I was told that I could make
21    suggestions and I noticed that some of my
22    fellow students started in a different phase
23    than I did and several of them started in the
24    SQL phase and that was one of the tougher
25    languages to learn and I was making a

Page 57

1    suggestion that if everyone could start in
2    the Office phase like I was fortunate enough
3    to, then, you know, it would be very helpful
4    to the other students.
5  Q.  So you wrote Exhibit 105?
6  A.  Yes, I did.
7  Q.  And you were stating your opinion that you
8    thought it was a good thing to have your
9    first phase be about Microsoft Office?
10  A.  Yes.
11  Q.  Okay.
12  A.  Also I made the suggestion that everybody get
13    a laptop.
14  Q.  I think I saw that a time or two. We'll talk
15    about that as we go on. You made that
16    suggestion often, didn't you?
17  A.  Several times, yes.
18  Q.  Can you identify Exhibit 106 for me?
19  A.  This was apparently when they got me the job
20    at Adecco to CCH.
21  Q.  What's the number in the bottom right corner
22    of that document?
23  A.  VAT 000576.
24  Q.  So it looks like you had some E-mail
25    communication with Career Services?

Page 58

1  A.  Yes.
2  Q.  And this is about what happened when you got
3      your job at CCH through Adecco Staffing?
4  A.  Yes.
5  Q.  Can you tell me what Exhibit 107 is?
6  A.  This was right after I got hired by Adecco.
7      I was just letting them know that I had
8      gotten the job and their response to me.
9  Q.  What is Exhibit 108?
10 A.  This is when Susan Coomes found me a job, the
11     part-time job at the Knowledge Learning
12     Centers.
13 Q.  Is this a form you filled out for the people
14     in Career Services?
15 A.  Yes.  This is -- yes, this is my writing.
16 Q.  What is Exhibit 109?
17 A.  That is -- that is the resume that Career
18     Services helped me put together.
19 Q.  Does it also have in it some of the work
20     papers, the CP Skill Set work papers that
21     they gave to you to help in that process?
22 A.  Yes.
23 Q.  On the last page of Exhibit 109 on the page
24     marked VAT 590, CP Skill Set, at the top
25     there are a number of numbers in that span of

Page 59

1      words that go from "Weak" to "Very Strong."
2      What are those numbers?
3  A.  That is -- they had me fill in for each
4      sentence or for each description, use the
5      sentence number and put it in the spot that I
6      think that I felt my experience warranted.
7  Q.  Okay.  So, for example, on the skill set of
8      No. 4, "Experienced with programming in
9      Visual Basic," it looks like you rated
10     yourself as "Skilled/Experienced"?
11 A.  Right in that area.  This was also filled out
12     at the beginning of my -- or pretty much at
13     the beginning of my experience there at
14     Vatterott.  And I thought I was a lot hotter
15     than I was in reality.
16 Q.  It's your belief that you worked on your
17     resume at the beginning of your time at
18     Vatterott?
19 A.  It was towards the beginning, yes.  It was --
20     this was probably done around Phase 3.
21        Now, this has been updated since I
22     graduated from Vatterott.  If you'll notice
23     down at the bottom under Work History where
24     it says -- or the very top line, it says '04,
25     2004 to present -- no.  This one -- I'm

Page 60

1      sorry.  This one hasn't been updated.
2  Q.  So you started at Vatterott in October
3      of 2003, correct?
4  A.  I think that's right.
5  Q.  And you would have filled out the last page
6      of VA -- Exhibit 109, the page marked
7      VAT 590, you would have filled that out at
8      least after April of 2004, correct?
9  A.  I'm sorry, would you repeat that?  Because
10     there was two classes that I did not have at
11     the time that I filled this out.
12 Q.  Do you remember filling out the CP Skill Set
13     documents before Career Services updated your
14     resume?
15 A.  This one here?
16 Q.  Both of them that are in Exhibit 109.
17 A.  I don't remember specifically.  I think
18     that -- let me see.  It was Susan Coomes who
19     actually did this.  And she had a trial one
20     given to me for me to go over and I made some
21     corrections on it and then gave it back to
22     her and then she included the corrections.
23     If I remember right, it took a couple of
24     visits.
25 Q.  At what point in time did you first realize

