**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

| | |
|---|---|
| CARL JAMIESON, KENNETH LYNCH, )<br>AARON BORST, NATHAN COOK, )<br>RHONDA FOWLER, JAMES HADLEY, )<br>BRYAN HUDSON, TIANA KENNEDY, )<br>KENNETH MILLER, SHANNON POUND, )<br>BIBI SANANIKONE, SCOTT A WARD, )<br>CLIFF ZOLLMAN, and all other similarly )<br>situated current and former students, )<br>  )<br>  Plaintiffs, )<br>  )<br>v. )<br>  )<br>VATTEROTT EDUCATIONAL CENTERS, )<br>INC. d/b/a/ VATTEROTT COLLEGE, )<br>  )<br>  Defendant. )<br> _____ ) | Case No. 06-1103-WEB |

**Memorandum and Order**

This matter is before the court on the following motions: Plaintiffs' Motion to Certify

Class Action (Doc. 58) and Defendant's Motion for Summary Judgment (Doc. 69).

**I.  Summary of Claims**.

Vatterott College is an educational institution that provides occupational training in

various fields, including computer programming, medical office employment, and electrical

mechanic courses of study.  According to Plaintiffs' Second Amended Complaint ("SAC"), the

above-named plaintiffs enrolled in and completed courses at Vatterott College's Wichita,

Kansas, campus.  They now assert claims against Vatterott for breach of contract, violation of

the Kansas Consumer Protection Act, fraud, and punitive damages.

*Breach of Contract*.  The claims for breach of contract allege that Enrollment

Agreements between the plaintiffs and Vatterott specified the hours and weeks of instruction that would be provided.  Plaintiffs allege that each course of study was to meet for 60 weeks, with each class scheduled to meet Monday through Thursday for four and one-half hours every day. SAC ¶ 151.  The SAC alleges that plaintiffs did not receive the hours and weeks of instruction promised in the Enrollment Agreements, thereby breaching the agreement and causing damages to the plaintiffs.  ¶¶ 152-154.

More particularly, plaintiffs Borst, Cook, Hadley, Lynch, Miller, Pound, and Sananikone allege that for 10 weeks of their 60-week course of study, Vatterott provided no instructor, and they received no instruction during that time. ¶¶ 20, 27, 41, 73, 82, 91, 100.  Plaintiff Fowler alleges that no instructor was provided for the first 4 weeks of her 60-week session.  ¶136. Plaintiffs Hudson and Zollman allege that no instructor was provided for 2 weeks of their session and instructors would regularly adjourn class by 8:00 p.m. instead of the scheduled 10:30 p.m. ¶¶ 118, 126.  Plaintiffs Jamieson, Kennedy, and Ward allege simply that Vatterott did not provide the hours and weeks of instruction provided in the Enrollment Agreement.  ¶¶ 50, 59, 109.

*Kansas Consumer Protection Act (KCPA)*.  Plaintiffs allege that Vatterott's courses of study, instruction, use of equipment, laboratories, classrooms and other facilities, and job placement assistance constituted services covered by the KCPA, and that Vatterott violated the Act in various ways, including: by knowingly representing that its services had characteristics, uses or benefits which they did not have; by willfully using exaggeration, falsehoods and ambiguity about material facts related to the services; by willfully concealing or failing to disclose material facts; by engaging in deceptive acts; by taking advantage of plaintiffs' lack of

familiarity with the subject matter; by charging fees that grossly exceeded prices for similar services at other schools; by providing services while knowing plaintiffs would be unable to derive any material benefit from them; by making misleading statements of opinion; and by engaging in unconscionable acts and practices, as a result of which plaintiffs suffered damages. *See* SAC ¶¶ 155-173.

*Fraud*.  Plaintiffs allege that Vatterott knowingly or recklessly made false statements for the purpose of inducing plaintiffs to enter into Enrollment Agreements, and that plaintiffs reasonably relied upon such statements, thereby suffering damage.

In support of the KCPA and fraud claims, plaintiffs Borst, Cook, Hadley, Jamieson, Kennedy, Lynch, Miller, Pound, Sananikone, and Ward allege that prior to enrolling, they were told by Vatterott admissions representatives: that in the computer course of study they would receive entry-level training, including training in the current versions of Java and C++ and other programming languages; that Vatterott had connections with Koch Industries, Coleman, and many airline companies and these employers actively and regularly sought Vatterott graduates; and that Vatterott would provide assistance with job placement.  These plaintiffs claim they enrolled in reliance upon these representations, but in truth the versions of the computer programs taught by Vatterott were out-dated and were no longer used in the computer programming industry; that Vatterott did not have the connections with employers that it had claimed; and these employers did not seek Vatterott graduates for open positions.  Several of these plaintiffs further allege that they received no training in the C++ language, and only partial training in the Java language.

Plaintiff Hudson alleges that prior to enrolling, he told a Vatterott representative that he

was interested in becoming a journeyman electrician, and the representative falsely told him he would receive "hands on" experience with motor controls, that he would receive sufficient training to pass the journeyman's exam, and that the representative could serve as his sponsor for the examination.

Plaintiff Zollman alleges that a Vatterott representative falsely told him prior to enrolling that 80% of the electrical mechanic course was hands-on training as opposed to classwork, when it was actually only 15-20% hands-on training.

Plaintiff Fowler alleges that Vatterott representatives falsely told her before and after enrolling that in the medical office assistant program she would receive certifications for coding, transcription, CPR, and first aid, and that testing for the certification would be given at Vatterott.

She also alleges that representatives guaranteed the starting pay in her field when she graduated would be between $12 and $15 per hour, but she has had to obtain employment at a lower rate of pay.

## II.  Motion for Summary Judgment.

After examining the issues involved, the court concludes it is appropriate to address the pending motion for summary judgment prior to the motion for class certification.  The reasons for this include plaintiffs' concession that some of the claims should be dismissed on summary judgment, and because the summary judgment motion addresses the scope of the Kansas prohibition on educational malpractice claims – an issue previously addressed by the court.[1]  As

---

[1] The court granted in part and denied in part defendant's motion to dismiss the breach of contract claims in the First Amended Complaint.  The ruling was based on *Finstad v. Washburn Univ. of Topeka*, 252 Kan. 465 (1993), which held that Kansas law does not recognize a tort for educational malpractice.  *See* Doc. 17.

a practical matter, it is appropriate to clarify the nature and scope of the pending claims before determining their suitability for class action treatment.  *Cf. Curtin v. United Airlines, Inc.*, 275 F.3d 88, 92-93 (D.C. Cir. 2001); *Greenlee County, Ariz. v. United States*, 487 F.3d 871, 880-81 (Fed. Cir. 2007).

Plaintiffs argue the motion for summary judgment is premature because they "have not even begun merits discovery (except to the extent class certification discovery overlapped the merits of some claims)."  Doc. 73 at 2.  They argue the court "should either refuse Vatterott's application for judgment or order a continuance to permit Plaintiffs to conduct merits discovery."  *Id*.  Alternatively, they argue the motion should be denied on the merits.

Rule 56(f) provides in part that if a party shows *by affidavit* that for specified reasons it cannot present facts essential to its opposition, the court may deny the motion, order a continuance, or issue any other just order.  Plaintiffs have failed to provide an affidavit in accordance with the rule.  Nevertheless, insofar as plaintiffs' brief identifies specific reasons why further discovery is necessary with regard to particular facts or claims, and the defendant has not provided anything to suggest otherwise, the court will refrain from granting summary judgment at this time as to any such fact or claim.  *Cf. Awulonu v. Unified School Dist. No. 261*, 363 F.Supp.2d 1300, 1303 (D. Kan. 2005) ("Unless dilatory or lacking in merit, [a motion under Rule 56(f)] should be liberally treated.").  Defendant does not dispute plaintiffs' assertion that discovery to date has been directed toward class certification issues rather than to the merits of the claims.  *See* Doc. 23 (Magistrate's order establishing schedule for addressing class certification; deferring remaining deadlines for future conference).  The court will not grant summary judgment insofar as the record clearly shows that the plaintiffs have not had adequate

opportunity for discovery.  *Cf. Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 244-45 (4th Cir. 2002) (rule requiring affidavit must be reconciled with general rule that summary judgment is only appropriate after adequate time for discovery); *Abercrombie & Fitch Stores, Inc. v. American Eagle Outfitters, Inc.*, 280 F.3d 619, 627-28 (6th Cir. 2002) (court will not exalt form over substance where plaintiff has adequately explained need for further discovery).  The court will not refrain from addressing particular facts or claims, however, where plaintiffs have failed to identify any specific reason for deferring summary judgment or where the record indicates they have had an adequate opportunity to discover the relevant facts.

Defendant's motion for summary judgment, highly summarized, argues that plaintiffs' various claims of misrepresentation are not supported by evidence; that plaintiffs did not reasonably rely on any such misrepresentations; that plaintiffs' misrepresentation claims are barred by the *Finstad* prohibition of the tort of educational malpractice; and that plaintiffs' claims for breach of contract are not supported by evidence.

A.  *Defendant's Statement of Uncontroverted Facts*.

1. Each Plaintiff is a graduate of Vatterott College's Wichita, Kansas campus.

2. Prior to the commencement of their course work at Vatterott, the named Plaintiffs executed Enrollment Agreements on the following dates for the following programs:

• Rhonda Fowler: January, 2003, medical office assistant.
• Tiana (Thorp) Kennedy: April, 2003, computer programming.
• Aaron Borst: May, 2003, computer programming.
• Kenneth Lynch: June, 2003, computer programming.
• James Hadley: July, 2003, computer programming.
• Carl Jamieson: September, 2003, computer programming.
• Nathan Cook: October, 2003, computer programming.
• Bibi Sananikone: October, 2003, computer programming.
• Scott Ward: October, 2003, computer programming.
• Shannon (Joiner) Pound: November, 2003, computer programming.

• Kenneth Miller: December, 2003, computer programming.
• Bryan Hudson: November, 2004, electrical mechanic.
• Cliff Zollman: February, 2005, electrical mechanic.

Plaintiffs' Enrollment Agreements, attached to defendant's motion as Exhibit B, are the best

evidence of the promises and agreements contained therein.

  3. In consideration for tuition paid, Vatterott agreed to instruct each

Plaintiff in a specified course of study. Vatterott also agreed to and did provide each student

with seventy-two (72) quarter credit hours towards a diploma over a sixty (60) week term (see

Exhibit B, ¶ 1 of each Agreement; see also Exhibit A).

  4. In the Second Amended Complaint, Plaintiff Aaron Borst alleged that Vatterott

employees Linda McClure, Darlene Smith, and Brenda Boone made certain representations to

him that were false or misleading.

  5. Mr. Borst never spoke with Ms. McClure, Ms. Boone, or Ms. Smith prior to

enrolling at Vatterott (see Borst Depo., attached hereto as Exhibit D, pp. 11:15-20:11).

  6. In the Second Amended Complaint, Plaintiffs Nathan Cook, James Hadley,

Kenneth Miller, Shannon Pound, Bibi Sananikone, and Scott Ward alleged that Ms. McClure

and Ms. Smith made certain representations to them, which were false and misleading.