Page 61

1      you were dissatisfied with your Vatterott
2      education?
3  A.  Just before graduation.
4  Q.  And what was it that changed your mind to
5      thinking that you were now dissatisfied?
6  A.  Towards the end of my last phases is when I
7      started seriously applying for computer
8      programming jobs.  And at first I looked at,
9      you know, very specifically for things that I
10     had been taught, for courses that I had been
11     taught and they were scarce.  The only time
12     that I really saw anything that I had been
13     taught, I remember -- I don't remember who it
14     was to, but I remember seeing a Visual Basic
15     as one of the qualifications but it was
16     strung together with a whole bunch of other
17     stuff that I didn't understand.  And also asked for a
18     degree.  And at that point, I just started
19     applying to everything.
20 Q.  So many of the jobs you applied for after you
21     graduated from Vatterott stated that they
22     wanted a four-year degree?
23 A.  Oh, yes.
24 Q.  You knew you didn't have a four-year degree,

Page 62

```
 1       correct?
 2   A.  Correct.
 3   Q.  But was it the fact that you were not being
 4       hired for positions that required a four-year
 5       degree part of what led you to be
 6       dissatisfied with your Vatterott education?
 7   A.  That was part of it.
 8   Q.  And what was the other part of it?
 9   A.  That I knew enough to know or I was taught
10       enough to know and I knew enough that I
11       didn't know.  The more I learned, the more I
12       realized I didn't know.
13   Q.  So in your opinion, would the Vatterott
14       program be better if instead of lasting about
15       14 months, it would last longer?
16   A.  If it still taught six phases, yes.  If it
17       would last a lot longer, that would be great.
18       If they would concentrate on one or two
19       languages then 14 weeks in current use, then 14
20       weeks might be enough if it was -- if you
21       would receive a certification at the end of
22       the -- at the end of the course.
23   Q.  What do you mean, a certification?
24   A.  Certification is kind of -- it's kind of like
25       a degree.  You are certified that you are
```

Page 63

```
 1       very, very well trained in this particular
 2       language.  It's a certification.
 3   Q.  Issued by who?
 4   A.  Well, they would have to get -- they would
 5       have to get that set up with Microsoft.  I
 6       know Microsoft gives out certifications in
 7       their training courses for different
 8       languages.  But if you've got a certificate
 9       in a language, it means you're very, very
10       well-qualified.
11   Q.  And if you had that type of a certification,
12       you would probably be qualified for even more
13       than an entry level position, correct?
14   A.  Possibly.  I don't know.  I've never gotten
15       that far.  I do know that the certification
16       carries a lot of weight.
17   Q.  If you were taking the same courses in six
18       phases that you took at Vatterott, how long
19       do you think the program would need to last
20       instead of 14 months?
21   A.  I'm really not qualified for that, to answer
22       that.  I would say it would depend on the
23       language.
24   Q.  Assuming the same language as you were
25       taught.
```

Page 64

```
 1   A.  Well, I know that the book for SQL is almost
 2       two and a half inches thick.  The outdated
 3       language that I took, SQL or SQL 2000, the
 4       book is almost two and a half inches thick
 5       and we barely got into it.  The Visual Basic
 6       book on the other hand was the first one, was
 7       probably three-quarters of an inch thick, so
 8       it would really depend on the language being
 9       taught.
10   Q.  Are you of the opinion that the course should
11       be long enough to teach through the entire
12       textbook at a school such as Vatterott?
13   A.  I've never taken a course where they've
14       taught all the way through every page of a
15       textbook, not even in college.  I'd say that
16       it would need to cover a lot more than it
17       did.
18   Q.  How would you determine how much more of each
19       book it should cover?
20   A.  Well, if I was qualified in that language, I
21       would probably know what was being used in
22       the real world.  I don't.  I'm not qualified
23       to answer that question really.  It would
24       take somebody who's been out there, who's
25       been into it, like Bill Harvey, good example.
```