  7.  The Plaintiffs listed in fact number 6 have identified a basis upon which further

discovery could disclose the identities of individuals other than Ms. McClure or Ms. Smith who

allegedly made misrepresentations to them.  Doc. 73 at 4-6.

  8. In the Second Amended Complaint, Plaintiff Kenneth Lynch alleged that Ms.

McClure, Ms. Smith, and another Vatterott employee, Debra Schraeder, made certain

representations to him that were false or misleading (see Exhibit C, ¶ 60).

9.  Plaintiffs have cited evidence that one person who made representations to Lynch which he contends were false was Diana Otis, and they have identified a basis upon which further discovery could disclose the identity of other individuals who allegedly made misrepresentations.  Doc. 73 at 6.

10. Plaintiffs in the computer programming course of study alleged in the Second Amended Complaint that Vatterott informed them the program would provide "entry-level training in computer programming and editing."

11. Plaintiffs in the computer programming course of study also alleged that Vatterott informed them the program would provide "training in the current versions of Microsoft Office Suite, Visual Basic, SQL, Java, and C++ programming languages."

12. Vatterott's catalogs in effect when Plaintiffs enrolled provided that Vatterott reserves the right to make changes in faculty, course content, structure of curriculum, methods of delivery and class schedule as needed (Exhibit M).

Although plaintiffs contend they cannot admit or deny this assertion because discovery to date has been limited to the issue of class certification, they fail to explain what additional discovery is necessary to ascertain this fact.  Defendant cites the affidavit of Ms. Otis to support its contention that the catalogues cited were in effect at the relevant times.  The affidavit further asserts that the catalogues have been produced to the plaintiffs in discovery.  In this instance, plaintiffs' failure to meet the requirements of Rule 56(f) leads the court to conclude that the fact in uncontroverted for purposes of summary judgment.

13. Each computer programming "course description" section of the relevant Vatterott catalogs states: "The college reserves the right to alter the scope and sequence of the

course at any time" (see Exhibit M).

14.  At or about the time of enrollment, each Plaintiff named in this action represented in writing that he or she "received and carefully reviewed" various written documents, including the school's catalog, and that they were not relying on any other promises, representations, or inducements other than those contained in the written documents listed therein (see Plaintiffs' Affidavits, attached hereto as Exhibit N).

15. Plaintiffs Borst, Hadley, and Lynch alleged they did not receive training in the C++ programming language, and that they received only partial training in Java because the instructor failed to complete the course of study in that programming language.

16. Mr. Borst received training in C++ from Sue Colle, but in his opinion Ms. Colle was not qualified to teach that programming language (see Exhibit D, pp. 28:16-29:8; 32:12-14; 51:22-52:14; 67:6-67:9).

Borst testified there was a wall with the teachers' credentials posted on it, and that Ms. Colle was the only instructor who did not display credentials for the subject matter she was teaching.  She did not have anything listed for the C++ class she was teaching.  Borst testified he had no other way of knowing what credentials Colle did or did not have for C++.   Exh. D at 27-29.

17. According to Mr. Hadley, Ms. Colle "didn't know too much about C++ to be teaching it. . . . She was pretty much learning herself as she goes on, if she was there."

18. According to Mr. Hadley, Ms. Colle's replacement, Tom Liu, "seemed like he knew the material" but was difficult to understand due to his accent.

19. Ms. Colle and Mr. Liu also trained Mr. Lynch in C++. In Mr. Lynch's opinion,

Ms. Colle did not know anything about C++, and Mr. Liu, who seemed to understand the programming language, was difficult to understand and did not know anything about teaching.

20. In order to maintain accreditation through the Accrediting Commission of Career Schools and Colleges of Technology ("ACCSCT"), Vatterott is required to have a local Program Advisory Committee for each course of study (see Standards of Accreditation, Exhibit O, pp. 25-26; see also Diana Otis Affidavit ("Otis Aff."), Exhibit P, ¶ 2)).  *See also* Exh. AA at ¶3.

21. In order to maintain accreditation, more than fifty percent (50%) of the members on the Program Advisory Committee for each program must represent employers in the major occupation or occupations for which training is provided in the relevant program (see Exhibit O, p. 25; see also Otis Aff. ¶3).

22. The Program Advisory Committee reviews the relevant program's established curricula and comments as to its objectives, content, and length (see Exhibit O, p. 26; see also Otis Aff. ¶4 ).

23. Vatterott's Program Advisory Committees met at least twice a year during the relevant time period (see Otis Aff. ¶5 ).

24.  Along with other subjects of inquiry, the Program Advisory Committee considered whether the curriculum is sufficient to give each student entry-level skills, whether the instructional materials are current and relevant to what is used in the field, whether relevant and current practices of the occupation are contained within the curriculum, and whether changes in the curriculum are necessary (see Advisory Committee Meeting Minutes, attached hereto as Exhibit Q).

25. Vatterott's catalogs published during the relevant time frame describe the

Computer Programming course of study by stating:

The objective of this course is to prepare the graduate for entry-level
employment as a computer programmer, computer operator, a database
technician, a database administrator, or similar position in the data processing
environment.

(See Exhibit M.)

26. Mr. Lynch was employed at CCH, Inc. as a software tester for a program
called "Fixed Assets," which involved running a program to ensure all of the current functions
worked properly.

27. Mr. Cook is currently employed by CCH.

28. Mr. Cook's first position at CCH was a release and support intern, which
meant he was a beta tester, testing programs.

29. A week or so after beginning employment at CCH, Mr. Cook started working
at his current position on a product called CertiTAX, an online tax calculation engine, for
which he takes calls, answers emails, and helps customers tie their billing system to the
software.

30. Mr. Ward worked at CCH as a technical support representative supporting tax
accountant software.

31. Mr. Hadley worked for CCH supporting tax software.

32. Ms. Pound worked at CCH testing a program called Pro Forma, which rolls
over the user's taxes from one year to another.

33. In her position at CCH, Ms. Pound wrote "bugs" (i.e., notes in a database that
informed programmers regarding issues with the software) which assisted the programmers in
fixing problems.

34. Ms. Sananikone is currently employed by CCH as a release and support analyst (i.e., she tests and debugs tax software before it is released).

35. Ms. Sananikone "write[s] test cases," which are "scripts of how to test the functionality of the program, what it should do and how it should look, how it should react; and then [she] take[s] that and [she] test[s] from that script."

36. According to Ms. Sananikone, CCH would not have hired her but for her training at Vatterott.

37. Mr. Jamieson also worked at CCH after graduation.

38. Each computer programming Plaintiff alleged he or she was informed the credits earned at Vatterott would transfer "to other colleges and universities."

39. Each Vatterott catalog contains an explanation regarding articulation (i.e., the transferability of Vatterott's credits to other institutions) (see Exhibit M).

40.  Articulation is clearly and adequately explained in each catalog (see Exhibit M).

41. One version of the articulation language provides:

Vatterott College has a limited number of articulation agreements for transfer of credit hours to other colleges or educational institutions. Most of the degree programs at Vatterott College are occupational in nature. Therefore, students who wish to continue their education utilizing credits from Vatterott College are cautioned to verify their plans before they enroll at Vatterott College. Many colleges do not accept credits from Vatterott College. (Emphasis in original).

(See Exhibit M.).

42. A second version of the articulation language provides:

The programs at Vatterott College are occupational in nature and may not transfer to other institutions. Therefore, students who plan to continue their education utilizing credits earned at Vatterott College must first verify that the receiving institution will accept the credits before they enroll at Vatterott College. Many

colleges do not accept credits from Vatterott College and it is the student's responsibility to ensure that Vatterott College credits will be accepted.

(See Exh.  BB).

43. When Kenneth Miller attempted to transfer the credits he earned at Vatterott to Southwestern College in 2006, he was informed that forty-eight (48) of his credits from Vatterott would transfer and that with those credits plus six hours transferred from another university, he could obtain a degree in only two and a half years of additional study.

44. Vatterott currently does and has historically maintained credit transfer ("articulation") agreements with other educational institutions (see Articulation Agreements with National American University, Southwestern College of Professional Studies, University of Phoenix, Friends University, and Webster University; Exhibit S).

45. Mr. Lynch is the only plaintiff that alleged he attempted unsuccessfully to transfer credits.

46. Mr. Jamieson is not claiming damages from an inability to transfer his credits from Vatterott.

47. Plaintiffs Kennedy, Hadley, Borst and Ward never attempted to transfer their credits.

48. Each computer programming Plaintiff, except Mr. Lynch, alleged in the Second Amended Complaint that he or she was informed the Vatterott program was equivalent to sixty (60) credit hours of college instruction.

49. Each Plaintiff referenced in paragraph 48 was specifically questioned about every representation on which they relied when enrolling at Vatterott. Not one Plaintiff testified that he or she was informed the Vatterott program was equivalent to sixty (60) hours

13

of college instruction (see Exhibit D, pp. 12:19-13:20, 14:21-20:11; Exhibit E, pp. 27:15-

30:1; Exhibit F, pp. 25:3-27:19; Exhibit R, pp. 15:1-23:24; Exhibit G, pp. 15:7-26:17; Exhibit

H, p. 89:3-14; Exhibit I, p. 52:3-8; Exhibit J, pp. 24:17-25:17; Exhibit K, p. 32:10-14).

50. Mr. Lynch alleged in the Second Amended Complaint that Vatterott

representatives informed him the computer programming course of study was the equivalent

of an associate's degree.

51. Mr. Lynch denied at his deposition that any specific reference was made to an

associate's degree, although he testified Diana Otis told him his Vatterott education would be the

equivalent of a two-year degree (see Exhibit L, p. 23:20-23).

52. Vatterott's catalog states that thirty-six (36) quarter credit hours is the

equivalent of one academic year (see Exhibit M).

53. Each computer programming Plaintiff alleged in the Second Amended

Complaint that he or she was informed Vatterott "had connections with Koch Industries,

Coleman, and many airline companies," and that "those employers actively and regularly

sought Vatterott graduates" (see Exhibit C, ¶¶ 7, 21, 30, 42, 51, 60, 74, 83, 92, and 101).

54. Over the relevant years, Vatterott's Advisory Committee's representatives

have included organizations such as: Boeing Company; Cessna Aircraft Company; Via Christi

Health Systems; Wichita State University; Fahnestock Heating and Air, Inc.; Wichita Clinic;

Bombardier Aerospace; Galichia Medical Group; Advanced Orthopedic Associates; Telcove;

LSI Logic; The Trane Company; Waldorf and Riley; Northrock Chiropractic Clinic; MKEC

Engineering Consultants, Inc.; McBride Electric; Computer America; UA Local 441; Central

Plains Steel; Thayer Aerospace; Excel Corp.; Pioneer Balloon Co.; Ziegler Electric; Kansas

Independent Electrical Contractors; KU School of Medicine – Wichita; and Via Christi

Regional Medical Center (see Exhibit M; Exh. BB).