Page 65

```
 1   Q.  Have you spoken with Bill Harvey about your
 2       thoughts about the quality of the education
 3       you received at Vatterott?
 4   A.  No.
 5   Q.  Can you tell me what Exhibit 110 is?
 6   A.  This looks like my resume before I started at
 7       Vatterott.
 8   Q.  On the second page of Exhibit 110 there are
 9       some handwritten notes.  Do you see those?
10   A.  Yes.
11   Q.  Are those your notes?
12   A.  Oh, yes.  Those -- oh, I guess this was when
13       I --
14   Q.  Were these some of the papers you gave to
15       Career Services to help them in updating your
16       resume?
17   A.  I don't believe I ever gave them a copy of my
18       resume.  This is one that I was making
19       corrections on.  I might have.
20   Q.  For what it's worth, I'll let you know that
21       Exhibit 110 came from the files at Vatterott.
22   A.  Okay.  I guess I did then.
23   Q.  But regardless, you believe that most of this
24       document, Exhibit 110, was your resume before
25       you started at Vatterott with some changes
```

Page 66

1    and additions made in handwriting?
2    A.   Yes.  This was probably -- I probably gave
3         this to Susan Coomes when she was helping me
4         write this one, 109.
5    Q.   Okay.  Can you identify Exhibit 111?
6    A.   This is my enrollment.
7    Q.   And in the bottom left above the word
8         "Student," is that your signature?
9    A.   Yes, it is.
10   Q.   And it appears you signed this on
11        September 23, 2003?
12   A.   Yes.
13   Q.   And the initials "CMJ" appear in a number of
14        spots throughout the document.  Are those
15        your initials?
16   A.   Yes, they are.
17   Q.   That's in your handwriting?
18   A.   Yes, it is.
19   Q.   So, for example, in the paragraph numbered 7
20        it appears that you discussed with someone on
21        September 23, 2003, that you were receiving a
22        diploma?
23   A.   Correct.
24   Q.   You were never told, were you, that you were
25        receiving an Associate's Degree or the

Page 67

1    equivalent of an Associate's Degree?
2    A.   No.  We were receiving credit hours and --
3    Q.   Go ahead.
4    A.   This is the document I was referring to, I
5         believe, when the gentleman was saying, oh,
6         don't worry about it, this is just a
7         formality.
8    Q.   That gentleman's signature does not appear on
9         Exhibit 111, does it?
10   A.   No, it does not.
11   Q.   Debra Mancusco's signature appears on
12        Exhibit 111, doesn't it?
13   A.   Correct.
14   Q.   And the handwriting at the top of Exhibit 111
15        is not yours, is it?
16   A.   No.
17   Q.   Other than your initials?
18   A.   Other than my initials, no.
19   Q.   Now, if Debra Mancusco were to say that she
20        went through this agreement with you, filled
21        in the blanks other than your initials and
22        your signature and the other signature of the
23        co-director, would you dispute that?
24   A.   I remember going through this or one just
25        like it with a gentleman, with a man.

Page 68

1    Q.   If --
2    A.   I don't know if I would -- if that's her
3         signature, then no, I wouldn't dispute it but
4         I sure don't remember it.
5    Q.   And you understood when you signed this,
6         didn't you, that you were going to receive
7         72 quarter credit hours?
8    A.   Yes.  And I took that to believe -- I took
9         that to mean accredited hours.
10   Q.   And do you understand today that you did
11        receive 72 accredited quarter credit hours?
12   A.   I received 72 quarter hours.
13   Q.   You still believe that the program was not
14        accredited?
15   A.   Yes.
16   Q.   Tell me again why you think that.
17   A.   Because when other students who went through
18        this at the same time that I did tried to
19        apply those credit hours to other colleges,
20        they were denied.
21   Q.   Can you identify Exhibit 112, please.
22   A.   This looks like one of the documents I was
23        supposed to fill out when I took the tour of
24        the school.
25   Q.   Is that your signature at the bottom of the

Page 69

1    first page of Exhibit 112?
2    A.   Yes, it is.
3    Q.   And does that indicate that you filled this
4         out on the same date that you signed your
5         Enrollment Agreement?
6    A.   Yes, it does.
7    Q.   And is the handwriting on Exhibit 112 yours?
8    A.   Yes.
9    Q.   Is there anywhere on your application where
10        you wrote that you were only interested in a
11        program that would train you in the writing
12        and implementing of programs toward a
13        specific function or that you were only
14        interested in a program that would allow you
15        to work in the Internet security field?
16   A.   Not specifically.  But on Page 2 I did put
17        down, "I need to pursue a different career.
18        Computer training seems to be here to stay."
19        I made mention that my body was breaking down
20        and I needed to change careers and needed to
21        do something different.
22            And then on Page 3 where it asks which
23        answer best describes my attitudes, on No. 2
24        I put down, "may enable me to start a new
25        career."  I think I answered those questions,