55. Some of the organizations represented on the Advisory Committee have hired

Vatterott graduates (see Placement Database, attached hereto as Exhibit T).

56. While each computer programming Plaintiff alleged in the Second Amended

Complaint that he or she was advised Vatterott would provide job placement assistance, only

Mr. Borst and Mr. Lynch alleged that Vatterott failed to provide such assistance.

57. According to Mr. Borst, Career Services originally thought he was working in

the field because of an entry on his resume that indicated he was doing web design.

58. According to Mr. Borst, Career Services assumed that the web design position

listed on his resume was a paying job.

59. When Mr. Borst informed Career Services that the web design position was not

a paying job, Career Services provided placement assistance to him by sending his resume to

various potential employers.

60. Career Services also assisted Mr. Borst in preparing his resume and helped him

prepare for job interviews.

61. According to Mr. Borst, Career Services also offered mock interview sessions,

but he did not participate at his own election.

62. Prior to graduation, Mr. Lynch requested that Career Services fax his resume

to Tri-Sec Computers in Kansas City for a position as a computer installer.

63. Mr. Lynch interviewed and ultimately secured employment with Tri-Sec (see

Exhibit L, p. 83:6-13).

15

64. Career Services subsequently assisted Mr. Lynch with updating his resume and faxed it to Wal-Mart and to ATM Sales & Service for a position in web design (see Exhibit V).

65. Career Services ceased its placement efforts after Mr. Lynch obtained employment at CCH.

66. Plaintiff Bryan Hudson alleged in the Second Amended Complaint that Vatterott employee Darlene Smith made certain false or misleading representations to him.

67. Mr. Hudson was introduced to Ms. Smith during his initial visit to Vatterott, but she was not one of the Vatterott employees that made the allegedly false and misleading representations, including that he would receive hands-on experience with motor controls and sufficient training to make application for and pass the commercial journeyman's exam, that he could use his time at Vatterott toward fulfilling the apprenticeship hours required for commercial journeymen, and that Vatterott could serve as his sponsor when he applied to take the commercial journeyman's exam (see Hudson Deposition, attached hereto as Exhibit W, p. 25:3-20; see also Exhibit C, ¶ 110).

Hudson testified that it was Debra Smith who made representations to him about hands-on training and the journeyman's exam.  Exh. W at 25-26.

68. Mr. Hudson was specifically questioned about each representation on which he relied when enrolling at Vatterott, but he never testified he was informed that his time at Vatterott could be used toward fulfilling apprenticeship hours.

69. Mr. Hudson located a sponsor other than Vatterott for his journeyman's exam (see Exhibit W, pp. 57:24-58:20).

70. Plaintiff Rhonda Fowler alleged in the Second Amended Complaint that Vatterott informed her she would receive certifications in coding, transcription, CPR and First Aid, and that Vatterott would administer testing for those certifications.

71. Ms. Fowler also alleged she was "guaranteed" starting pay in the field would be between $12.00 and $15.00 per hour.

72. The Vatterott catalog states that students will be certified in CPR and First Aid upon completion of the applicable courses. It contains no representation regarding certifications in coding or transcription (see Exhibit M at VAT003102).

73. Ms. Fowler was certified in CPR and First Aid during her enrollment at Vatterott.

74. Plaintiffs Borst, Cook, Hadley, Lynch, Miller, Pound and Sananikone all alleged in the Second Amended Complaint that Vatterott provided no instructor for ten weeks of their course work at Vatterott.

75. Plaintiffs Jamieson, Kennedy, and Ward alleged more generally that, "on information and belief," Vatterott did not provide the hours and weeks of instruction promised in the Enrollment Agreement.

76. Plaintiffs Zollman and Hudson alleged Vatterott failed to provide an instructor for two weeks, and that instructors would regularly adjourn class by 8:00 p.m.

77. Ms. Fowler alleged in the Second Amended Complaint that Vatterott failed to provide an instructor for the first four weeks of her course work.

78. Mr. Cook testified that during the second ten-week phase of his course work, his instructor left employment at Vatterott, and he had substitutes thereafter.

79. According to Mr. Cook, after the second phase he "didn't have a solid teacher for the rest of [his] phases. . . . for the remainder of [his] tenure [the students] had inadequate staff for the computer programming area."

80. Mr. Hadley's testified that during the fourth ten-week phase, his instructor, Sue Colle, was frequently absent.

81. According to Mr. Hadley, when his instructor was absent, another instructor covered the class by distributing assignments to the class.

82. In Mr. Hadley's opinion, when Ms. Colle was present, "she didn't really know too much" about the subject matter she was teaching (i.e., C++ programming), and "[s]he was pretty much learning herself as she goes on, if she was there."

83. According to Ms. Kennedy, Ms. Colle was regularly absent, and she was not qualified for her job because she was unable to answer students' questions.

84. According to Ms. Kennedy, the evening classes generally let out an hour or so early. She said there were times when they had no instructor at all because of absenteeism.  She testified there was a period of time that Ms. Colle was out two or three times a week for almost the entire 10-week phase, and that when she was out they had no substitute instructor, but just worked on what they thought they were supposed to work on.  She said if the students got lost they would just leave because they couldn't do anything without an instructor.  Exh. G at 98-99.

85. Mr. Borst testified that "sometimes" during his C++ phase, Ms. Colle would fail to show up for class or she "wouldn't have enough of a lesson plan to fill the day."

86. According to Mr. Miller, for six weeks of one ten-week phase, he had only temporary instructors.

18

87. Ms. Pound testified that she went without an instructor for a week or a week and-a-half of class after an instructor quit, after which time Vatterott provided two substitute instructors.

88. According to Ms. Pound, these instructors were not "qualified" to teach the curriculum.

89. Ms. Sananikone testified she went without an instructor for "maybe two weeks," after which time Vatterott provided "fill-ins."

90. According to Mr. Zollman, during the two-week period where Vatterott allegedly failed to provide an instructor, an instructor from another class provided a short lecture and instructed the class regarding reading materials and the assignments to be completed.

91. According to Mr. Jamieson, his classes usually met for the full allotted time period.

92. According to Mr. Ward, he "always had a teacher" except for those times his instructor was absent from class briefly to start up a class whose instructor was absent.

93. The Enrollment Agreement contained representations about the instruction that would be provided to students. See Exhibit B. For example, Nathan Cook's agreement, which is substantially similar to the other agreements at issue, included the following: (Handwritten or hand-marked entries on the form are designated here in brackets.)

> "1. That for and in consideration of payment of the contract price ..., the COLLEGE agrees to instruct said STUDENT in the following course of study: [Computer Programming]," [17,612.40] Total Tuition [72] Quarter Credit Hours [60 Weeks] Length.
> "5. The STUDENT will start class on [12-29-03] and will be on the [Morning] class schedule [8:00 a.m – 12:30 p.m.] Monday

through Thursday, with classes to be held at [3639 N. Comotara
Wichita, KS 67226]".
"19.  The COLLEGE reserves the right to make changes in faculty,
course content, structure of the curriculum, methods of delivery
and class schedule as needed."

94.  If Vatterott's classes would always meet for the full allotted time, the students would
receive more than the number of clock hours required to grant students 72 quarter credit hours of
credit pursuant to the conversion factors provided by the Accrediting Commission of Career
Schools and Colleges of Technology (ACCSCT).  Exh. P, ¶ 7.

95.  For training at Vatterott, the computer programming Plaintiffs paid (including
tuition, books, fees, etc.) $19,672.90, the electrical mechanic Plaintiffs paid $20,056, and the
medical office assistant Plaintiff paid $17,971.63.

96.  The Wichita Technical Institute ("WTI") offers hands on training designed to put
students to work in specialized industries.  The programs it offers include Electronics
Technology; Computer Electronics Networking Technology; Heating, Air Conditioning and
Refrigeration; Medical Assistant; and Medical Insurance Billing and Coding Specialist.  Exh. Z.

97.  WTI's tuition and fees as of January 2008 were:

- Electronics Technology (72 week program): $24,956.71.

- Computer Electronics Networking Technology (72 week program): $25,482.05.

-  Heating, Air Conditioning and Refrigeration: $23,421.20

- Medical Assistant (60 week program): $18,422.16.

- Medical Insurance Billing and Coding (48 weeks): $15,718.73.

Defendant has cited evidence of additional cost data for WTI, including figures for
tuition during the periods when the plaintiffs were enrolled at Vatterott.  Doc. 77, Exh. CC.

B.  *Plaintiffs' Statement of Additional Facts*.

1 & 2.  As noted previously, the court concludes plaintiffs have specified a basis upon which further discovery could disclose the identity of individuals who allegedly made misrepresentations to the plaintiffs.

3.  Vatterott had not provided Kenneth Lynch the School Catalog or Student Handbook when it asked him to sign the Affidavit attached to defendant's Motion for Summary Judgment as Exhibit N.

4.  Vatterott had not provided Aaron Borst a Student Handbook when it asked him to sign the Affidavit attached to Defendant's Motion for Summary Judgment as Exhibit N.  Exh. D at 15.

5.  Rhonda Fowler signed the Affidavit attached to Defendant's Motion for Summary Judgment as Exhibit N.  She remembers that she had a stack of papers when she signed the Affidavit, but cannot recall whether she had seen the School Catalog at that time.  Exh. X at 38.

6.  Cliff Zollman had not been given an opportunity to study the Student Handbook or Course Catalog when Vatterott asked him to sign the Affidavit attached to Defendant's Motion for Summary Judgment as Exhibit N.

7-17.  Vatterott maintains a placement database, which lists "Graduates placed in the field from 2003-present and their locations of employment."  The database lists a number of graduates (11 of whom are specifically identified by plaintiffs) as being "placed" at various employers, although the "date hired" for these individuals indicates they were employed by their employer before they attended or graduated from Vatterott.

18.  Other than Vatterott faxing his resume for him, Mr. Lynch found and secured

21

employment with Tri-Sec without Vatterott's assistance.

19 (& 21). For four of six ten-week phases of his Computer Programming course of study, Nathan Cook's classes would end by 8:30 or 9:00 instead of 10:30 p.m. as indicated on the Enrollment Agreement. Exh. E at Pp. 41-45. (To the extent defendant attempts to controvert this or other testimony by citing an affidavit of one of its instructors, the court adopts plaintiffs' version of the facts for purposes of the motion for summary judgment, in keeping with the standards governing such motions.)

20 (& 22). For at least half of a ten-week phase of his Computer Programming course of study, James Hadley either had no instructor, or another instructor would write down assignments on the board and leave, with no one there to provide instruction. Exh. F at Pp. 39, 52-55.

23. In one ten-week phase, instruction in Kenneth Miller's class would usually end at 8:00 p.m. instead of 10:30 p.m. Miller testified that there would be no instruction going on, and so students would have all that time to do homework. He would sometimes leave when there was no instruction because he had to be at work early the next morning. Exh. H at 70-71.

24. Miller was sometimes required to sign in, but he said as far as signing in, they were told that if they remembered, fine, but if not the school would just sign them out for 10:30 p.m. Exh. H at 70-71.