Page 70

1   you know, in the hopes of finding a new
2   career.  Now, on No. 17 on the last page
3   says -- I wrote down, "Computers are here to
4   stay and are great information tools."  And
5   on 19 I did put down that "I admire people
6   who recognize an opportunity, seize it and
7   make it work for them."  And I was hoping
8   that Vatterott was going to be my
9   opportunity.
10  Q.  Can you identify Exhibit 113 for me, please.
11      Let me help you with this one a little
12  bit.  Let me take you to the last page of
13  Exhibit 113.  Is that top paragraph your
14  handwriting followed by your signature?
15  A.  Yes.
16  Q.  Do you remember being asked a series of
17  questions on September 23, 2003, by
18  Ms. Mancusco?
19  A.  I don't remember this document.  I obviously
20  signed it.
21  Q.  Does looking at Exhibit 113 refresh your
22  memory about some of the conversation the two
23  of you had?
24  A.  I'm sorry, would you repeat the question?
25      (The requested portion of the record

Page 71

1   was read by the reporter, as follows:
2   Question: "Does looking at Exhibit 113
3   refresh your memory about some of the
4   conversation the two of you had?")
5   A.  Not yet.
6   Q.  Take all the time you need.
7   A.  A little.  I remember a little of this but
8   not all of it.  I don't remember talking with
9   Debra Ann in this much length.
10  Q.  What is Exhibit 114?  Do you recognize that
11  to be a copy of your high school transcript?
12  A.  I guess it is.  Yeah, I guess it is.
13  Q.  Does it appear to be accurate to you?
14  A.  Yes.  Yes, I assume so.
15  Q.  Did you ever read your Vatterott catalog that
16  was given to you?
17  A.  Yes, I did.
18  Q.  When did you read it?
19  A.  At the beginning.
20  Q.  At the beginning of what; when you first
21  received it?
22  A.  Within a very short time thereafter.
23  Q.  Within a day or two?
24  A.  Probably.  I was excited to get started.
25  Q.  Other than what you've told me today about

Page 72

1   hearing from some students that they couldn't
2   transfer their credits, do you have any
3   specific reason to dispute that Vatterott was
4   at the time you attended and still is
5   accredited by the Accrediting Commission of
6   Career Schools and Colleges of Technology in
7   Arlington, Virginia?
8   A.  I don't really understand the question.
9   Q.  Other than what you've told me about hearing
10  that some students couldn't transfer their
11  classes, do you have any reason to believe
12  that Vatterott wasn't accredited when you
13  attended there by the ACCSCT?
14  A.  No.  I was just going by what other students
15  told me.
16  Q.  Do you remember reading the part of the
17  catalog that talked about Vatterott College
18  having a limited number of articulation
19  agreements for transfer of credit hours to
20  other colleges or educational institutions
21  and stating that most of the degree programs
22  at Vatterott College are occupational in
23  nature, therefore, students who wish to
24  continue their education utilizing credits
25  from Vatterott College are cautioned to

Page 73

1   verify their plans before they enroll at
2   Vatterott College, many colleges do not
3   accept credits from Vatterott College?
4   A.  I don't remember reading that.
5   Q.  If it was in the catalog, you could have read
6   it though?
7   A.  Yes.
8   Q.  What is Exhibit 115?
9   A.  It verifies that I've received those
10  documents, the documents listed here.
11  Q.  And is that your printed and signed name on
12  Exhibit 115?
13  A.  Yes.
14  Q.  And is that your social security number?
15  A.  Yes, it is.
16  Q.  Do you remember signing this on September 23,
17  2003?
18  A.  I remember signing a lot of things, so -- I
19  don't remember specifically signing this but
20  I did, so I did sign it.
21  Q.  Can you identify Exhibit 116 for me?
22      Well, first let me ask, have you seen
23  Exhibit 116 before today?
24  A.  I don't believe so.
25  Q.  Okay.  I'll represent to you that this came