25. In another ten-week phase, Kenneth Miller's class would generally start between 6:30 and 7:00 pm. instead of 6:00 p.m., and the instruction would end at 8:30 or 8:45 p.m. instead of 10:30 p.m. Exh. H at 76-77.

26. In another ten-week course of study, Kenneth Miller's class would start at 7:00 p.m.

instead of 6:00 p.m. and would frequently end early.  Exh. H at 77.

27.  In another ten-week course of study, Kenneth Miller's class would start late and end early.  Exh. H at 78.

28.  In one ten-week course of study, Shannon Pound had no instructor for a week and a half.

29.  At other times, Shannon Pound's classes would routinely let out two hours early, but she did not have to sign out.  Students were given problems or exercises to complete, and were told they could leave when they finished them.  Exh. I at 31, 33, 35.

30.  The instruction in Cliff Zollman's evening classes routinely ended at 8:30 p.m. instead of 10:30 p.m.  He estimated he left class between 8:00 and 8:30 p.m. "ninety-two percent" of the time.  About two days a week the instructor would dismiss the class at 8:00 or 8:30 p.m., and on other days there was no instruction going on by that time so students would leave.  Doc. 70, Exh. Y at 107-09.

31.  Cliff Zollman testified that he and other students were told by at least one instructor to write on the sign-in sheet that they left at 10:00 p.m. even if they were leaving before then.

32.  In one ten-week phase, Kenneth Lynch's class would end at least an hour early about every night.  Sometimes the instructor would dismiss class early and sometimes students would simply leave because there was no more instruction provided at that point.  Exh. L at 54-55.

33.  In all but one of his ten-week phases, Kenneth Lynch was instructed to sign out as if he were leaving at 10:00 p.m., even if he left earlier.  Exh. L at 55, 81.

34.  In one ten-week phase, Kenneth Lynch was without an instructor for a period of time until Vatterott obtained an instructor to replace the one who left.  Exh. L at 57.

35.  For all but one of his phases, Kenneth Lynch's classes were dismissed or instruction ended one to two hours early approximately 80 percent of the time.  Exh. L at 79-80.

C.  *Standard*.

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c).  A fact is "material" if it might affect the outcome of the suit under the governing law.  An issue is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party.  *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986).  Because it is the role of a jury to resolve conflicts in the evidence, on summary judgment the court must examine the factual record and draw all reasonable inferences in the light most favorable to the nonmoving party. *Seamons v. Snow*, 206 F.3d 1021, 1026 (10th Cir. 2000). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Anderson*, 477 U.S. at 255.

Under Rule 56, the moving party initially bears the burden of making a prima facie showing of the absence of a genuine issue of material fact and an entitlement to judgment as a matter of law.  *See Adler v. Wal-Mart Stores, Inc*., 144 F.3d 664, 670 (10th Cir. 1998). This burden may be satisfied by pointing to an absence of evidence on an essential element of the non-movant's claim. *Id*. at 671 (*citing Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). Once the moving party carries this burden, the opposing party cannot simply rest upon the pleadings; it must come forward with specific facts showing that there is a genuine issue for trial.  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp*., 475 U.S. 574, 587 (1986).

24

Computer Programming Plaintiffs.

1.  *Evidence of Misrepresentation- identity of agent*.

Vatterott first argues that any misrepresentation claims of plaintiffs Borst, Cook, Hadley, Kennedy, Miller, Pound, Sananikone, Ward, and Lynch are not supported by the evidence. Specifically, Vatterott argues the deposition testimony of these plaintiffs contradicts the allegations in the complaint, and therefore entitles Vatterott to summary judgment on the fraud, KCPA, and punitive damage claims.  Doc. 70 at 20-21.

The court concludes that Vatterott has not shown an entitlement to summary judgment arising from differences between deposition testimony and the complaint.  Defendant points out that in some instances, plaintiffs' deposition testimony identifies different Vatterott employees as having made misrepresentations than were previously identified in the complaint.  For example, James Hadley's deposition testimony indicated that the two Vatterott employees who made representations to him were Debra Schrader and Ray Costello, not Linda McClure and Darlene Smith, as the complaint alleged.  Nathan Cook's deposition testimony showed that he could not remember the names of the individuals who allegedly made representations to him, although he was able to describe the individuals.  On this issue, plaintiffs have identified a basis upon which further discovery could disclose the identity of individuals who allegedly made misrepresentations to them.   These sort of variances from the complaint do not entitle the defendant to summary judgment, particularly where the plaintiffs have not had an adequate opportunity to seek discovery on the issue.  Insofar as Vatterott seeks summary judgment because plaintiffs' deposition testimony differs from the complaint, the motion is denied.

2.  *Alleged failure to provide "entry-level" training and "current" programs*.

The plaintiffs who took computer programming courses contend Vatterott falsely represented to them that if they enrolled they would receive "entry-level training in computer programming and editing," including "training in the current versions of Microsoft Office Suite, Visual Basic, SQL, Java, and C++ programming languages." *See e.g.,* Doc. 18, ¶ 7.  Vatterott contends this alleged failure cannot support a claim because it falls under the educational malpractice theory rejected by the Kansas Supreme Court in *Finstad v. Washburn Univ. of Topeka*, 252 Kan. 465, 845 P.2d 685 (1993).  According to defendant, "[p]roof of each student's qualifications upon graduation necessarily requires a subjective inquiry into the areas prohibited by *Finstad*," including the qualifications of the instructors, the number and types of classes in the course of study, and a determination of what is and is not material to a particular field of study. Additionally, defendant says the claims require problematic inquiry into causation, such as the reasons that individual students were unable to obtain employment, including the study habits and efforts of these students.  Doc. 70 at 22.

In response, plaintiffs argue *Finstad* is not implicated because their claims "are based strictly on what they were told by Vatterott employees," rather than upon a common law duty to provide a certain level of education.  Doc. 73 at 30.  Moreover, "[t]he issue for entry-level training as the basis for fraud and KCPA claims is whether entry level training was in fact *offered*, not received." Thus, plaintiffs say, whether or not they received this level of education will not be an issue.  "Plaintiffs contend this representation was false, and that an entry-level computer programming education was not even offered...."  *Id*.

In *Finstad*, the Kansas Supreme Court cited the following public policy reasons for its refusal to recognize the tort of educational malpractice:  (1) a lack of a measurable standard of

care; (2) inherent uncertainties as to the cause and nature of damages; (3) the potential for a flood of litigation; and (4) the courts' overseeing the day-to-day operation of the schools. *Finstad*, 252 Kan. at 477.  In ruling on Vatterott's motion to dismiss, the court previously noted that such concerns apply with equal force to a breach of contract claim when the essence of the claim is that the school breached a promise to provide an "effective education."  Such a claim would force the court to enter into an inappropriate review of educational policy and procedures. Doc. 17 at 10.  Plaintiffs' assertion that Vatterott failed to provide an "entry level education" is precisely the type of claim precluded by *Finstad's* rationale.  Plaintiffs offer no objective standard for what constitutes an "entry level education;" they do not define the term in their briefs.  They appear to be challenging the adequacy of Vatterott's curriculum, teachers, and/or method of teaching, and argue that Vatterott did not adequately prepare them to work in entry level programming positions.  *Finstad* makes clear that the resolution of such issues is not the province of courts and juries.  Allowing a court or jury to determine what sort of "entry level education" is appropriate would directly implicate *Finstad's* concern about court interference in the operation of schools.  It would also open the floodgates of litigation to any student dissatisfied with their employment prospects, notwithstanding the fact that the student's own efforts and abilities are a significant factor in the "highly collaborative process" of education. The court concludes that plaintiffs' claims for an alleged failure to provide an entry level education are barred by *Finstad*.  *Cf. Alsides v. Brown Institute, Ltd.*, 592 N.W.2d 468, 476 (Minn. App. 1999) ("Claims by students, whether styled as breach of contract, fraud, or misrepresentation, that attack the general quality of education provided are claims for educational malpractice and are not actionable.").

*Finstad* also bars plaintiffs' claim of fraud or a KCPA violation based on an alleged misrepresentation that they would receive training in "the current version" of several computer programs or languages.  While this is a closer question, the alleged representation is sufficiently vague that it implicates *Finstad's* concerns.  The claim necessarily challenges the suitability of the materials used by Vatterott in its curriculum and the adequacy of the teachers who taught the material.  Plaintiffs argue the court should refrain from addressing summary judgment on this issue because they have not yet retained an expert to opine "as to whether the most current versions of programs were offered...."  Doc. 73 at 31.  But application of the *Finstad* factors to this issue does not depend upon the opinion of an expert.  On the contrary, it highlights the problem.  Whether the class materials and the teachers' lectures, demonstrations, and answers to questions constituted adequate training on a particular program, and whether that training was sufficiently related to "the current version" of a particular program, both involve a fair amount of opinion.  Resolution of the issue requires an assessment of the effectiveness of Vatterott's materials, methods, and teachers.  It also requires an assessment of what skills and knowledge employers in the field consider "current" insofar as these programs are concerned.  Case law holds that public policy should prevent a court from interfering "when the controversy requires the examination of the efficacy of the course of instruction."  *Paladino v. Adelphi Univ.*, 89 A.D.2d 85, 454 N.Y.S.2d 868 (Sup. Ct. 1982).  Vatterott, like many trade schools, has an advisory board staffed by local employers who help assess the suitability of the curriculum for employment in a given field.  Allowing a student to challenge whether the material was sufficiently "current" would permit a court or jury to assess what is and is not material to a particular course of study, and to substitute their judgment for the judgment of professional

educators.  *Cf. Paladino*, 89 A.D.2d at 90 ("The courts are an inappropriate forum to test the
efficacy of educational programs and pedagogical methods.").  *See also id.* at 94: ("[C]laims
concerning misrepresentation as to the quality or comparative quality of the education * * *
provided by [defendants] are not statements of fact capable of proof, but rather opinions which
ought not provide a basis for the imposition of liability.").  Under the circumstances, the court
agrees with defendant that these claims are barred by the Kansas Supreme Court's rationale in
*Finstad*.

       3.  *Claim for misrepresentation of transferability of credits*.

      Plaintiffs' response states that "[l]imited discovery has revealed that Vatterott had credit
transfer agreements with other colleges and universities at the time of Plaintiffs' enrollment...."
Doc. 73 at 33.  As a result, "Plaintiffs remove this allegation from their class-wide claim for
fraud and violations of the KCPA."  *Id.*

      Inasmuch as plaintiffs have shown no genuine issue of material fact regarding this
representation, Vatterott's motion for summary judgment on these claims will be granted.

       4.  *Claim for misrepresentation concerning Sixty Credit Hours*.

      Plaintiffs likewise "remove their fraud and KCPA allegations regarding whether they
were told their education was the equivalent of 60 college credit hours."  Doc. 73 at 33.
Accordingly, defendant's motion for summary judgment as to these claims is granted.

       5.  *Claim for misrepresentation concerning local employers*.

      Plaintiffs claim they enrolled at the school in reliance upon oral misrepresentations by
Vatterott that it "had connections with Koch Industries, Coleman, and many airline companies"
and that these companies "actively and regularly sought Vatterott graduates."