Page 74

1    from file material at the school about you
2    and it appears to be a note from Bill Harvey.
3    Do you remember discussing with Bill Harvey
4    the days you were missing from class because
5    of sickness?
6  A.  Not specifically.  But if there's school work
7    to do, I wanted to do it.  I think this was
8    during one of those times that I had
9    pneumonia.
10 Q.  Do you recognize Exhibit No. 117 as a copy of
11    your Vatterott transcript?
12 A.  Yes.
13 Q.  And does the grade average and attendance
14    average appear to you to be correct?
15 A.  It looks very familiar, yes.
16 Q.  Can you identify Exhibit 118 for me, please.
17 A.  This looks like critiques that we made on
18    different students and -- I'm sorry, on
19    different teachers.
20 Q.  And in the bottom right corner of each page
21    of Exhibit 118, is that your signature?
22 A.  Yes.
23 Q.  Do you recognize Exhibit 119?
24 A.  This looks like questionnaires that we were
25    given during different phases to get feedback

Page 75

1    on how we thought the course was being
2    handled.
3  Q.  And are all of these pages of Exhibit 119 the
4    forms that you filled out?
5  A.  Yes.
6  Q.  And would I be correct in stating that on the
7    handwritten comments at the bottom of these
8    forms your primary suggestion was that the
9    school provide laptops for the students?
10 A.  I did mention it several times, yes.  Yes.
11 Q.  Did you ever mention in Exhibit 119 a belief
12    that you were not being adequately trained in
13    the computer languages?
14 A.  In the computer languages?
15 Q.  Yes.
16 A.  No.
17 Q.  Did you ever mention in Exhibit 119 that you
18    felt you were not being adequately trained at
19    Vatterott?
20 A.  No.
21 Q.  And as late as November 4, 2004, you agreed
22    that the school was as it was represented to
23    you before you enrolled, that you were
24    satisfied with the training you were
25    receiving and that you would recommend

Page 76

1    Vatterott and its programs to a friend,
2    correct?
3  A.  Yes.  That's what I put down at that time.
4  Q.  Can you tell me what Exhibit 120 is?
5  A.  It is an E-mail that I received from Susan
6    Coomes listing the personnel, the staff
7    members, the titles and descriptions of each
8    one.
9  Q.  This was at a point in this lawsuit when the
10    judge had said that the plaintiffs needed to
11    go back and get much more specific with their
12    allegations about who at Vatterott made
13    misrepresentations, correct?
14 A.  I don't remember exactly.
15 Q.  And you talked with Ms. Coomes and asked her
16    to put together a list of the people who were
17    at Vatterott to assist you and the other
18    plaintiffs in figuring out who might have
19    made alleged misrepresentations to each of
20    you?
21 A.  Yes.
22 Q.  And that was because the plaintiffs were
23    having trouble remembering who people at
24    Vatterott were?
25 A.  Yes.

Page 77

1  Q.  So did you forward to the other plaintiffs a
2    copy of Susan Coomes' E-mail description of
3    people contained in Exhibit 120?
4  A.  It was my habit to forward all communications
5    to all of the students.
6  Q.  Can you identify 121?
7  A.  It looks like an E-mail that I sent to Jane
8    Ward attaching earlier E-mails when we were
9    trying to get everybody together to respond
10    to the lawyers.
11 Q.  And have you had any discussion with Jane
12    Ward about whether she was going to join in
13    your lawsuit or not?
14 A.  Originally she was but I haven't heard
15    anything from her lately.
16 Q.  To your knowledge, is she still today at
17    Thayer Aerospace?
18 A.  To my knowledge, yes.
19 Q.  Was she in your class?
20 A.  No.  She was in computer-aided drafting.
21 Q.  What is Exhibit 122?
22 A.  These are receipts that I kept on my computer
23    from resumes that I had E-mailed.
24 Q.  So this is some record of resumes you sent
25    out after you graduated from Vatterott?