Defendant first argues this claim is barred by *Finstad* because it would require "evidence related to the reasons individual Plaintiffs were unable to secure positions with these employers." Doc. 70 at 30.  The court disagrees.  Unlike a complaint about the suitability of course materials or the competency of teachers, determining whether specified local employers "actively and regularly sought Vatterott graduates" appears to involve an assertion of historical fact that would not require any inquiry into educational methods or policies.  Nor does it necessarily require an examination of why a particular plaintiff was not hired.  *Finstad* might be implicated if plaintiffs were to claim a loss of income from not being hired by these companies – such a claim would require evidence of why they were not hired.  But insofar as plaintiffs merely claim they suffered monetary damages by paying tuition to Vatterott – tuition they would not have paid but for the misrepresentation – *Finstad* is not implicated and does not bar the claim.

Defendant next argues the plaintiffs cannot establish reasonable reliance upon the alleged misrepresentations because they each signed a document (entitled "Affidavit") at the time of enrollment stating that they have not relied upon any representations other than those contained in six specified documents, including the Enrollment Contract, School Catalog, and Student Handbook.  In response, plaintiffs point out there is some evidence that Vatterott had not provided plaintiffs with all of the specified documents when it asked them to sign the Affidavits.  Plaintiffs suggest Vatterott may have thus prevented them from examining the relevant documents before they executed the affidavits.  Plaintiffs further argue that summary judgment on this issue is premature because they have not completed discovery on the merits.

After reviewing the nature of the claim and Vatterott's argument concerning reliance, the court concludes that summary judgment would be premature on this issue because plaintiffs have

not a full opportunity to conduct discovery on the merits.  Accordingly, defendant's motion is denied without prejudice.

      6.  *Misrepresentation concerning job placement assistance*.

      Plaintiffs alleged that Vatterott falsely represented it would provide them with job placement assistance.  In response to defendant's motion for summary judgment, however, plaintiffs "remove this allegation" from the fraud and KCPA claims.  Doc. 73 at 35. Accordingly, defendant's motion for summary judgment as to this claim is granted.

      <u>Electrical Mechanic Plaintiffs</u>.

      1.  *Fraud, KCPA, and Punitive Damage claims of Bryan Hudson*.

      Vatterott argues it is entitled to summary judgment on these claims because Hudson's deposition testimony shows that Vatterott employee Darlene Smith did not make the representations alleged in paragraph 110 of the complaint.  Doc. 70 at 33.  As plaintiffs point out, however, there is some evidence that a Vatterott employee other than Ms. Smith made the alleged representations.  Moreover, plaintiffs have not yet been afforded an opportunity to conduct merits discovery on these claims.  Under the circumstances, defendant's motion for summary judgment on this issue is premature and will be denied.

      2.  *Reliance on alleged misrepresentation of "hands-on" training*.

      Plaintiff Hudson alleges that he enrolled at Vatterott in reliance upon a misrepresentation that he would receive hands-on training with motor controls as part of the electrical mechanical course of study.  Plaintiff Cliff Zollman alleges that he enrolled in reliance upon a misrepresentation that eighty percent of the curriculum was hands-on training.  In its motion for summary judgment, Vatterott argues that any reliance by the plaintiffs on these representations

31

could not have been reasonable because plaintiffs signed the previously-mentioned Vatterott "Affidavit" which stated they were not relying on any representations other than those in six specified documents. Vatterott says the six documents do not contain the representations alleged above. For the reasons previously stated, however, the court concludes that the plaintiffs are entitled to an opportunity to conduct merits discovery prior to any summary judgment motion on this issue.

     3. *Misrepresentation claim - training sufficient to pass journeyman's exam*.

     Plaintiff Hudson alleges that a Vatterott employee represented to him that in the electrical mechanical course of study he "would receive sufficient training to make application for and pass the commercial journeyman's exam." Doc. 18 at ¶110. In its motion for summary judgment, Vatterott argues that the *Finstad* prohibition on educational malpractice claims precludes recovery for such a claim because it would require an inquiry into the efficacy of the school's educational program and its teaching methods. Plaintiff denies that the claim is barred, saying it is "exactly the same as the issue of providing entry-level training to computer programming students."

     Claims that attack the general quality of educational services provided to students, regardless of the underlying legal theory, have generally been rejected by the courts. *See CenCor, Inc. v. Tolman*, 868 P.2d 396, 398 (Colo. 1994) (citations omitted). By contrast, when students allege that educational institutions have failed to provide specifically promised services – for example, a failure to offer any classes at all or a failure to deliver a promised number of hours of instruction – such claims have been upheld on the basis of the law of contracts. *Id.* The latter type of claims would presumably be actionable as well under a theory of misrepresentation

or consumer fraud.  Examples of representations that could permit a cause of action would be where a trade school "has made a positive representation that a certain curriculum will be offered and the student then finds that such curriculum is not available," or where the school "has asserted that it is accredited or licensed to give a certain degree and it is later discovered that this is false."  *See Cavaliere v. Duff's Business Institute*, 413 Pa.Super. 357, 605 A.2d 397, 404 (1992).  *See also Ross v. Creighton Univ.*, 957 F.2d 410, 417 (7th Cir. 1992) ("In these cases, the essence of the plaintiff's complaint would not be that the institution failed to perform adequately a promised educational service, but rather that it failed to perform that service at all.").

In *Wickstrom v. North Idaho College*, 111 Idaho 450, 725 P.2d 155 (1986), students sued a school for breach of contract based upon a representation that they would be "qualified for employment as 'entry level journeymen'" if they completed the school's maintenance mechanic course.  *Id.*, 725 P.2d at 156.  The district court dismissed the claim on the pleadings, but the Idaho Supreme Court reversed.  The Court's majority said a contract claim could exist "if certain fundamentals of the course necessary to attaining qualification as an 'entry-level journeyman' were not even presented in the course."  *Id.* at 157.  Such fundamentals "would include the number of days/hours required to complete a prescribed course of study and other *objective* criteria in a course's presentation."  *Id.* at 158, n.1 (emphasis in original).  These objective criteria "would not implicate the policy concerns regarding the viability of contract claims predicated upon the more subjective nuances of the teacher-student relationship (i.e. methodology of teaching and other matters usually raised under the rubric, 'educational malpractice,' which cause of action Idaho does not recognize."  *Id.*  Because the plaintiffs' complaint in *Wickstrom* did not explain how the course failed to comply with the contract, the

33

Idaho Supreme Court remanded to give the plaintiffs a chance to amend their complaint.  Two

justices dissented, saying the claim should have been barred by public policy because it required

a judicial inquiry into the quality and adequacy of the school's course of instruction.  *Id.* at 160-

62.  Another case dealing with an alleged failure to prepare students for a professional exam is

*Miller v. Loyola Univ. of New Orleans*, 829 So.2d 1057 (La. App. 4 Cir. 9/30/02).  In that case,

an appellate court affirmed by a 2-1 vote the dismissal of a claim alleging in part that a law

school breached an obligation "to supply the course instruction necessary to pass the MPRE

examination and to practice the profession of law."  The majority concluded that such a claim

would require improper judicial interference with the discretionary decisions of educational

institutions.  *Id.*. at 1061 (it is "not the place of the court system to micro-manage the adequacy

of instruction or management at institutions of higher learning, even if it were feasible, which we

feel it is not.").

Plaintiff's allegation of a lack of sufficient training to apply for and pass the

journeyman's exam is more analogous to an attack on the general quality of Vatterott's

educational services than to a failure to provide some objective, specifically promised service.

Plaintiff has not specified any fundamental deficiency in Vatterott's course of instruction, nor

has he identified any benchmark by which the course could be said to be lacking an objectively

identifiable component required to pass the journeyman exam.  As it is, the claim stands on the

same footing as the claims dismissed by this court in its prior order: "Without specific and

detailed contractual promises, Plaintiff's allegations implicate *Finstad's* concern of having

courts oversee the general operations of educational institutions."  *See* Doc. 17 at 12.  "[A]n

inquiry into these allegations would require the trier of fact to weigh the qualifications of the

instructors and the methods by which they taught ....” *Id*. at 13.  *Cf. Bittle v. Oklahoma City University*, 6 P.3d 509, 514 (Okla. Ct. App. 2000) (“[W]e are persuaded by the overwhelming weight of authority from other jurisdictions that, absent a specific, identifiable agreement for the provision of particular services, the public policy ... militates against recognition of a claim by a student against a private educational institution arising from the institution's alleged improper or inadequate instruction however denominated-either in tort or contract-for ‘educational malpractice.’”).  The court therefore concludes the claim is barred by the *Finstad* public policy exception and the defendant is entitled to summary judgment on this claim.

   4 & 5.  *Misrepresentation - Apprenticeship hours & Sponsorship*.

   Plaintiff Hudson initially alleged that Vatterott misrepresented that his school hours would fulfill time requirements for electrician apprenticeship and that one of his instructors could serve as his sponsor for the journeyman’s exam.  Plaintiff now “remove[s]” these allegations from their fraud and KCPA claims.  Doc. 73 at 36.  Accordingly, the court grants defendant’s motion for summary judgment with respect to these claims.

   Medical Office Assistant Claims.

   1.  *Justifiable reliance*.

    For the same reasons stated previously, the court concludes that the plaintiffs are entitled to an opportunity to conduct merits discovery prior to any summary judgment ruling by the court with respect to defendant’s claim that the “Affidavit” signed by plaintiff precludes justifiable reliance upon any alleged misrepresentations of Vatterott.


   2.  *Statements Regarding First Aid & CPR*.

35

Plaintiff Rhonda Fowler alleged in the complaint that Vatterott falsely represented that she could obtain certification in First Aid and CPR in her class work.  Plaintiff now concedes that defendant's motion for summary judgment should be granted on these allegations.  Doc. 73 at 37.  The court therefore grants defendant's motion with respect to these claims.

Breach of Contract Claims.

Vatterott contends plaintiffs have not cited evidence to support a claim for breach of contract.  It argues that plaintiffs' deposition testimony shows –  contrary to the allegations in the complaint – that plaintiffs were provided with instructors during their course of study and that substitutes were provided when the regular instructors were absent.  Doc. 70 at 36-40.  Vatterott also notes that it provided, and plaintiffs received, diplomas certifying their receipt of 72 quarter credit hours of accredited ACCSCT credits.  Vatterott argues that allowing plaintiffs to pursue a claim because Vatterott allowed students "to occasionally leave class early," or based upon absent instructors, would open the flood-gates of litigation and invite lawsuits whenever a class fails to meet for the full allotted time or a class is cancelled due to an instructor's absence.  Doc. 77 at 26.  These public policy concerns are heightened, Vatterott argues, because plaintiffs continue to complain they were not provided with instruction during in-class work time or that they were provided with incompetent teachers.  Vatterott contends public policy precludes such claims: "Decisions by instructors or institutions to allow students time in class to work on their assignments may be affected by a variety of factors, including the expectation that students are more likely to perform the work assigned if allowed time to work during class, and/or that it would be helpful to students to have particular resources available while they complete their work."  *Id*.  Furthermore, it argues, under the *Finstad* public policy exception, evaluations of

36

teacher competence should be left to educators, regulatory bodies, and accrediting agencies, not to the courts.