Page 78

1    A.  Yes, I believe so.  This is not complete but,
2        yes.
3    Q.  And is there anywhere -- well, let me
4        withdraw that.
5            What is Exhibit 123?  And it's a thick
6        document so take all the time you need to
7        flip through it.
8    A.  Yes.
9    Q.  Just looking first for a general description
10       of the contents.
11   A.  It looks like this is -- these are different
12       businesses that I sent resumes to or
13       inquiries to, just verifying that I did send
14       these out.
15   Q.  Okay.
16   A.  This was all online.
17   Q.  Now, all of these documents came from what
18       you produced to us in response to our written
19       questions and written requests for documents.
20       Do you think you have any other written
21       record of jobs you've applied for other than
22       Exhibit 122 and 123?
23   A.  No, I don't.  I think I deleted a lot of
24       them.
25   Q.  And did you receive any correspondence by

Page 79

1        E-mail, Internet or letter from any of the
2        applications you made that are reflected in
3        Exhibits 122 or 123?
4    A.  Well, the responses aren't here.  I did
5        follow-up possibly, not on all of them, but I
6        did follow-up and on these I got back E-mails
7        saying, sorry, the job has been filled or no,
8        we require a degree and unfortunately, I did
9        not save all of those.
10   Q.  It looks like you saved some, though, and
11       some are part of Exhibit 123?
12   A.  Some of them I did save.
13   Q.  If you come across any record of your
14       applications or any responses to any other
15       jobs other than what's in 122 or 123, will
16       you give those to your attorney right away?
17   A.  Yes, I will.
18           I think this is probably it.
19   Q.  What is Exhibit 124?
20   A.  Looks like my W-2 from the year 2000.
21   Q.  Is 124 a copy of your Federal Income Tax
22       Returns for the years 2000 through 2006?
23   A.  Appears to be, yes.
24   Q.  Now, these are not all signed versions.  Do
25       you know if these are final, true and

Page 80

1        accurate copies of what you filed for your
2        income taxes for these years?
3    A.  I believe they are.  I know the 2006, 2005
4        and 2004 were done online.
5            Yes.  2004, 5 and 6 were done online
6        using CCH software.
7    Q.  So to the best of your knowledge, is
8        Exhibit 124 a true and accurate copy of your
9        Federal Income Tax Returns for the years 2000
10       through 2006?
11   A.  Without referring to my own copies, they
12       appear to be correct.
13   Q.  What is Exhibit 125?
14   A.  That is a copy of one of the statements that
15       I got from Direct Loans, my student loan.
16   Q.  Showing that as of June 30, 2007, you had a
17       balance of $12,272.12?
18   A.  Correct.
19   Q.  How long have your payments been deferred?
20   A.  From the beginning, from the day they first
21       started.  I think I might have made a couple
22       of payments but I've never really been able
23       to make any payments to them.
24   Q.  Have you ever declared bankruptcy?
25   A.  No.  Come close.

Page 81

1    Q.  I am about out of questions.  Before I close
2        for the day, though, I want to give you one
3        more chance:  Have you thought of any other
4        misrepresentation that you believe was made
5        at anytime by anyone at Vatterott to you in
6        any form that we've not discussed already
7        today?
8    A.  I can't think of anything that we haven't
9        already discussed.
10           MR. HERREN:  Thank you very much.
11           THE WITNESS:  Is that it?
12           MR. JOHNSON:  Let's see.  I may
13       have a couple questions.
14           CROSS-EXAMINATION
15   MR. JOHNSON:
16   Q.  Mr. Jamieson, during your enrollment at
17       Vatterott College, you were pretty much of a
18       cheerleader for that school, were you not?
19   A.  Yes.
20   Q.  And you felt like you were getting a good
21       computer programming education?
22   A.  At the time, yes.
23   Q.  And Exhibit No. 119, your remarks on there
24       basically reflect that you thought you were
25       getting a good education; is that correct?

Page 82

1  A. Correct.
2  Q. Now, you did make some written remarks on
3     here concerning getting a laptop computer?
4  A. We need the tools of the trade.
5  Q. That was, obviously, that was something that
6     was a little sticking point with you I take
7     it?
8  A. Not just me.
9  Q. Now, you mentioned earlier in your testimony
10    that right at the end when you started
11    applying for jobs you began to realize that
12    you weren't getting what you paid for?
13 A. Correct.
14 Q. Why is it that you still went ahead and did
15    not disagree with any of the statements set
16    forth by the school in Exhibit No. 119?
17 A. Because what we were taught, what we did go
18    through, we went through well. It just
19    wasn't enough time to go through all of it.
20    And I still didn't understand that there was
21    so much more that was needed just to become
22    an entry level programmer.
23 Q. And in November 2004 when you agreed with the
24    statement, "Since becoming a student at
25    Vatterott, I find the school to be as it was