In response, plaintiffs argue that the "superficial comparison" of plaintiffs' deposition testimony to the complaint does not entitle Vatterott to summary judgment.  They contend the deposition testimony merely "clarified the factual issues in the case and did not remove any element of Plaintiff's breach of contract claim.  Whether Plaintiffs received the hours and weeks of instruction promised is still a disputed issue of material fact precluding summary judgment." Doc. 73 at 37.   Plaintiffs do concede that the breach of contract claims of Mr. Jamieson and Mr. Ward should be dismissed.  *Id.* at 38.  As for the others, however, they argue that the deposition testimony shows they did not receive the hours and weeks of instruction promised.  With regard to Vatterott's claim that the 72 quarter credit hours awarded to plaintiffs means there was no breach of contract, plaintiffs say this ignores the court's prior ruling that a promise to provide a specific number of hours or weeks of instruction is a contractual promise that can be enforced.

To the extent plaintiffs' breach of contract claim is based on allegations that instructors were incompetent or that their methods of instruction were inadequate, the court agrees with Vatterott that such claims are barred by *Finstad*.  Under *Finstad's* reasoning, the adequacy of teachers and teaching methods are matters entrusted to educators and institutions that regulate them, not to judges and juries.  Moreover, plaintiffs have not pointed to any specific promises by Vatterott concerning the qualifications or methods that would be used by instructors. Accordingly, defendant's motion for summary judgment is granted with respect to any such claims.  With respect to Vatterott's alleged failure to conduct classes for the full four and a half hour period identified in the enrollment agreement [for example, "The STUDENT ... will be on

the Morning class schedule 8:00 a.m – 12:30 p.m. Monday through Thursday"], the court concludes that Vatterott is likewise entitled to summary judgment.  As an initial matter, there is significant variance in the deposition testimony as to what the plaintiffs mean when they say classes frequently "ended early" or "let out" before the scheduled ending time.  For example, several plaintiffs testified there were periods when students were given problems or exercises to complete in class and the students could then leave when they finished the exercises.  Others testified that students would sometimes leave after a teacher was done lecturing "because there was no instruction going on," although an instructor was apparently still in the classroom and could have been consulted had a student been so inclined.  The mere fact that lectures or oral instruction did not continue until the close of the scheduled class period does not support a claim for breach of contract.  As Vatterott points out – and plaintiffs have not genuinely controverted – if classes had always met for the full allotted time, students would have received more than the number of clock hours required to grant 72 quarter credit hours.  A fair reading of the enrollment agreement shows that Vatterott specifically promised to provide a 60-week course of study totaling 72 quarter credit hours, not classes that continued until the end of each scheduled time period.  There is no genuine dispute in the evidence cited but that Vatterott did provide, and students did receive, a course of study that provided 72 quarter hours of accredited instruction credits.  Moreover, the enrollment agreement upon which plaintiffs rely as promising specified hours also states that Vatterott "reserves the right to make changes in faculty, course content, structure of the curriculum, methods of delivery and class schedule as needed."  Under these circumstances, Vatterott's asserted failure to keep classes in session for the full time four and a half hour period identified in the enrollment agreement will not support a claim for breach of the

school's contract with the students.

Although Vatterott reserved the right to make changes in faculty and class schedules as needed, the question of whether Vatterott provided any instructor at all presents a different question.  Vatterott promised in the enrollment agreement "to instruct" the student in a 60-week course of study for 72 quarter credit hours.  The deposition testimony of several plaintiffs provides evidence that some of them were left without instructors for significant periods of time, in some instances over two weeks.  The court concludes that such evidence is sufficient to create a genuine issue for trial on these students' claims for breach of contract.  A reasonable jury could find that a complete failure by Vatterott to provide instructors at all, on more than a *de minimus* basis – including the practice of having an instructor from another class come by, give a brief talk and assignment, and then leave to go back to their own class – was a breach of Vatterott's promise to provide 60 weeks of instruction to the students.[2]  *Cf. Zumbrun v. Univ. of Southern California*, 25 Cal.App.3d 1, 101 Cal.Rptr. 499, 504-05 (breach of contract claim stated where instructor, as part of faculty strike, ceased giving lectures and refused to give final exam; whether failure of consideration was minimal or whether it justified refund of portion of tuition was for jury to determine).  On the other hand, several students merely testified that they frequently had substitute teachers and that, in the opinion of the students, the substitutes did not adequately know the material.  The latter type of testimony is not sufficient to create a genuine

---

[2] A reasonable person would understand that the school's promise to instruct the student in a 60-week course would be subject to the ordinary incidents of life,  such as an illness or emergency, which could occasionally cause an instructor to miss a class.  A student could not reasonably expect such language to mean that a single or even an occasional failure by the school to provide a substitute instructor on such occasions is a breach of the agreement.  But a reasonable person would construe the language in the agreement to mean that a failure to provide any instructor at all for extensive periods of time was a breach of the school's promise.

issue of fact.  Any inquiry into whether or not substitute teachers were effective or knew the material is the type of inquiry prohibited by *Finstad*.  *See Paladino v. Adelphi Univ*., 89 A.D.2d 85, 92, 454 N.Y.S.2d 868  (contract claim dismissed where it "require[d] the factfinder to enter the classroom and determine whether or not the judgments and conduct of professional educators were deficient.").  Allowing students to bring lawsuits based upon claims that their teachers lacked sufficient knowledge or were ineffective would open the floodgates of litigation and would improperly make judges and juries into *de facto* educational policymakers.

As the foregoing suggests, plaintiffs' breach of contract claims depend on whether there is evidence that Vatterott failed to provide them with an instructor for a period that a reasonable person could find to be a breach of the promise to instruct the students.   The following is a brief summary of the pertinent deposition testimony relating to this issue.

*Nathan Cook*.  Mr. Cook testified in his deposition that after one of his instructors quit during "Phase 2" [a ten-week session] the class "had fill-ins" [i.e. substitute teachers] thereafter. Mr. Cook was of the opinion that the substitutes were inadequate instructors.  Doc. 70, Exh. E, Depo. Pp. 40-44.

*James Hadley*.  Mr. Hadley, speaking about Phase 4 of his instruction, testified that instructor Sue Colle was there perhaps "half the time," and that "for the most part it was another instructor coming in from a different course that would write assignments on the board or just give us assignments to do."  Doc. 70, Exh. F, Depo. Pp. 39-40.  Hadley testified these other instructors would not stay for questions, but would come from another class to write an assignment on the board and then "go back to their class."

*Tiana Kennedy*.  Ms. Kennedy testified that Ms. Colle was absent "two, three times a

week" during every week of the Phases she taught.  Doc. 70, Exh. G, Depo. P. 28.  When

Kennedy and other students voiced a complaint about Colle's absenteeism to the Vice President

of the school, the Vice President's exact words, according to Kennedy, were, "How dare you

come to me with this," and she did not want to hear anything about it.  *Id.* at Pp. 55-56.  There

was one point Ms. Colle was out an entire week.  When she came back she informed the class

that she had a health problem, and shortly thereafter the school hired another instructor to take

over the class.  The replacement instructor was knowledgeable but had a hard time speaking

English.  He lasted a few weeks and then quit.  *Id.* at 57.

*Kenneth Miller.*  Mr. Miller testified that during Phase 3 of his course, he had a

permanent instructor for about four weeks, and then several temporary instructors during the

next six weeks.  Doc. 70, Exh. H, Depo. Pp. 68-69.  Mr. Miller was of the opinion that the

instructor he had did not know what he was doing.  *Id.* p. 70.  Miller testified that usually from

8:00 on, students were given time in class to work on their assignments.  Miller testified that he

would sometimes leave early because there was no instruction going on.  *Id.* at 71.

*Shannon Pound.*  Ms. Pound testified that during Phase 3, her instructor quit and the class

had no instructor for a week and half.  She testified that students would come in and there would

be nothing to do.  Doc. 70, Exh. I, Depo. Pp. 33-34.  After that, the son of a Vatterott instructor

came in as a temporary substitute.  The class had other substitutes for the remainder of that

phase.   Ms. Miller was of the opinion that many of these instructors were not qualified to teach

the material they were teaching.

*Bibi Sananikone.*  Ms. Sananikone, who was in the same phases as Ms. Pound, testified

that during Phase 3 the class had an instructor for a very short period, perhaps two weeks, and

"then all of a sudden we came in and we didn't have an instructor."  Doc. 70, Exh. J, Depo. P. 62.  The instructor had quit and the school was trying to find another one.  The class had two "fill ins," who "just sat in ... [and] said, 'here's your assignments, do them, when you're done you can go.'"  *Id*.  The next fill-in read from the book and asked questions and would make the class do exercises.  *Id*. at 62-63.  The class eventually ended up with a permanent instructor for the remainder of Phase 3.

*Cliff Zollman*.   Mr. Zollman testified that during Phase 4, his class went without an instructor for two weeks when the regular instructor left.  Doc. 70, Exh. Y, Depo. P. 96.  During that time, an instructor from another class would come and check on the class and give them ideas about what to read.  *Id*.  "He would spend about 15 minutes with us, short talk, and then go back to his original class and we would be left there with no instructor."  *Id*. at 97.

*Kenneth Lynch*.  As defendant points out, Mr. Lynch gave no testimony in his deposition that Vatterott failed to provide an instructor for any portion of his class sessions.

Viewing this evidence in the light most favorable to plaintiffs, the court concludes that the following plaintiffs have shown a genuine issue of material fact as to whether Vatterott breached the contract by failing to provide the promised instruction:  James Hadley, Tiana Kennedy, Shannon Pound, Bibi Sananikone, and Cliff Zollman.  Vatterott's motion for summary judgment is denied with respect to such claims.  Plaintiffs Nathan Cook and  Kenneth Lynch have failed to show a genuine issue of material fact on their claims for breach of contract; Vatterott's motion is granted with respect to such claims.  Additionally, Vatterott's motion is granted with respect to the breach of contract claims of Mr. Jamieson and Mr. Ward in view of plaintiffs' concession of those claims.

42

KCPA Claim - 50-627(b)(3) - Tuition "grossly exceeding" other similar services.

Vatterott contends plaintiffs have produced no evidence to support their KCPA claim that the school's tuition grossly exceeded the price of similar services by other providers.   In response, plaintiffs argue that the comparison of various schools' tuition "is a matter for merits discovery, which Plaintiffs have not begun due to the Court's scheduling order."  Doc.  73 at 41.  Because plaintiffs have identified a specific basis upon which further discovery could be material to their claims, the court concludes that summary judgment would be premature on this issue, as plaintiffs have not a full opportunity for discovery.  Accordingly, defendant's motion on this issue is denied without prejudice.

**Summary**:

Defendant Vatterott's Motion for Summary Judgment is GRANTED IN PART and DENIED IN PART.

The motion for summary judgment is GRANTED as to the following:

Claims that Vatterott misrepresented to plaintiffs: that they would receive entry-level training and "current version" training in computer programs; the transferability of credits; that a degree was worth 60 college credit hours; and that it would provide job placement assistance;

Plaintiff Hudson's claim that Vatterott misrepresented that his training would be sufficient to pass the journeyman's exam, that his hours would count toward his apprenticeship, and that his instructor could serve as a sponsor; plaintiff Fowler's claim that Vatterott falsely represented she could obtain certification in First Aid and CPR; plaintiffs Jamieson and Ward's claims for breach of contract; all breach of contract claims based on allegations that instructors were incompetent or that their methods of instruction were inadequate; and all breach of contract

43

claims by plaintiffs Cook, Lynch, Jamieson, and Ward.

The motion for summary judgment is DENIED as to all other claims, including: claims that Vatterott misrepresented that specified companies "actively and regularly sought" Vatterott graduates; plaintiff Hudson's claims for misrepresentation other than those identified in the foregoing paragraph; the breach of contract claims of plaintiffs Hadley, Kennedy, Pound, Sananikone, and Zollman that allege Vatterott failed to provide the promised instruction; and plaintiffs' claims that Vatterott violated the KCPA by charging grossly excessive tuition.

### III.  **Motion to Certify Class**.

A.  *Summary*.  Plaintiffs have moved to certify a class action under Rule 23(b)(3).  They

say that although their experiences occurred at different times in different courses of study,

"their claims are in essence the same: they are all victims of Vatterott's scheme of promising a

useful course of study and, after the students paid for the course, not delivering the necessary

hours and weeks of instruction it promised."  Doc. 59 at 3.  Plaintiffs seek to have three claims

certified for class treatment.  First is a breach of contract claim for Vatterott's failure to provide

the hours and weeks of instruction promised in the Enrollment Agreements.  *Id*.  Because

Vatterott's liability "will be based on the same contractual language, [] Vatterott will be held to

one standard of liability on a class-wide basis."  *Id*.  Plaintiffs' second and third claims are based

on false representations Vatterott allegedly made to get them to enroll.  *Id*.  Plaintiffs contend

Vatterott made these statements routinely and as a matter of policy or practice to potential

students.  *Id*.  Therefore, even though the statements may have been made at different times and

places, "they represent a common policy or practice by Vatterott of making inflated statements to

convince students to enroll...."  *Id*. at 4. [3]  Plaintiffs further propose three subclasses within the

action: the Computer Programming plaintiffs, the Electrical Mechanical plaintiffs, and the

Medical Office Assistant plaintiffs.

---

[3] Several of plaintiffs' arguments for class certification are no longer valid in light of the dismissal of several claims on summary judgment.  The court will consider the motion to certify, however, as it applies to the remaining claims.  In their motion to certify, for example, plaintiffs recite several misrepresentations that Vatterott allegedly made to the "computer programming plaintiffs," including misrepresentations concerning the hiring of Vatterott graduates by local companies, that graduates would be qualified as entry-level computer programmers, that credits would transfer to other schools, and that Vatterott would provide job placement assistance  Doc. 59 at Pp. 4-12.  All but the first of these alleged misrepresentations have been dismissed or withdrawn on summary judgment.

Plaintiffs' subclass definitions consist of all "All persons who executed an Enrollment Agreement with Vatterott College for the [Computer Programming, Electrical Mechanical, or Medical Office Assistant] course of study at the Wichita, Kansas campus, paid the course of study tuition, began the course of study between April 20, 2001 and April 20, 2006, and completed or graduated from the course of study." Plaintiffs argue this will sufficiently define the class and make it easy to determine who is a member.

*Rule 23(a) Prerequisites*. Plaintiffs contend the prerequisites of Rule 23(a) are satisfied. With regard to numerosity under Rule 23(a)(1), plaintiffs assert that the Computer Programming subclass would consist of 98 persons; the Electrical Mechanical subclass would consist of 46 persons; and the Medical Office Assistance subclass would consist of 199 persons. The total class would thus be comprised of 343 students. Doc. 59 at p. 23.

As for commonality under Rule 23(a)(2), plaintiffs address separately the claims for breach of contract, KCPA violations, and fraudulent misrepresentation. On the breach of contract claims, common issues of fact allegedly include the promises made to each plaintiff via the Enrollment Agreement, and the issue of whether the plaintiffs received the hours and weeks of instruction promised in the agreement. Doc. 59 at 24. A common issue of law, according to plaintiffs, is whether Vatterott breached the agreement by failing to provide the promised instruction. On the alleged KCPA violations, plaintiffs contend Vatterott made a series of misrepresentations to prospective students, some of which were specific to the student's particular course of study. *Id*. at Pp. 25-26. Plaintiffs contend these misrepresentations are common because "Defendant had a pattern or practice of making these claims to prospective students,... *Id*. at 26. Plaintiffs further identify common issues of law relating to KCPA

46

violations, including whether Vatterott knowingly made false statements, omissions or exaggerations relating to its services and whether the school's tuition grossly exceeded the prices at which similar services were available at other institutions.  *Id*. at 27.  They make similar arguments on the claims of fraudulent misrepresentation, again based on the assertion that Vatterott had a policy or practice of making the same representations to prospective students. With regard to the element of reliance on the fraud claims, plaintiffs argue that "reliance in this case is demonstrated by the very fact that Plaintiffs enrolled in the courses of study and paid tuition for the programs."  *Id*. at 29.  Lastly, plaintiffs argue that damages are a common issue of fact and law because the class members' damages are all based upon the same enrollment agreements and classes.

With regard to typicality under Rule 23(a)(3), plaintiffs similarly argue that their claims for breach of contract are typical of class members because the claims are based on the same language in the Enrollment Agreement promising specific hours and weeks of instruction.  The KCPA and fraud claims are allegedly typical because of Vatterott's asserted policy or practice of making the same false representations about the school to students.  *Id*. at Pp. 30-32.

Plaintiffs contend the final prerequisite of Rule 23(a) – that the representative parties will fairly and adequately protect the interests of the class – is satisfied, because the named plaintiffs and their counsel have no conflicts with the absent class members, and because class counsel has the experience and resources necessary to vigorously prosecute the action.  *Id*. at 33.

*Rule 23(b)(3)*.  Plaintiffs further argue a class action is appropriate pursuant to Rule 23(b)(3).  They believe questions of law or fact common to the class members predominate over any questions affecting only individual members, asserting that the defendant's alleged breach of

the Enrollment Agreement, and the evidence needed to support such a claim, is common to the

class.  Doc. 59 at p. 34.  Plaintiffs likewise contend that any calculation of damages on their

claims presents a class-wide issue, because damages will either be based on the tuition paid or

upon the hours and weeks of instruction promised as compared to the hours and weeks actually

provided, neither of which requires individual inquiry.  Plaintiffs' KCPA claims will likewise be

proven on a class-wide basis, plaintiffs say, because the alleged misrepresentations were the

product of a policy or practice under which the same representations were made to the class

members.  Moreover, "[p]roof of the falsity of these representations about the school and the

courses of study will be common the class because whether the statement was true or false will

generally apply to each class member."  *Id*. at 41.  Common questions also predominate,

plaintiffs say, with respect to their KCPA claim that Vatterott's tuition was grossly excessive,

because the claim will be proven by showing the tuition price that applied to the members of the

three subclasses and by using expert testimony.  Plaintiffs argue the claim will require no

individual inquiry of class members.  *Id*. at 42.  Plaintiffs contend the claim of fraudulent

misrepresentation will likewise be predominated by common questions, as the court found in

*Johnson v. Midland Career Institute, Inc.*, 1993 WL 420954 (N.D. Ill., Oct. 18, 1993).  Plaintiffs

say the issue of reliance upon misrepresentations will not present individual issues, because the

definition of the proposed subclasses "will ensure that any class member has proven reliance

upon Defendant's misrepresentations by paying tuition and enrolling, and will therefore be an

inherently predominate issue for the class."  Doc. 59 at 45.

　　　　Plaintiffs argue a class action is superior to other methods of adjudication and would be

the most efficient way to handle these claims.  Plaintiffs note there are no other actions pending,

and they say there is no other forum better suited to handle the litigation.  Doc. 59 at p. 46.  They argue it would be more efficient to try the claims of approximately 345 members in one action than to handle that many claims individually.  They further argue the members do not have the financial resources or incentive to try these cases individually, where the economic damages will not exceed the value of the tuition paid, which is approximately $20,000 or less for each member.  Any alternative to certification, they say, would result in duplicative and wasteful litigation, as well as a choice by many plaintiffs not to sue due to the high cost of individual litigation.  Plaintiffs thus argue that "class treatment is the most appropriate way for this case to proceed."  *Id*. at 47.

> *Discussion*.

> *Rule 23(a) Standards for Class Certification*.

As this court recounted in *Thompson v. Jiffy Lube International, Inc.*, 250 F.R.D. 607 (D. Kan. 2008):

>> Rule 23(a) contains four initial prerequisites for a class action. A party seeking class certification must show under a strict burden of proof that all four requirements are clearly met. *Trevizo v. Adams*, 455 F.3d 1155, 1162 (10th Cir.2006).  First, the movant must show numerosity-that the class is so numerous that the joinder of all members is impracticable. Second, the movant must show commonality-that there are questions of law or fact common to the class. Third is typicality-that the claims and defenses of the representative parties are typical of the claims or defenses of the class. And fourth, the movant must show adequacy of representation-that the representative parties will fairly and adequately protect the interests of the class. *Id*.

>> In determining the propriety of a class action, the question is not whether the plaintiffs have stated a cause of action or will prevail on the merits, but whether the requirements of Rule 23 are met. Shook v. El Paso County, 386 F.3d 963, 968 (10th Cir.2004). Nothing in Rule 23 authorizes the court to conduct a preliminary inquiry into the merits to determine whether the case may be

maintained as a class action. Eisen v. Carlisle & Jacquelin, 417
U.S. 156, 177, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974). Thus, the
court must accept the substantive allegations of the complaint as
true. Shook, 386 F.3d at 968. But the court "need not blindly rely
on conclusory allegations which parrot Rule 23," and may if
necessary "probe behind the pleadings before coming to rest on the
certification question." Gen. Tel. Co. of the Southwest v. Falcon,
457 U.S. 147, 160, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982). A class
action may only be certified if the trial court is satisfied, after a
rigorous analysis, that the prerequisites of Rule 23(a) have been
satisfied. Shook, 386 F.3d at 968.

*Thompson*, 250 F.R.D. at 619-20.

A. *Numerosity*.  Defendant does not appear to specifically challenge the requirement of

numerosity.  Under the circumstances, including plaintiff's estimate of the likely number of class

members, the court finds that this prerequisite is satisfied.

B. *Commonality*.  "Rule 23(a)(2) requires the court to find that 'there is at least one

question of law or fact common to the class.'" *Garcia v. Tyson Foods, Inc.*, 255 F.R.D. 678, 688

(D. Kan. 2009) (*citing Realmonte v. Reeves*, 169 F.3d 1280, 1285 (10th Cir.1999)).

Plaintiffs argue common issues exist on their breach of contract claims because all of the

plaintiffs executed the same Enrollment Agreement.  The remaining breach of contract claim

(after the court's summary judgment ruling) asserts that Vatterott breached the agreement by

failing to provide instructors for significant periods of class time.  For members of the class

asserting such a claim, there would appear to be a common legal issue concerning the extent of

the school's duty to provide an instructor and the point at which the failure to provide an

instructor constitutes a breach of the school's promise to the student.  As the court notes infra,

however, there are significant variations in factual issues for different members of the class.

As for the plaintiffs' KCPA and fraud claims, the claims remaining after summary

judgment include Vatterott's alleged misrepresentations that certain employers regularly sought Vatterott graduates, whether Vatterott's tuition grossly exceeded the price for similar services at other institutions, and whether Vatterott misrepresented the amount of "hands on" training to prospective students of the Electrical Mechanical course of study.  Whether Vatterott misrepresented the extent to which employers sought Vatterott graduates could present a common issue, although again the factual differences between students presents problems that are discussed infra.  With respect to the claim for grossly excessive tuition, that would appear to present common issues to the prospective class members, given that the school's tuition was presumably more or less uniform among students, notwithstanding some variation between students in different courses of study and in different years.  This claim does present common issues of fact and law among the class.  Finally, the claim for misrepresentation of the amount of hands-on training in Electrical-Mechanic courses of study appears to present common issues of fact and law to class members in this particular subclass.

With respect to damages, plaintiffs contend a common issue exists because class members' damages "are based on the same Enrollment Agreement...."  This allegation could translate into a common issue among the class to the extent the damages claimed are based solely on the amount of tuition involved.  In that event, a common factual issue would be presented, since the measure of damages for each member would likely be the same.

C.  *Typicality*.  "Rule 23(a)(3) requires the named plaintiffs to show that the claims or defenses of the representative parties are typical of those of the class members they seek to represent."  *Garcia, supra*, 255 F.R.D. at 689 (*citing Rector v. City & County of Denver*, 348 F.3d 935, 949 (10th Cir.2003)).  "Differing fact situations of class members do not defeat

typicality under Rule 23(a)(3) so long as the claims of the class representative and class members are based on the same legal or remedial theory." *Harlow v. Sprint Nextel Corp.*, 254 F.R.D. 418, 425 (D. Kan. 2008) (*citing Adamson v. Bowen*, 855 F.2d 668, 676 (10th Cir.1988)). This element requires that the representative plaintiffs possess the same interests and suffer the same injuries as the proposed class members. *See Thompson v. Jiffy Lube Intern., Inc.*, 250 F.R.D. 607, 622 (D. Kan. 2008) (typicality requirement is meant to ensure that the named representative's claims have the same essential characteristics as the claims of the class at large). In this instance, the class members asserting breach of contract for failure to provide promised instruction are relying upon the same contractual language, the same legal theory, and at least to some extent the same remedial theory.  There are factual differences between many of the class members, but as noted above, the relatively low threshold of Rule 23(a)(3) does not preclude a finding of typicality based solely on that fact.  The court finds the plaintiffs have satisfied the typicality requirement on this claim.  As for the claim for misrepresentation of the amount of hands-on training in Electrical-Mechanic courses, the subclass members asserting this claim rely upon an alleged practice by the school in making such misrepresentation; their claim could be considered typical on that basis.  Likewise, the plaintiffs' claims that Vatterott violated the KCPA by charging grossly excessive tuition would be typical of the claims of class members in that regard.

D.  *Adequacy of Representation*.  Rule 23(a)(4) requires a showing that the representative parties "will fairly and adequately protect the interests of the class."  As Judge Lungstrum noted in addressing this element:

> "The adequacy of representation requirement is of particular importance because inadequate representation would infringe upon

the due process rights of absentee class members who are bound
by the final judgment of the suit." Robinson v. Gillespie, 219
F.R.D. 179, 185 (D.Kan.2003) (quoting Edgington v. R.G.
Dickinson & Co., 139 F.R.D. 183, 190 (D.Kan.1991)). "Resolution
of two questions determines legal adequacy: (1) do the named
plaintiffs and their counsel have any conflicts of interest with other
class members and (2) will the named plaintiffs and their counsel
prosecute the action vigorously on behalf of the class?" Rutter &
Wilbanks Corp. v. Shell Oil Co., 314 F.3d 1180, 1187-88 (10th
Cir.2002). To satisfy this requirement, the plaintiffs must show
that their interests are not antagonistic to those of class members.
See Robinson, 219 F.R.D. at 185; Aks v. Southgate Trust Co.,
1992 WL 401708, at *4 (D.Kan.1992).

*Doll v. Chicago Title Ins. Co.*, 246 F.R.D. 683, 686 (D. Kan. 2007). Defendant Vatterott has not

specifically challenged this particular element. Vatterott has complained of factual differences

between the representative plaintiffs and the class members, but more so in terms of the

requirements of Rule 23(b)(3) than Rule 23(a)(4). The court concludes that plaintiffs have met

the requirements of Rule 23(a)(4).

     E. *Rule 23(b)(3) requirements*. "To certify a class under Rule 23(b)(3), the court must

find that common questions predominate over questions affecting only individual members; and

that class resolution is superior to other available methods for the fair and efficient adjudication

of the controversy." *Garcia, supra*, 255 F.R.D. at 690 (*citing* Fed.R.Civ.P. 23(b)(3); *Amchem*

*Prods., Inc. v. Windsor*, 521 U.S. 591, 615 (1997)). Judge Lungstrum explained in *Garcia*:

     The Rule 23(b)(3) predominance inquiry tests whether
proposed classes are sufficiently cohesive to warrant adjudication
by representation," a standard "far more demanding" than the
commonality requirement of Rule 23(a). Amchem Prods., 521 U.S.
at 623-24, 117 S.Ct. 2231. The predominance requirement, then,
requires more than a common claim; issues "common to the class
must predominate over individual issues." In re Hydrogen
Peroxide Antitrust Lit., 552 F.3d 305, 311 (3rd Cir.2008); accord
Monreal v. Potter, 367 F.3d 1224, 1237 (10th Cir.2004). "The
nature of the evidence that will suffice to resolve a question
determines whether the question is common or individual."

>Hydrogen Peroxide, 552 F.3d at 311 (quoting Blades v. Monsanto
>Co., 400 F.3d 562, 566 (8th Cir.2005)). If the proposed class
>members will need to present evidence that varies from member to
>member in order to make out a prima facie case, then it is an
>individual question. Blades, 400 F.3d at 566; Hydrogen Peroxide,
>552 F.3d at 311 ("If proof of the essential elements of the cause of
>action requires individual treatment, then class certification is
>unsuitable."). If, on the other hand, the same evidence will suffice
>for each member to make out a prima facie case, then it is a
>common question. Blades, 400 F.3d at 566.

*Garcia*, 255 F.R.D. at 690.

*Breach of contract*. While it is true that plaintiffs' breach of contract claims arise from a common document applicable to the class as a whole (i.e. the enrollment agreement), there are significant individual issues pertaining to this claim. The claim that Vatterott failed to provide instructors as promised requires proof pertaining to individual classrooms, not to the class members as a whole. There were clearly variations from classroom to classroom with regard to how often particular instructors were absent, not to mention variations from year to year, which plaintiffs have not addressed in their motion. While the class members may generally share the same legal theory of how the agreement was breached, the dominant issue on this claim appears to the court to require something approaching individual proof – i.e., the degree to which particular plaintiffs were deprived of an instructor in particular classes. Although the issue could be considered common to all students in a particular classroom, the court cannot say it would be common to the members of the purported class action. Damages for such a breach likewise would also be dependent upon individual circumstances and the degree to which particular members of the purported class were deprived of an instructor, although a common "formula" approach to damages, as suggested by plaintiffs, could conceivably allow for class-wide determination of damages. Nevertheless, given the nature of the claim and the proof required to

54

show that individual members were deprived of an instructor, which is clearly the most significant issue on this claim, the court cannot find that common issues predominate over questions affecting individual members.  Plaintiffs have failed to meet their burden with respect to certification of a class action on this claim.

*Fraud/Misrepresentation*.  Plaintiffs' misrepresentation claims include allegations that Vatterott misrepresented to prospective students that local employers regularly sought Vatterott graduates and misrepresented the degree to which the Electrical-Mechanic course work involved hands-on training.  Although plaintiffs acknowledge that these representations were made orally to different students at different times, and acknowledge the difficulty of certifying claims of oral misrepresentation, they nevertheless contend common issues predominate because the school allegedly had a uniform policy or practice of making such representations, as evidenced by "scripts" given to the school's agents.  Plaintiffs have not cited to any evidence showing that the scripts themselves contained actionable misrepresentations, and as defendant points out, there is significant factual variation in the misrepresentations testified to by the individual plaintiffs.  The record before the court does not show evidence of uniform misrepresentations to students on these issues that would make a class action feasible.  *Cf*. Fed.R.Civ.P. 23, Advisory Committee Notes to 1966 Amendment ("although having some common core, a fraud case may be unsuited for treatment as a class action if there was material variation in the representations made or in the kinds or degrees of reliance by the persons to whom they were addressed.").  The fraud and misrepresentation claims depend heavily on individual inquiry and fact-finding as to what each particular individual was told.  Whether students actually relied upon these claimed misrepresentations likewise presents an individual inquiry that predominates over the common

issues relating to these claims.  Under these circumstances, the court concludes that plaintiffs'

motion to certify such claims for class action treatment should be denied.

*KCPA Violation - Excessive Tuition.*  Unlike the other claims presented here, plaintiffs'

claim that Vatterott violated the KCPA by charging tuition that grossly exceeded services at

similar institutions is a claim on which common issues would predominate over individual ones.

Although there may be some variation in tuition from year to year and between different areas of

study, there is no indication that individual inquiry would be required on this claim in any

significant respect.  Aside from this requirement, Rule 23(b)(3) also requires a finding that a

class action "is superior to other available methods for fairly and efficiently adjudicating the

controversy."  Given the nature of this particular claim, the court concludes that this matter

should be set down for a hearing to determine whether the claim of grossly excessive tuition

should be certified for class action treatment.

**IV.  Conclusion.**

Defendant Vatterott's Motion for Summary Judgment (Doc. 69) is GRANTED IN PART

and DENIED IN PART as set forth above.

Plaintiffs' Motion to Certify Class Action (Doc. 58 ) is DENIED IN PART and TAKEN

UNDER ADVISEMENT IN PART.  The court hereby schedules a hearing for August 11, 2009,

at 10:00 a.m. on the issue of whether plaintiffs' KCPA claim for grossly excessive tuition should

be certified for class action treatment under Fed.R.Civ.P. 23(b)(3).

IT IS SO ORDERED this   14th   Day of July, 2009, at Wichita, Ks.

s/Wesley E. Brown
Wesley E. Brown
U.S. Senior District Judge