Page 83

1     represented to me before enrolling," why did
2     you agree with that statement?
3  A. I don't remember exactly why I -- why I
4     agreed with that. Looking at it in
5     hindsight, I would not put that down. But I
6     don't know.
7  Q. Did there come a time after you filled out
8     this one student critique dated 11-4-04 that
9     you felt that the school was not as it was
10    represented when you enrolled?
11 A. I didn't really come to that conclusion until
12    awhile after I graduated and had been looking
13    for jobs for computer programming.
14 Q. Did there come a point in time when you would
15    not recommend Vatterott College as programs
16    to a friend?
17 A. Right now I would not.
18 Q. And why not?
19 A. Because I feel like I was shorted. I feel
20    like I did not get what I had signed up for.
21    Maybe it was, you know, just overenthusiasm
22    on my part but I don't feel that the
23    education was adequate to become an entry
24    level computer programmer.
25 Q. Were you ever told by any representative at

Page 84

1     Vatterott either before you enrolled or after
2     you enrolled that you need additional
3     education to get a computer programming --
4     entry level computer programming job over and
5     above what you had at Vatterott?
6  A. It wasn't put to me quite that way. It was
7     put to me that employers are always
8     interested in people who want to further
9     their education and it was strongly
10    recommended that, you know, we continue on
11    going to school.
12 Q. Who told you that?
13 A. Bill Harvey.
14 Q. And was that told to you before or after you
15    signed the Enrollment Agreement?
16 A. After.
17 Q. Did you have any understanding that to get a
18    job at an entry level computer programmer in
19    this metropolitan area, that you would need a
20    four-year college degree?
21 A. I was never told that.
22          MR. HERREN: Object to the form
23    of the question.
24          You can answer now. I had to make an
25    objection for the record.

Page 85

1  A. Oh, okay. I'm sorry, restate the question.
2  Q. Prior to enrolling at Vatterott, did any
3     representative at Vatterott advise you that
4     to get a job in the Wichita metropolitan area
5     you would need to have a -- as an entry level
6     computer programmer you would need a
7     four-year degree?
8  A. No.
9  Q. Degree was never mentioned?
10          MR. HERREN: Same objection.
11 Q. Were you ever given any materials from Career
12    Services on how to conduct a job search?
13 A. I think that in the beginning I was given
14    some materials like that. Gen. Ed. was
15    supposedly geared toward how to do an
16    interview, you know, what to dress like. But
17    that's what Gen. Ed. basically was, was how
18    to get a job.
19          MR. JOHNSON: That's all I have.
20          MR. HERREN: I'm done.
21          MR. JOHNSON: We'll have him read
22    and sign.
23    (Deposition concluded at 4:32 p.m.)
24          *    *    *
25

Page 86

I have read or have had read to me the foregoing testimony recorded on pages 4 to 85, inclusive, and the same is true and correct to my knowledge and belief.


CARL M. JAMIESON        (Date)



STATE OF          )
                  ) SS:
        COUNTY)
Subscribed and sworn to before me, the undersigned authority, this, the       day of
        ,      .


Notary Public


(Commission Expires)




JAMIESON v. VATTEROTT

---

Page 87

CERTIFICATE
STATE OF KANSAS)
        ) SS:
SEDGWICK COUNTY)
    I, SUSAN K. ORTH-NEVIL, a Certified Shorthand Reporter for the State of Kansas, do hereby certify that the within-named witness was by me first duly sworn to testify the truth, that the testimony given in response to the questions propounded, as herein set forth, was first taken in machine shorthand and reduced to writing with computer-aided transcription, and is a true and correct record of the testimony given by the witness. I certify that review of the testimony was requested by the witness or the parties. If any changes are made by the deponent during the time period allowed, they will be appended to the transcript.
    I further certify that I am not a relative or employee or attorney or counsel of any of the parties, or a relative or employee of such attorney or counsel, or financially interested in the action.
    WITNESS my hand and official seal at Wichita, Sedgwick County, Kansas, this       day of
        ,      .


        SUSAN K. ORTH-NEVIL, CSR
        220 Orpheum Centre
        200 North Broadway
        Wichita, KS   67202
COSTS: